UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 00-6273-CR-HUCK



UNITED STATES OF AMERICA,

    *Plaintiff,*

vs.

ARIEL HERNANDEZ, et al.,

    *Defendant,*
_____/

## MOTION TO SUPPRESS
## CONFESSIONS, ADMISSIONS AND STATEMENTS

THE DEFENDANT, **ARIEL HERNANDEZ,** by and through undersigned counsel, pursuant to Rules 12 and 41(f) of the Federal Rules of Criminal Procedure, moves this court to suppress as evidence at the time of trial in the above-styled cause all written and oral statements made by the defendant to the police, Federal Bureau of Investigations or other law enforcement officers and as grounds for this motion the defendant states:

### STATEMENTS TO BE SUPPRESSED

    a. March 28, 1999:    Statement to Broward Sheriff's Office Detectives.

    b. March 28, 1999:    Statement to FBI Agents.

    c. April 8, 1999:      Statement to FBI Agents.

### FACTUAL BACKGROUND

2. On or about March 18, 1999, U.S. District Court Judge, William P. Dimitrouleas entered an Order Authorizing the Interception of Wire Communications. Subsequently, Judge Dimitrouleas entered Orders on April 20, 1999 and May 20, 1999 authorizing the continued interception of wire communications.

*United States v. Ariel Hernandez*
CASE NO. 00-6273-CR-HUCK

3. On or about March 21, 1999 the Broward County Sheriff's Office (BSO) began an investigation into the death of Jeannette Smith, whose body had been located near mile marker 31 on Alligator Alley.

4. On March 26, 1999 BSO was notified by a Miami-Dade Homicide Detective that the Federal Bureau of Investigation (FBI) was working a case involving wire taps and had intercepted a call pertaining to a possible homicide. BSO detectives contacted FBI agents and learned the nature of the subject call(s), and as a result began to target Ariel Hernandez as the subject of their investigation. On or about March 27, 1999 BSO Detectives obtained an Arrest Warrant for Ariel Hernandez for First Degree Murder.

### March 28, 1999 Statement to BSO

In the morning of March 28, 1999, between 9:00 AM and 10:45 AM, BSO Detectives arrived at the apartment that Mr. Hernandez shared with his girlfriend, Tammy Bubel. Although Officers had already obtained a warrant for Mr. Hernandez's arrest for First Degree Murder, Mr. Hernandez was not informed that he was under arrest. He was neither handcuffed nor was he otherwise secured. He was not informed that he was under arrest for murder. He was not informed that the officers had already secured a warrant for his arrest for First Degree Murder. Mr. Herandez was then requested, not ordered, to accompany the officers to the police station. He was informed and otherwise led to believe that the police wanted to question him only regarding an investigation into fraudulent checks. It appears that the officers purposely failed to inform the Defendant that he was under arrest for First Degree Murder and further, intentionally led him to believe that he was only being questioned pertaining to fraudulent checks.

*United States v. Ariel Hernandez*
CASE NO. 00-6273-CR-HUCK

Mr. Hernandez was transported to the BSO office at approximately 10:45 AM. Detectives again advised Mr. Hernandez that they wanted to speak to him regarding the fraudulent checks. At no time prior to being interviewed by BSO was Mr. Hernandez informed that he was under arrest for Murder. Mr. Hernandez was affirmatively misled into believing that he was only then in custody for allegations pertaining to fraudulent checks. He was then advised him of his Miranda Rights and executed a written waiver form at approximately 10:58 AM. According to police reports, BSO Detectives began to interview Mr. Hernandez at 11:45 AM. However, they did not take a recorded statement from him until approximately 4:05 AM, some 4 hours and 20 minutes after the interview began. Mr. Hernandez was first interviewed by BSO detectives.

During the BSO interview Mr. Hernandez explained his involvement in the fraudulent check scheme. However, he initially denied any involvement in the death of Jeannette Smith. BSO Detectives then made threats of violence against Mr. Hernandez as well as threats of prosecution for First Degree Murder if he did not give them a statement in which he admitted that he in fact killed Ms. Smith. Detectives further informed Mr. Hernandez, that if he did give a statement to the effect that Jeannette Smith had accidentally died during "rough sex," he would probably not be charged at all and if he were to be charged with anything related to Ms. Smith's death the charge could only be manslaughter for the accidental death.

Mr. Hernandez eventually succumbed to the threats and promises of leniency made by the Detectives and gave a statement, except that he again denied any personal involvement in the death of Ms. Smith attributing the actual death to others.

Finally, after further discussions which included additional threats of prosecution for First Degree Murder, Mr. Hernandez agreed to admit that he was directly involved in the death of Ms. Smith. Mr. Hernandez then gave a statement which allegedly detailed his direct involvement in the "rough sex" death of Ms. Smith.

The statements given to BSO were not voluntarily given and were extracted from Mr. Hernandez by threats of violence, enhanced prosecution for First Degree Murder and by promises of a reduction of charges. At the time the Defendant agreed to waive his Constitutional Rights pursuant to Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed. 2d 694 (1966), the Defendant had been informed only that he was the subject of an investigation for charges pertaining to Fraudulent Checks. BSO did not again advise Mr. Hernandez of his Constitutional Rights when the interrogation became directed to the homicide investigation.

This statement should be suppressed as involuntary. Additionally, the Defendant's waiver of rights pertained only to charges arising out of the fraudulent checks. This constituted a limited waiver of his right to counsel which did not extend to discussions pertaining to any other police investigations such as Murder, RICO, etc. This limited waiver of rights is tantamount to an invocation of his Constitutional right to counsel.

Extension of his waiver beyond the intended scope, renders said waiver involuntary and not knowingly and intelligently made.

### March 28, 1999 Statement to FBI

After being interviewed by BSO, Agents from the FBI conducted an interview of Mr. Hernandez. Mr. Hernandez immediately complained to FBI agents about the treatment he had

4

*United States v. Ariel Hernandez*
*CASE NO. 00-6273-CR-HUCK*

received at the hands of the BSO detectives and informed them that his statement to the Detectives had been untrue.

FBI agents then conducted an interrogation of Mr. Hernandez which delved into the circumstances and Mr. Hernandez's knowledge and possible involvement in the death of Jeannette Smith.

The Defendant concedes that by the time the FBI began its interview of him, he knew that he was a suspect in the alleged homicide of Jeannette Smith. However, it is submitted that the improper interrogation methods by BSO coupled with the short duration of time between the BSO interview and the FBI interview tainted the statement obtained by the FBI. There were no attenuating circumstances between the BSO and the FBI interviews by which this Court could find that the FBI statement was not tainted by the previous BSO statement.

### April 8, 1999 Statement to FBI

On or about March 31, 1999 Mr. Hernandez's then counsel, Jerry Velazquez and his law partner Ramond R. Beitra, met with FBI S/As Feisthamel and Grover at the N. Miami Office of the FBI. During this meeting, Messrs. Velazquez and Beitra discussed, inter-alia, the various incentives for Mr. Hernandez to give the FBI a statement. Eventually, during that meeting, the agents and the attorneys contacted AUSA Brian McCormick in order to discuss immunity for Mr. Hernandez's statement. This conversation led to further discussions of Mr. Hernandez's incentives to give a statement. Among these "incentives" was the statement to the effect that if he told the truth and the information turned out to be useful they (Prosecution) would give him leniency which could include the Witness Protection Program and other benefits.

5

*United States v. Ariel Hernandez*
CASE NO. 00-6273-CR-HUCK

Mr. Velazquez then communicated this discussion to Mr. Hernandez. During discussions with his client, Mr. Velazquez repeated that AUSA McCormick and the FBI agents had told him that he (Mr. Hernandez) would received more lenient treatment if he gave a truthful statement that proved to be useful to the Government. Mr. Hernandez viewed the Prosecution offer of leniency as his only way out and agreed to give a statement to the FBI.

On April 2, 1999 AUSA Brian McCormick, Jerry Velazquez, Esq. and Ariel Hernandez executed a letter agreement conferring upon Mr. Hernandez, Use Immunity, but not derivitive use immunity, upon Mr. Hernandez. Pursuant to this letter agreement, on April 8, 1999 Mr. Hernandez was transported to the BSO office for the purpose of being interviewed by the FBI.

During the April 8, 1999 interview, Mr. Velazquez was located in the lobby area of the BSO office. This information was known to the agents. He was not in the interview room. However, during this interview, Mr. Hernandez requested on at least three occasions to have his attorney present. Each time, an agent left the room and returned to inform Mr. Hernandez that his attorney was not present.

The April 8, 1999 statement to FBI was a direct result of the promises of leniency made by FBI Agents and AUSA McCormick to the Mr. Hernandez through his attorney, Jerry Velazquez. Further, these statements were in direct contravention of the protections of <u>Miranda</u>, by failure to inform the Defendant's attorney of his requested presence and failure to terminate the interview once the Defendant invoked his right to counsel.

*United States v. Ariel Hernandez*
CASE NO. 00-6273-CR-HUCK

## **MEMORANDUM OF LAW**

### I
### DEFENDANT'S STATEMENT OF MARCH 28, 1999 TO BSO: SELECTIVE WAIVER OF MIRANDA RIGHTS

The statements were obtained from the defendant in violation of his right to counsel and his privilege against self-incrimination guaranteed by the Fifth and Sixth Amendments and the Due Process Clause of the Fourteenth Amendment to the United States Constitution as interpreted by the United States Supreme court in Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed. 2d 694 (1966).

Any examination of the Defendant's waiver of his Miranda Rights the Court must consider the scope of the waiver as it was intended by the Defendant. Clearly, a Defendant may choose to waive his rights as to one line of questioning or even for selective questions. See *Michigan v. Mosley*, 423 U.S. 96, 103-04 (1975); *U.S. v. Thierman*, 678 F.2d 1331, 1335 (9th Cir. 1982). See also *Bruni v. Lewis*, 847 F.2d 561 (9th Cir. 1988), cert. denied, 489 U.S. 1055 (1989) (defendant agreed to answer those he felt good about answering or those that he believed his attorney would approve of.) However, where the interrogating officers, affirmatively mislead a defendant into believing that they are only seeking to interrogate him on a particular subject in order to obtain a Miranda Waiver, the officers have overstepped their limits and the waiver is no longer knowingly, freely and voluntarily made.

The defendant is not unmindful of the U.S. Supreme Court decision in *Colorado v. Spring*, 479 U.S. 564, 107 S.Ct. 851, 93 L.Ed2d 954, which ostensibly appears to hold otherwise. In

<u>United States v. Ariel Hernandez</u>
CASE NO. 00-6273-CR-HUCK

*Colorado*, at page 853 the Court phrased the issue as follows:

> In *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the Court held that a suspect's waiver of the Fifth Amendment privilege against self-incrimination is valid only if it is made voluntarily, knowingly, and intelligently. *Id.*, at 444, 86 S.Ct., at 1612. This case presents the question whether the suspect's awareness of all the crimes about which he may be questioned is relevant to determining the validity of his decision to waive the Fifth Amendment privilege.

The defendant in *Colorado* was being investigated for the murder of another during a hunting trip. Agents of the ATF later arrested the defendant for the interstate transportation of stolen firearms. The defendant waived his Miranda rights and agreed to speak to the agents. During that interview the Agents asked the defendant if he had ever shot anyone. The defendant admitted that he had once. Agents also inquired as to whether he had killed the specific victim in this investigation, which the defendant denied. Approximately 2 months later, the defendant was again interviewed about the murder. He was again advised of his Miranda rights, waived them and again confessed to the murder.

The State of Colorado Appellate Court and the Colorado Supreme Court held that the failure to advise the defendant, in his first statement, of the fact that he was to be interviewed regarding the homicide warranted suppression of the defendant's statement.[1]

---

[1] Although the first statement was not admitted, the defendant argued that the improperly obtained first statement tainted the subsequent statement and rendered the second a fruit of the poisonous tree.

*United States v. Ariel Hernandez*
*CASE NO. 00-6273-CR-HUCK*

The State of Colorado Supreme Court held:

> "Here, the absence of an advisement to Spring that he would be questioned about the Colorado homicide, and the lack of any basis to conclude that at the time of the execution of the waiver, he reasonably could have expected that the interrogation would extend to that subject, *are* determinative factors in undermining the validity of the waiver." *Id.,* at 874 (emphasis in original).

*Colorado*, at 885.

Although the Supreme Court in *Colorado* held that:

> This Court has never held that **mere silence** by law enforcement officials as to the subject matter of an interrogation is "trickery" sufficient to invalidate a suspect's waiver of *Miranda* rights, and we expressly decline so to hold today.

*Colorado,* at 859. (Emphasis added).

It is significant to note that the not so subtle distinction between the holding in the *Colorado* case and the matter before this Court is in the conduct of the officers. In the matter at bar, the Defendant herein alleged that the officers threatened him with physical violence. Additionally, the officers in this case affirmatively mislead Mr. Hernandez in to believing that the scope of the interrogation would be limited to fraudulent checks. This is particularly significant when viewed in the context of the Defendants criminal history. Which history includes previous arrests for charges related to fraudulent checks.

Although the majority opinion reaches a conclusion in apparent opposition to that which this Defendant urges, the Court has not ruled out the possibility of a favorable result herein. In a

<u>United States v. Ariel Hernandez</u>
CASE NO. 00-6273-CR-HUCK

footnote, the majority states:

> FN8. **In certain circumstances, the Court has found affirmative misrepresentations by the police sufficient to invalidate a suspect's waiver of the Fifth Amendment privilege.** See, *e.g., Lynumn v. Illinois*, 372 U.S. 528, 83 S.Ct. 917, 9 L.Ed.2d 922 (1963) (misrepresentation by police officers that a suspect would be deprived of state financial aid for her dependent child if she failed to cooperate with authorities rendered the subsequent confession involuntary); *Spano v. New York*, 360 U.S. 315, 79 S.Ct. 1202, 3 L.Ed.2d 1265 (1959) (misrepresentation by the suspect's friend that the friend would lose his job as a police officer if the suspect failed to cooperate rendered his statement involuntary). **In this case, we are not confronted with an affirmative misrepresentation by law enforcement officials as to the scope of the interrogation and do not reach the question whether a waiver of *Miranda* rights would be valid in such a circumstance.**

Colorado, at page 862. (Emphasis added).

Recognizing that this Court may disagree with the factual assertions of threats of violence and trickery on the part of law enforcement officers, the Defendant is compelled to draw this Court's attention to the dissent by Justice Marshall and which is joined by Justice Brennan. The dissenting opinion is included here in its entirety since its reasoning cannot be improved upon and since it will best preserve this issue for the future:

> Justice MARSHALL, with whom Justice BRENNAN joins, dissenting.
>
> The Court asserts there is "no doubt" that respondent Spring's decision to waive his Fifth Amendment privilege [479 U.S. 578] was voluntarily, knowingly, and intelligently made. *Ante*, at 857 and 858. I agree, however, with the Colorado Supreme Court that a significant doubt exists in the circumstances of this case and thus the State has failed to carry the "heavy burden" recognized in *Miranda v. Arizona*, 384 U.S. 436, 475, 86 S.Ct. 1602, 1628, 16 L.Ed.2d 694 (1966), for establishing the constitutional validity of Spring's alleged waiver.
>
> Consistent with our prior decisions, the Court acknowledges that a suspect's waiver of fundamental constitutional rights, such as *Miranda*'s protections against

10

United States v. Ariel Hernandez
CASE NO. 00-6273-CR-HUCK

> self-incrimination during a custodial interrogation, must be examined in light of the " ' "totality of the circumstances." ' " *Ante*, at 857, quoting *Moran v. Burbine*, 475 U.S. 412, 421, 106 S.Ct. 1135, 1141, 89 L.Ed.2d 410 (1986), in turn quoting *Fare v. Michael C.*, 442 U.S. 707, 725, 99 S.Ct. 2560, 2572, 61 L.Ed.2d 197 (1979); see also *id.*, at 724-725, 99 S.Ct. at 2571-2572; *North Carolina v. Butler*, 441 U.S. 369, 374-375, 99 S.Ct. 1755, 1757-58, 60 L.Ed.2d 286 (1979); *Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938). Nonetheless, the Court proceeds to hold that the specific crimes and topics of investigation known to the interrogating officers before questioning begins are "not relevant" to, and in this case "could not *860 affect," the validity of the suspect's decision to waive his Fifth Amendment privilege. *Ante*, at 859. It seems to me self-evident that a suspect's decision to waive this privilege will necessarily be influenced by his awareness of the scope and seriousness of the matters under investigation.
>
> To attempt to minimize the relevance of such information by saying that it "could affect only the wisdom of" the suspect's waiver, as opposed to the validity of that waiver, ventures an inapposite distinction. *Ibid.* Wisdom and validity in this context are overlapping concepts, as circumstances relevant to assessing the validity of a waiver may also be highly relevant to its wisdom in any given context. Indeed, the admittedly "critical" piece of advice the Court recognizes today--that the suspect be informed that whatever he says may be used as evidence against him--is certainly relevant to the wisdom of any suspect's decision to submit to custodial interrogation without first consulting his lawyer. *Ante*, at [479 U.S. 579] 857. The Court offers no principled basis for concluding that this is a relevant factor for determining the validity of a waiver but that, under what it calls a *totality* of the circumstances analysis, a suspect's knowledge of the specific crimes and other topics previously identified for questioning can never be.
>
> The Court quotes *Moran v. Burbine, supra*, 475 U.S. at 422, 106 S.Ct., at 1141, as holding that "a valid waiver does not require that an individual be informed of *all* information 'useful' in making his decision or *all* information that 'might ... affec[t] his decision to confess.' " *Ante*, at 859 (emphasis added). Noticeably similar is the Court's holding today: "[A] suspect's awareness of *all* the possible subjects of questioning in advance of interrogation is not relevant to determining" the validity of his waiver. *Ante*, at 859 (emphasis added). This careful phraseology avoids the important question whether the lack of *any* indication of the identified subjects for questioning *is* relevant to determining the validity of the suspect's waiver.
>
> I would include among the relevant factors for consideration whether before waiving his Fifth Amendment rights the suspect was aware, either through the circumstances surrounding his arrest or through a specific advisement from the

11

arresting or interrogating officers, of the crime or crimes he was suspected of committing and about which they intended to ask questions. To hold that such knowledge is relevant would not undermine the " 'virtue of informing police and prosecutors with specificity' as to how a pretrial questioning of a suspect must be conducted," *ante*, at 859, n. 9 (quoting *Fare v. Michael C., supra*, 442 U.S., at 718, 99 S.Ct., at 2568), nor would it interfere with the use of legitimate interrogation techniques. Indeed, requiring the officers to articulate at a minimum the crime or crimes for which the suspect has been arrested could contribute significantly toward ensuring that the arrest was in fact lawful and the suspect's statement not compelled because of an error at this stage alone, a problem we addressed in *Brown v. Illinois*, 422 U.S. 590, 601, 95 S.Ct. 2254, 2260, 45 L.Ed.2d 416 (1975), under the [479 U.S. 580] Fourth Amendment on the assumption that the defendant's waiver of his Fifth Amendment rights in that case had been voluntary. See also *Dunaway v. New York*, 442 U.S. 200, 217, 99 S.Ct. 2248, 2259, 60 L.Ed.2d 824 (1979) (voluntary waiver of *Miranda* warnings is a threshold requirement for Fourth Amendment analysis).

The interrogation tactics utilized in this case demonstrate the relevance of the information Spring did not receive. The agents evidently hoped to obtain from Spring a valid confession to the federal firearms charge for which he was arrested and then parlay this admission into an additional confession of first-degree murder. Spring could not have expected questions about the latter, separate offense when he agreed to waive his rights, as it occurred in a different State and was a violation of state law outside the normal investigative *861 focus of federal Alcohol, Tobacco, and Firearms agents.

"Interrogators describe the point of the first admission as the 'breakthrough' and the 'beachhead,' R. Royal & S. Schutt, The Gentle Art of Interviewing and Interrogation: A Professional Manual and Guide 143 (1976), which once obtained will give them enormous 'tactical advantages,' F. Inbau & J. Reid, Criminal Interrogation and Confessions 82 (2d ed. 1967)." *Oregon v. Elstad*, 470 U.S. 298, 328, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985) (BRENNAN, J., dissenting). The coercive aspects of the psychological ploy intended in this case, when combined with an element of surprise which may far too easily rise to a level of deception, l cannot be justified in light of *Miranda*'s strict [479 U.S. 581] requirements that the suspect's waiver and confession be voluntary, knowing, and intelligent. 384 U.S., at 445-458, 475-476, 86 S.Ct., at 1612-1613, 1628. If a suspect has signed a waiver form with the intention of making a statement regarding a specifically alleged crime, the Court today would hold this waiver valid with respect to questioning about any other crime, regardless of its relation to the charges the suspect believes he will be asked to address. Yet once this waiver is given and the intended statement made, the protections afforded by *Miranda* against the "inherently compelling pressures" of the

>custodial interrogation, *id.,* at 467, 86 S.Ct., at 1624 have effectively dissipated. Additional questioning about entirely separate and more serious suspicions of criminal activity can take unfair advantage of the suspect's psychological state, as the unexpected questions cause the compulsive pressures suddenly to reappear. Given this technique of interrogation, a suspect's understanding of the topics planned for questioning is, therefore, at the very least "relevant" to assessing whether his decision to talk to the officers was voluntarily, knowingly, and intelligently made.
>
>Not only is the suspect's awareness of the suspected criminal conduct relevant, its absence may be determinative in a given case. The State's burden of proving that a suspect's waiver was voluntary, knowing, and intelligent is a "heavy" one. *Miranda,* 384 U.S., at 475, 86 S.Ct., at 1628. We are to " 'indulge every reasonable presumption against waiver' of fundamental constitutional rights" and we shall " 'not presume acquiescence in the loss of fundamental rights.' " *Johnson,* [479 U.S. 582] 304 U.S., at 464, 58 S.Ct., at 1023 (citations omitted); see *Brewer v. Williams,* 430 U.S. 387, 404, 97 S.Ct. 1232, 1242, 51 L.Ed.2d 424 (1977). It is reasonable to conclude that, had Spring known of the federal agents' intent to ask questions about a murder unrelated to the offense for which he was arrested, he would not have consented to interrogation without first consulting his attorney. In *862. this case, I would therefore accept the determination of the Colorado Supreme Court that Spring did not voluntarily, knowingly, and intelligently waive his Fifth Amendment rights. 713 P.2d 865, 873-874 (1985). 2
>
>I dissent.

The written and oral statements were obtained from the defendant in violation of his right to counsel and his privilege against self-incrimination guaranteed by the Fifth and Sixth Amendments and the Due Process Clause of the Fourteenth Amendment to the United States Constitution as interpreted by the United States Supreme court in <u>Miranda v. Arizona</u>, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed. 2d 694 (1966).

<u>United States v. Ariel Hernandez</u>
CASE NO. 00-6273-CR-HUCK

## II
## THE STATEMENTS OF MARCH 28, 1999 TO BSO AND FBI
## <u>WAS NOT FREELY AND VOLUNTARILY GIVEN</u>

The written and oral statements allegedly obtained from the defendant were not freely and voluntarily given, in violation of the defendant's rights guaranteed by the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

In the matter at bar, the BSO officer(s), faced with the Defendant's refusal to speak to them about his alleged participation were forced to engage in misrepresentation, threats, and coercion which finally overcame the Defendant's will to remain silent. Under the totality of these circumstances, the Defendant's will was clearly overborne by the stress and coercive nature of the interrogation. This coercion goes far beyond that normally and necessarily a part of any police encounter or detention.

The Due Process Clause of the Fourteenth Amendment prohibits the govenment's use of involuntary confessions. *Miller v. Fenton*, 474 U.S. 104 (1985); *Harris v. Dugger*, 874 F.2d 756 (11th Cir. 1989; *Miller v. Dugger*, 838 F.2d 1530 (1988).

Involuntary statements are inherently untrustworthy. Their use violates our fundamental sense of decency. *Spano v. New York*, 360 U.S 315, 320 (1959). In order to determine whether a statement was voluntarily given by a defendant the Court must determine "whether, under a totality of the circumstances, the challenged confession was obtained in a manner compatible with the requirements of the constitution." *Collazo v. Estelle*, 940 411, 415 (9th Cir. 1991) (en banc), cert. denied, 112 S. Ct. 870 (1992) (quoting *Miller v. Fenton*, 474 U.S. 104, 112 (1985). "A statement is involuntary if it is extracted by any sort of threats or violence [or] obtained by any direct or implied

14

United States v. Ariel Hernandez
CASE NO. 00-6273-CR-HUCK

promises, however slight, [or] by the exertion of any imporper influence." *U.,S. v. Bautista-Avila*, 6 F.3d 1360, 1364 (9th Cir. 1993) (quoting *Leon Guerrero*, 847 F.2d at 1366, additional citations omitted. "The test is whether, considering the totality of the circumstances, the government obtained the statement by physical or psychological coercion or by improper inducement so that the suspect's will was overborne" See *Derrick v. Peterson*, 924 F.2d 813, 817 (9th cir. 1990).

Most importantly, the government bears the burden of proving, by a preponderance of the evidence, that the statement attributed to the defendant has been voluntary obtained. See *Lego v. Twomey*, 404 U.S. 477, 489 (1972); *U.S. Swint*, 15 F.3d 286, 288-89 (3d Cir. 1994). the Court must always make a determination as to the voluntariness of a defendant's statement and the Defendant is entitled to have a heaing on that issue, outside of the presence of the jury. *Jackson v. Denno*, 378 U.S. 368 (1964); *U.S. v. Restrepo*, 994 F.2d 173 (5th Cir. 1993). The admissibility of confessions is further governed by the provisions of 18 U.S.C. Sec. 3501.

Clearly, the statement to BSO Detectives on March 28, 1999 was the result of improper coercion, threats and misrepresentations.

It is submitted that the March 28, 1999 interrogation conducted by the BSO officers necessarily tainted the subsequent interview conducted by the FBI. The FBI interview occurred on the same date as the BSO interrogation and was separated in time by a matter of only a few minutes. At the time the Defendant was interrogated by the FBI he was still under the influence of the coercive interrogation by BSO and the circumstances were not so attenuated as to remove this taint from the FBI interview.

*United States v. Ariel Hernandez*
CASE NO. 00-6273-CR-HUCK

## III
## THE STATEMENT OF APRIL 8, 1999 TO BSO AND FBI
## WAS NOT FREELY AND VOLUNTARILY GIVEN

The Defendant's statement of April 8, 1999 was secured after the Defendant's counsel, Jerry Velasquez and FBI agents met to discuss the possibility of entering into a cooperating plea agreement.[2] During a meeting with FBI agents, the Defendant's attorney and the FBI agents made contact with the United States Attorney's Office. As a result of these conversations between the Defendant's counsel, FBI agents and AUSA Brian McCormick, an agreement was reached which ultimately resulted in execution of the use immunity letter agreement of April 2, 1999.

The government has indicated that it does not intend to utilize the defendant's April 8, 1999 statement during its case in chief, since doing so would violate the terms of the April 2, 1999 letter agreement. However, the government has also indicated that it feels that use of this statement for impeachment would be permissibkle. Therefore, this motion seeks to preclude the government from utilizing this statement for impeachment purposes.

Whether a defendant's statements are inadmissible because of implied promises made by a government agent is a matter governed by the Fifth Amendment. *See United States v. Braxton*, 112 F.3d 777, 780 (4th Cir.1997) (en banc). A statement is coerced if it was extracted by implied promises "however slight." *Hutto v. Ross*, 429 U.S. 28, 30, 97 S.Ct. 202, 50 L.Ed.2d 194 (1976). "The proper inquiry is whether the defendant's will has been overborne or his capacity for self-determination critically impaired." *Braxton*, 112 F.3d at 780.

---

[2] At the time of these discussions the Defendant was represented by privately retained counsel who has never been associated with the undersigned.

<u>United States v. Ariel Hernandez</u>
CASE NO. 00-6273-CR-HUCK

In the matter at bar, the Defendant was informed that the government, through its counsel, AUSA Brian McCormick, made certain specific representations of leniency and special treatment if the Defendant agreed to meet with the FBI agents and to give a statement. These promises included benefits such as participation in the Federal Witness Protection Program, a reduction of charges or initial charges of lesser degree and other possible benefits. The benefits promised were contingent upon the following factors:

    a. Mr. Hernandez would have to give truthful information, and

    b. The information would have to be useful.

Mr. Velasquez communicated these discussions to Mr. Hernandez who viewed this as his only way out of his current situation.

Clearly, the circumstances of this April 8, 1999 statement render his statement as unreliable and the product of the contingent benefits promised to the Defendant if he agreed to cooperate and give a statement to the FBI.

The undersigned has conferred with AUSA Jeffrey Sloman and AUSA Larry Levicchio who have indicated that the Government opposes the relief sought by this Motion.

WHEREFORE, the Defendant respectfully moves this Honorable Court to enter its Order suppressing the aforementioned statements from trial and all hearings in this cause.

                                                            Respectfully submitted,

                                                            JEFFREY D. WEINKLE, ESQ.
                                                            FBN: 271934

United States v. Ariel Hernandez
CASE NO. 00-6273-CR-HUCK

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was mailed/delivered this 2 day of MARCH, 2001 to: United States Attorney's Office, AUSA LARRY LaVECCIO, 99 N.E. 4th Street, Miami, FL 33132; and to:

Richard Houlihan, Esq.
Suite 310
300 Aragon Avenue
Coral Gables, FL 33134
(Attorney for Trentacosta)

Fred Haddad, Esq.
101 NE Third Avenue
Suite 202
Ft. Lauderdale, FL 33301
(Attorney for Massaro)

Samuel D. Deluca
3451 John F. Kennedy Blvd.
Jersey City, New Jersey 07307
(Attorney for Ruggiero)

Donald Spadero, Esq.
1000 S. Federal Highway
Suite 103
Ft. Lauderdale, FL 33316
(Attorney for Chiusano)

Michael Smith, Esq.
633 SE 3rd Street
Suite 4F
Ft. Lauderdale, Fl
(Attorney for Silverman)

Alejandro Taquechel, Esq.
Suite 238
3750 W. 16th Avenue
Hialeah, FL 33012
(Attorney for Carlos Garcia)

Thomas Almon, Esq.
321 NE 26th Street
Miami, FL 33137
(Attorney for Monico)

Manuel Gonzalez, Esq.
782 NW Le Jeune Road
Suite 440
Miami, FL 33126
(Attorney for Banks)

JEFFREY D. WEINKLE, ESQ.
1035 NW 11th Avenue
Miami, FL 33136-2911
Tel: 305-373-4445
Fax: 305-545-8514

JEFFREY D. WEINKLE