UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 006-6273-CR-HUCK/BROWN

UNITED STATES OF AMERICA,

PLAINTIFF,

v.

ANTHONY TRENTACOSTA, et al.,

DEFENDANTS.
_____/

## GOVERNMENT'S RESPONSE TO DEFENDANT HERNANDEZ' MOTION TO SUPPRESS STATEMENTS

COMES NOW the United States of America, by and through the undersigned Assistant

United States Attorney, and files this Response in opposition to defendant Ariel Hernandez'

Motion to Suppress Statements (DE 192).

In his Motion, the defendant urges this Court to suppress three statements which he made to

law enforcement agents. The first was a sworn taped statement given by the defendant on March 28,

1999 to Detectives Frank Ilarraza and Eli Thomasevich of the Broward Sheriff's Office following

the defendant's arrest on that date. The second was an oral statement given by the defendant on that

same date to F.B.I. Special Agents William Howe Grover and Terry L. Feisthammel. The third was

an oral statement given by the defendant on April 8, 1999 to Agents Grover and Feisthammel. The

defendant seeks to have all of these statements suppressed, asserting that (1) On March 28, 1999

Det. Ilarraza led the defendant to believe that he was only being questioned with regard to a

fraudulent check scheme when, in fact, the detective intended to question the defendant about the

circumstances of a murder for which an arrest warrant had already been issued; (2) The detectives

made improper threats and promises to the defendant in order to coerce him into giving a statement on March 28, 1999; and (3) The statement given by the defendant on April 8, 1999 was the result of improper inducements and in contravention of the defendant's right to counsel.

### FACTS

On March 21, 1999, the body of Jeanette Smith was discovered by some fishermen contained within a stereo box in the water on the side of Alligator Alley. Ms. Smith's partially-clothed body was bound at the ankles with shoe laces and her wrists were bound behind her back. Some of her belongings were later discovered floating in the water several miles away. Ms. Smith was the apparent victim of strangulation. Broward Sheriff's Office Detective Frank Ilarraza was among the law enforcement officers who responded to the scene. Between March 21 and March 26, 1999, the defendant Ariel Hernandez was identified as a suspect in the case.[1]

On March 27, 1999, an arrest warrant was issued by Judge Victor Tobin of the Seventeenth Judicial Circuit of Florida commanding the arrest of Hernandez for First Degree Murder in connection with the death of Ms. Smith. Coincidently, on that same date at approximately 10:30 p.m., Det. Ilarraza received a telephone call from Ariel Hernandez during which Hernandez stated

---

[1] Agents of the F.B.I., pursuant to an order issued by The Honorable William P. Dimitrouleas, were monitoring several telephones utilized by co-defendant Frederick J. Massaro. On March 20, 1999, at approximately 3:43 p.m., a telephone conversation between Hernandez and Massaro was intercepted, during which the following exchange occurred:

> HERNANDEZ: "Listen, uh, things got, uh, a little messy yesterday. Remember that, uh, detective from the thing?" MASSARO: "From what thing?" HERNANDEZ: "The homicide." MASSARO: "Yeah." HERNANDEZ: "Well, the thing is this. I just, I, I tied up the loose end and I got a package I gotta get rid of." MASSARO: "Uh huh." HERNANDEZ: "What should I do?" MASSARO: "I don't know. I'll talk to you in person."

Thereafter, and for the next several days, conversations were intercepted involving Hernandez, Massaro, co-defendant Silverman and others during which the death of Ms. Smith and the disposal of her body and personal effects was discussed.

his name was "Frank."[2]  Hernandez stated that he was a Colombian who had disposed of Ms. Smith's car at the request of the two killers, whom he identified as Enrique Estevez and Francisco Santana. Hernandez further stated that Ms. Smith had been involved in a counterfeit check scheme with Estevez and Santana, and that they murdered her because they were concerned that she was going to turn them in to law enforcement agents. A transcript of this conversation is attached hereto as Attachment A.[3]

On March 28, 1999, Detectives Ilarraza, Devine and Thomasevich of the Broward Sheriff's Office, along with officers of the Sunny Isles Police Department, went to 253 172nd Street, Apt. 203, Sunny Isles, Miami-Dade County, Florida, where the defendant Hernandez was staying with his girlfriend, Tammy Bubel. Contrary to the assertions in the defendant's Motion, at page 2, Hernandez was informed that the detectives had an arrest warrant for Hernandez on the charge of murder in the first degree. Hernandez stated that he wanted to fully cooperate, that he knew persons who were connected to organized crime, and that he wanted to provide this information. Hernandez was informed that he could be booked in Miami-Dade County on the warrant, or that he could return with the Broward County Sheriff's Office detectives to Broward County to discuss the matter. Hernandez agreed to return with the Broward Sheriff's Office detectives to Broward County. Prior to leaving the apartment, Hernandez and Bubel both signed consent forms authorizing the search of the

_____

[2]The circumstances under which this conversation occurred are as follows: During the evening of March 27, 1999, Det. Ilarraza received a telephone call from a Miami-Dade homicide detective who indicated that he had received an anonymous call from a person who claimed that he knew who killed the girl who had been found in the box on Alligator Alley. The caller stated that he would call back within fifteen to twenty minutes. When he called back the Miami-Dade Homicide Division, they transferred the call to Det. Ilarraza's telephone and Det. Ilarraza was able to tape record the conversation.

[3]In his Motion, the defendant does not seek the suppression of this statement.

apartment. Copies of those consent forms are attached hereto as Attachment B.[4]

Thereafter, both Herandez and Bubel were taken to the Broward Sheriff's Office in separate vehicles. At the Broward Sheriff's Office, Hernandez was advised of his rights and executed a written waiver of same. A copy of that written waiver is attached hereto as Attachment C. Ms. Bubel was interviewed, during which she stated that Hernandez had admitted to her that he had killed Ms. Smith and disposed of her body. Thereafter, Hernandez spoke with the detectives. Initially, Hernandez stated that he had gotten a ride with Ms. Smith, who dropped him off in Miami Beach and proceeded away. Hernandez claimed that, at that time, her car was followed by two persons whom he knew as Enrique and Frankie. When confronted with the fact that the detectives believed Ms. Smith had been murdered at a hotel room in which Hernandez had been staying, Hernandez changed his story and stated that he had been instructed to bring Ms. Smith to the hotel room by Freddy (Massaro), and that he witnessed Ms. Smith being murdered by Tony (Trentacosta) after Tony had engaged in violent sexual activity with Smith. When confronted with the fact that Tammy Bubel had already given a statement in which she stated that Hernandez had admitted killing Ms. Smith himself, Hernandez stated that he was going to tell the truth, and thereupon told the detectives that he had accidently killed Ms. Smith during sexual activity. Hernandez further stated that he thereafter called Massaro, who responded to the scene of the murder and, with the assistance of Sonny (Silverman) and Joe, they boxed up and disposed of Ms. Smith's body. Hernandez also admitted that he was the individual who had placed the telephone call to Det. Ilarraza on the previous evening and stated that the murder had been committed by Enrique and Francisco (See Attachment A).

---

[4]The defendant has not challenged the legality of this search.

4

Thereupon, Hernandez gave a sworn taped statement to Detectives Ilarraza and Thomasevich, a transcript of which is attached as Attachment D. Contrary to the assertions in the defendant's Motion at page 3, the defendant was at no time subjected to improper threats.[5] Thereafter, the defendant was interviewed by F.B.I. Agents Grover and Feisthammel, who first reviewed with Hernandez his waiver of rights which he had previously signed. During this interview, Hernandez discussed his purported knowledge concerning, and activities with, several members and associates of organized crime. A report of that interview is attached hereto as Attachment E. Contrary to the assertions in the defendant's Motion, at pages 4-5, at no time during this interview did Hernandez complain to the F.B.I. agents about the treatment which he had received from the Broward Sheriff's Office detectives. The interview concluded with Hernandez stating that he would attempt to recontact the F.B.I. agents through his attorney, Jerry Valazquez.

The next day, on March 29, 1999, Hernandez placed a telephone call from the jail to co-defendant Massaro. This conversation was intercepted and recorded by agents who were continuing to monitor Massaro's telephones pursuant to the order which had been entered by Judge Dimitrouleas. Hernandez stated that he was "taking everything," and that Massaro did not have to worry about anything except Silverman's talking to the police. On April 1, 1999, Hernandez again called Massaro from the jail. Hernandez stated that he was taking "the whole rap," and that the story

---

[5]In his motion, at page 3, the defendant asserts amorphously that certain unnamed Broward Sheriff's Office detectives "made threats of violence against Mr. Hernandez." The defendant does not state who made such threats or what the nature of those threats were. In any event, these assertions are refuted by the taped statement of the defendant (Attachment D) during which, at page 21, the following exchange took place:

Det. Thomasevich: : "Okay. Have you, ah, have we treated you properly, Ariel? I mean, we ..." Hernandez: "You've been nothing but gentlemen." Det. Thomasevich: "We let you use the bathroom?" Hernandez: "You've been nothing but gentlemen."

that was in the newspaper was the story that Hernandez and "Jerry" came up with so that nobody else will get incriminated. Hernandez further stated that, the way it was explained to the police, it was an accidental homicide as a result of rough sexual activity.

Between March 28, 1999 and April 2, 1999, the defendant's attorney, Jerry Valazquez engaged in conversations with agents of the F.B.I. and prosecutors in the United States Attorney's Office in an attempt to offer Hernandez' cooperation in pending investigations. Toward that end, a standard proffer agreement was prepared, dated April 2, 1999, which was signed by Assistant U.S. Attorney J. Brian McCormick, Hernandez' attorney Jerry Valazquez, and Hernandez. This agreement conferred use immunity, but not derivative use immunity, in return for the defendant's proffer. A copy of that proffer agreement is attached hereto as Attachment F.[6] On April 8, 1999, in accordance with the terms of that agreement, Hernandez was again interviewed by F.B.I. Agents Grover and Feisthammel. During that interview, the defendant elaborated upon his purported knowledge of organized crime activities. Significantly, during this interview, the defendant denied that he had killed Ms. Smith, and reiterated that persons named Enrique and Francisco were responsible. The report of that interview is attached hereto as Attachment G. Contrary to the assertions in the defendant's Motion, at page 6, at no time during this interview did Hernandez ask to speak with his attorney.

---

[6]The defendant's assertions, at pages 5-6 and 17, that the government made certain promises to him as an inducement to give this proffer is specifically refuted by the proffer agreement itself, which states, at page one, "No other promises have been made by the United States Attorney's Office and/or the Federal Bureau of Investigation other than those expressly set forth below," and, at page two, "The government makes no other promises or assurances to you other than those set forth in this agreement." As set forth above, this agreement was subscribed by the defendant and his counsel.

## ARGUMENT

To determine whether statements provided by a defendant were voluntary, this Court must determine, based upon the totality of the circumstances, whether law enforcement officials obtained the evidence by overbearing the will of the defendant. Haynes v. Washington, 373 U.S. 503, 513-14 (1963). In Colorado v. Connelly, 479 U.S. 157, 170 (1986), the Court held that coercion by the law enforcement agents is a necessary element in making such a finding.

In the instant case, it is clear, based upon the totality of the circumstances, that the defendant voluntarily, indeed he anxiously, rendered a statement to law enforcement agents during several attempts at extricating himself from criminal liability for the murder of Jeanette Smith.[7]  These attempts began on March 27, 1999, prior to his arrest, when the defendant contacted law enforcement agents under an assumed name and attempted to place the blame on other persons, all in an attempt to divert attention from himself.  Thereafter, following his arrest, the defendant voluntarily spoke with homicide detectives and, after two futile efforts at placing the blame on others, eventually admitted as to his participation in the homicide, but asserting that it was an accident.  Thereafter, the defendant voluntarily met twice with federal agents and spoke about his involvement with organized crime members, some of whom are co-defendants in the instant case.  It is clear, from the statements themselves, coupled with the circumstances under which they were obtained, that the statements were voluntary and motivated by the defendant's desire to limit his own culpability and/or to shield his co-conspirators from involvement.

The defendant argues that the detectives misled the defendant, at the time of his arrest, into

---

[7]Insofar as the various statements given by Hernandez were contradictory, and in light of the fact that all of the statements contradict the other evidence in this case, it is anticipated that the government will be offering these statements at trial as false exculpatory statements.

believing that they were only concerned with questioning him about fraud charges, notwithstanding the warrant which had been obtained charging the defendant with first degree murder. As set forth hereinabove, this is factually incorrect. However, even assuming arguendo that these allegations set forth in the defendant's Motion were correct, the defendant is still not entitled to relief. The defendant recognizes, as he must, that the Supreme Court laid to rest the viability of his argument in Colorado v. Spring, 479 U.S. 564 (1987).[8]

As for the statement rendered on April 8, 1999 under the terms of a letter agreement executed by the defendant, his counsel and the Assistant U.S. Attorney, the defendant is correct in his assertion, at page 16 of his Motion, that, consistent with the terms of that agreement, the government does not intend to offer that statement against the defendant during its case in chief. However, to the extent that the defendant attempts to restrict the use of that statement by the government as impeachment or during its rebuttal case should the defendant testify at trial, he is simply incorrect. In United States v. Pielago, 135 F.3d 703 (11th Cir. 1998), the court upheld the validity of an agreement virtually identical to that which is before this Court, stating that "[t]he construction of proffer agreements, like plea agreements, is governed generally by the principles of contract law, as we have adapted it for criminal law." Id. at 709. Here, the agreement specifically states, twice, that no promises other than those contained within the agreement had been made to the defendant. Moreover, the agreement specifically states that the statement could be used against the defendant should he testify inconsistently in the future or make any materially false statements during the

---

[8]The defendant, in the instant case, tries to distinguish Colorado v. Spring, supra., by stating that, in the instant case, the defendant was also subjected to certain unspecified threats of violence and misleading conduct by the detectives. These assertions are simply denied by the government.

course of the proffer. The agreement was signed by the defendant, who had benefit of counsel of his own choice, and by the defendant's counsel. Under principles of contract law, the agreement is legally binding on both parties.

WHEREFORE, the government respectfully requests, based upon the above and foregoing, that the Court deny the defendant Hernandez' Motion to Suppress Statements.

Respectfully submitted,

GUY A. LEWIS
UNITED STATES ATTORNEY

By: _____
LAWRENCE D. LaVECCHIO
ASSISTANT UNITED STATES ATTORNEY
Florida Bar No. 305405
299 East Broward Boulevard
Fort Lauderdale, Florida 33394
954/356-7255/ 356-7230 - fax

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was delivered by U.S. mail to the following on this 14th day of June 2001.

Richard K. Houlihan, Esq. **(for Anthony Trentacosta)**
300 Aragon Avenue, Ste. 310
Coral Gables, Florida 33134

William D. Matthewman, Esq. **(for Ariel Hernandez)**
2300 Glades Rd., Suite 340 - West Tower
Boca Raton, Florida 33431

Fred Haddad, Esq. **(for Frederick J. Massaro)**
One Financial Plaza, Suite 2612
Fort Lauderdale, Florida 33394

Christopher A. Grillo, Esq. **(for Frederick J. Massaro)**
1 East Broward Blvd., #700
Ft. Lauderdale, Florida 33301

Samuel D. DeLuca, Esq. **(for Francis Ruggiero)**
3451 John F. Kennedy Blvd.
Jersey City, New Jersey 07307

Jeffrey Weinkle, Esquire **(for Ariel Hernandez)**
1035 NW 11th Avenue
Miami, Florida 33136

Donald Spadaro, Esquire **(for Julius B. Chiusano)**
1000 S. Federal Highway, Suite 103
Fort Lauderdale, Florida 33316

Michael G. Smith, Esquire **(for Adam Todd Silverman)**
633 SE 3rd Avenue, Suite 4F
Fort Lauderdale, Florida 33301

Albert Z. Levin, Esquire **(for Carlos Garcia)**
888 Brickell Avenue, Sixth Floor
Miami, Florida 33131

Thomas Almon **(for Charles P. Monico)**
321 NE 26th Street
Miami, Florida 33137

Manuel Gonzalez, Esquire **(for Anthony R. Banks)**
782 NW Le Jeune Road, Suite 440
Miami, Florida 33126

LAWRENCE D. LaVECCHIO
Assistant United States Attorney

10

STATEMENT OF:     **Ariel Hernandez - VI.. PHCiN3**
CASE NUMBER:     █████████

ΙΑʹΈ OF STATEMENT:  **March 27, 1999**

INVESΓIGAΓOR:     **Det. Frank E. Illarraza, CCN 6844**

LOCATION:

<u>PHONE CALL:</u>

Q.    Hello?

A.    Hello?

Q.    Hello.

A.    Hello.

Q.    How are you.

A.    Are you Mr. Francisco?

Q.    Yes I am Frank.

A.    Okay [unintelligible] told me to speak to you.

Q.    Yes.

A.    Okay do you know about the girl that appeared in the water, in a box.

Q.    In box, yes.

A.    Okay I know the names, and I know the description of the two, of the two gentlemen that were responsible for that thing.

Q.    Okay what are their names.

A.    Well the first his name is Francisco Santana.

Q.    Santana?

A.    He is approximately like 5'2", weighs between 230, 2, well 230 to 250 lbs.

STATEMENT OF:    **Ariel Hernandez - VIA PHONE**
CASE NUMBER:    

Q.    Okay.

A.    His hair is black, graying, with a mustache.

Q.    Okay.

A.    Enrique Estevez is approximately 5'1", weighs between 185 to 200 lbs.

Q.    You said Enrique.

A.    Estevez.

Q.    Estevez.

A.    Uhum [Yes]

Q.    Okay.

A.    He is blonde, with green eyes.

Q.    Okay.

A.    Very good looking, he is a good looking guy that any girl would throw herself at him.

Q.    Yes.  Like approximately how old are both of them.

A.    Well Enrique I am guessing that is between thirty to forty years old.

Q.    Okay.  And the other one, Francisco.

A.    He's an older person.

Q.    That's Francisco Santana.

A.    Yes, I.

Q.    Okay.

A.    Well since he has gray hair I thought that he is older than forty, fifty years old.

STATEMENT OF:    **Ariel Hernandez - VIA PHONE**
CASE NUMBER:    ▆▆▆▆▆▆▆▆

Q.    Okay forty to fifty, around there.

A.    Uhum [Yes]

Q.    Okay.  Do you know where they live.

A.    They're not from here.

Q.    They're not from there, okay.

A.    No.

Q.    Where are they from.

A.    Enrique lives in Cali, and Francisco lives in Medellin.

Q.    Okay.  And when did they arrive here.

A.    That yes I really couldn't tell you because I don't know.  Because they contacted me.  Because before I used to do, not their papers but I used to do their documents like I used to do their residence and all of that stuff, I used to do it via computer.

Q.    Okay.

A.    I know that they are [unintelligible] they are, I am leaving the country now because last night they killed my dog, they cut his head and they hung him from the front door.  And they said that the loose lips sink ships.

Q.    And how do you know that they're the ones who killed her.

A.    Well first of all because Francisco gave me $500.00 to drive the car, and they followed me in a Ford Explorer, green, with with, well I don't know if

STATEMENT OF:    **Ariel Hernandez** - VIA PHONE
CASE NUMBER:    

you know the Ford Explorer, but the Ford Explorer have a hood in the back.

Q.    Yes I know.

A.    Okay the hood was beige.

Q.    Okay.

A.    And the interior is beige.

Q.    Okay.

A.    And they paid me $200.00 to drive a car on 88 and Collins.

Q.    88 and Collins, and when, and where did they leave it, the car.

A.    Well I left it in front of a house that was under construction.

Q.    Yes.

A.    Right there by the sidewalk.

Q.    Okay. When you left the car there was there, were you the only one that was in the car.

A.    Well yes, they gave me several and they told me put these gloves on and drive the car to this address, and leave it here.

Q.    And did they tell you, and why, did they tell you where the car was from or they didn't tell you.

A.    No they didn't tell me anything. I know that it was a black car, a two-door.

Q.    How many doors.

A.    Two-door.

Q.    Two-door?

STATEMENT OF:    **Ariel Hernandez - VIA PHONE**
CASE NUMBER:

A.    Uhum.

Q.    Okay. And what else can you tell me about the car.

A.    Excuse me?

Q.    What else can you tell me about the car.

A.    Well the car was black.

Q.    Do you know what name brand.

A.    I believe it was a Honda or a Mazda.

Q.    Okay. Did it have the keys.

A.    Yes they had the keys and the key was a key with the alarm, there were two keys and there was one key with the Italian symbol.

Q.    And what did you do with the key.

A.    Well when I parked the car they followed me in the Ford.

Q.    Yes but what did you do with the car keys.

A.    I gave it to Francisco.

Q.    To Francisco. Okay. And they didn't tell you why they wanted that car, for you to take there, or anything like that.

A.    No. The thing is, that is why I am leaving the country very soon. I have my own pilot, I have my own plane, I live in Columbia.

Q.    And.

A.    Where I am going is of no interest to you. What I am giving you is the data that you need to see if you can get these people, because they killed

STATEMENT OF:    **Ariel Hernandez  - VIA PHONE**
CASE NUMBER:

my dog, and I have three daughters, and I have my wife, and I have to see

to the security of my family.

Q.    And how where they involved with this girl, what relationship did they have

with the girl.

A.    Well this girl, from what they told me, the girl, they what they used to do is

they would write bad checks, they'd buy merchandise, and the girl would

go and exchange it for money.

Q.    Okay.  So they used to buy merchandise with the checks and then the girl

would return the merchandise for refund.

A.    Yes.  And then they would give her the money.

Q.    Okay.  And where is it that they used to do that sort of stuff, you don't

know?

A.    Truthfully there you made it difficult for me.  I only know, because

Henrique likes to talk too much.  Francisco is an older person and he

doesn't discuss things too much.  But Enrique does like to talk about

things too much.  I.

Q.    Tell me, tell me, tell me one thing the box that they threw her in was it,

they showed it on T.V., it was a Sony box, they didn't say where they got

that, where they bought that box, or nothing about that.

A.    No.  I know that if, if, look I'm going to give you some information that they

didn't even report it on T.V. nor anything.  If that was the same box that I

STATEMENT OF:    **Ariel Hernandez - VIA PHONE**

CASE NUMBER:

saw on the news it was, they bought three, well three or four sound systems.

Q. Yes.

A. Made by that same name brand.

Q. Oh.

A. And the name brand was Sony.

Q. Yes.

A. And from what I saw on the news I saw the box, but I can give you some information so that you know that what I am telling you is the truth. That system was, held fifty plus one music C.D.'s , and it is of 250 amplifiers. That it is, what is it called here? Watts?

Q. Yes, watts.

A. Uhu.

Q. Okay. And what did they do with those things.

A. Well, well imagine.

Q. They didn't tell you what they did with them, if they returned it to the store, or.

A. No. What they used to do is they would buy and return to the store, or they would sell it to [unintelligible].

Q. Oh privately, okay.

A. Yes. Because what they used to do, the only, the only reason why I know what they did is because they had me drive the car:

STATEMENT OF:    **Ariel Hernandez - VIA PHONE**
CASE NUMBER:    ████████████

Q.    Okay.

A.    And I know where I parked the car, and when I gave him back the keys the day before I found my dog hanging from the front door, with his head cut off.

Q.    And why is it that they killed her though, that is what I don't understand.

A.    Well they killed her in accordance with what Enrique said, because I overheard a conversation between Enrique and another individual that truthfully I didn't know who he was talking to, only that he made a phone call. Was that they were afraid that the girl would turn them in.

Q.    Oh.

A.    Because Francisco received, Francisco had a few problems, and Francisco came to me and he came to me to see if I could make a new I.D. for him. And since I am a, I am a designer on the computer, I write a program and I do everything, I told him no. The day that I told him no, the next day I found my dog dead with his head cut off.

Q.    And what do you think he wanted a new I.D. for.

A.    Well I imagine if he did what I think he did, it was to run from the police.

Q.    From the police.

A.    Yes but one thing that you don't understand I am, are you familiar with the religion known as Santeria?

Q.    Yes.

A.    Okay I am Papalao.

STATEMENT OF:      **Ariel Hernandez** - VIA PHONE
CASE NUMBER:

Q.    Okay.

A.    You know that Papalao has [unintelligible].

Q.    Yes.

A.    And Papalao only does good deeds.  A Papalao helps people when they are having difficult problems.  A Papalao is the highest level one can attain in the religion of Santeria.

Q.    Yes.

A.    It is to help people, and to help people who are in trouble.  And the last three or four days I have had wrapped up, I have been [unintelligible] to find justice.

Q.    The only thing that I still don't understand is why did they bring her up here to Alligator Alley, all the way from down there  I don't understand that. Because the car, you're gonna tell me that we found the car down there, why did they bring her all the way up here.

A.    Well if I tell you why remember this is all anonymous.

Q.    Certainly.  Well you said that you're not gonna be here anyway, in the country.

A.    I am not going to be here, I am leaving in twenty, in twenty minutes, when I finish with you I'll board my private plane and I'll go back to Columbia.

Q.    Okay.  And why is that, why is it then that they brought her here.

A.    They brought her up there because according to Francisco, Francisco has had, Francisco has a lot of skeletons in his closet.

STATEMENT OF:        **Ariel Hernandez - VIA PHONE**
CASE NUMBER:

Q.    Yes.

A.    Do you understand what I am saying with that?

Q.    Yes.

A.    Okay and he has always taken them to that location or further up. Because he thought that if he took her over there the crocodiles would eat her. When they would pick up her scent they would eat her up.

Q.    Yes. Of course. Well and her I.D.?

A.    Well her I.D. this is the thing, Francisco took her license and her I.D. card and he burned it. That's what Enrique told me.

Q.    Okay.

A.    Because Enrique told me, [unintelligible] they came, because I was in [unintelligible] this and that and the other. Because I was at the club that night.

Q.    Okay.

A.    But I left because my wife called me on my beeper that my eldest daughter was sick, and then she called me to come home. And I went home and I left the two of them over there.

Q.    And now tell me where do you think that they killed her.

A.    If I know Francisco, because Francisco before he was an importer for Pablo.

Q.    Yes.

A.    Pablo Escobar?

STATEMENT OF:    **Ariel Hernandez - VIA PHONE**
CASE NUMBER:

Q.    Oh yes I know the name.

A.    Okay.  Do you know the name Willie Facon?

Q.    Yes I know him also.

A.    Okay he was an importer.  When Willie Facon killed, sent his woman who
      got assaulted, it was Francisco who sent the boys, the little young guys to
      go and shot him, and this and that, that it took place in Coral Gables, that
      it took place in front of a store.

Q.    Yes.

A.    Okay?  That I can tell you about because I know because I was involved
      in that in that incident for one reason.  And I was the one that maintained
      an account of all of the transactions that they did.  Every time that any
      monies had to be paid off I was the one that wrote the check or went to
      the bank and withdrew the money.

Q.    Okay.  And now, but you still haven't told me where you think that they
      killed her.

A.    Well to tell you the truth if they killed her it had to have been in
      [unintelligible]

Q.    Where?

A.    In Ft. Lauderdale.

Q.    In Ft. Lauderdale?

A.    Yes.

Q.    Okay.  And who was it Enrique or Francisco.

STATEMENT OF:    **Ariel Hernandez - VIA PHONE**
CASE NUMBER: 

A.    To me I believe it was the two of them.

Q.    Which one?

A.    Both of them.

Q.    Both of them together?

A.    Yes.

Q.    Do you think that they did something else to her, besides killing her.

A.    Well they told me that they killed her.

Q.    But.

A.    They strangled her.

Q.    But they didn't do anything, abused her, or anything like that.

A.    Physically?

Q.    Yes.

A.    They told me no.  As far as that is concerned I couldn't tell you yes or no.
I know that they didn't abuse her physically.

Q.    But do you believe them if they told you no.

A.    Well I can tell you from my own experience in Columbia as far as
Francisco if they killed her they had to have threatened her.

Q.    But tell me what kind of, how, you knowing them how have they sexually
abuse other women in the past, sexually.

A.    Well they have put a gun to their head and they have told them to suck
their dick.  They have put them on their four and they have broken their
anus.

STATEMENT OF:    **Ariel Hernandez** - **VIA PHONE**
CASE NUMBER:

Q.    They have what?

A.    The anus.

Q.    And how how have they done that.

A.    Well they put everything in them, from bottles to walking stick, the dick, whatever.

Q.    Okay. And so they have done this before. And when.

A.    Well with the girls in Medellin and more so the girl from [unintelligible] Barranquilla. Because the girls from Barranquilla are very needy. All of the girls from there are, you know they don't have a lot of money, there is no money there in Barranquilla.

Q.    And which one of the two do you think did that.

A.    To me it was Francisco Santana.

Q.    Okay.

A.    Because he is the sickest one of the two. Because he has a collection of movies of.

Q.    Sexual?

A.    Well yes, and besides that I saw one of his sex movies that he had that they tied a girl, raped her, and then ran a razor over her eyes. And to me that was real bad. That's why I'm leaving the country. Since.

Q.    Tell me something.

A.    Since I have a lot of contacts, and a lot of political ties with many countries I can hide from them.

STATEMENT OF:        Ariel Hernandez - VIA PHONE
CASE NUMBER:         

Q.    Do you think that they drugged her so that she could not resist or anything.

A.    I believe so.

Q.    Did they talk about that.

A.    Well before they did that they other, the day before they asked me for two pills.

Q.    For what?

A.    They asked me if I could get them, a, a, well an order.

Q.    A what?

A.    An order from the pharmacy.

Q.    What kind of pill.

A.    One was Zantac.

Q.    Zantac.

A.    Uhu. No Zantac.

Q.    Xanax.

A.    Exactly that.

Q.    So you think that they gave her that to, so that she would not resist or anything.

A.    Well if they, to tell you the truth if they got her they got her in the parking lot of her job where she comes out.

STATEMENT OF:    **Ariel Hernandez - VIA PHONE**
CASE NUMBER:    ████████████        '.

Q.    But so how, but she was, she was able to fight, she knew how to defend

herself, so you think that they gave her some kind of drug so that she

would not fight and she would get more.

A.    Well I know that when she was in the club she was sitting, I was in the

club with both of them.

Q.    Yes.

A.    I was by the bar and the two of them were on the girl, and the girl was with

a guy.

Q.    Yes.

A.    And that guy when he saw, the girl saw Frank [unintelligible], the girl I

don't know she told the guy, and the guy gave some money to the security

person so that he would send that person somewhere else. Because the

girl was very nervous. And the only reason that I have why they did what

they did is because the girl was making money for them and they were

worried that they girl would turn them in.

Q.    Hey tell me did any of these guys have a cast on his arm? They were

telling me that.

A.    No neither one of them had an arm in a cast. The only one that had, well

no one had anything, no cast on their arm. The only one that I saw was

the guy that was sitting with her had, to me he had something on his hand

because I saw one of the guys from the club that he held his hand and he

did [unintelligible]. I was sitting by the entrance.

STATEMENT OF:    **Ariel Hernandez - VIA PHONE**
CASE NUMBER: 

Q.    But from what I've told you neither one of them had a cast on their arm.

A.    Neither one of them had their arm in a cast.

Q.    Very good.   Because some people were telling me that, there was someone with a cast on his arm but they were not sure if it was a person in the club or the person that.

A.    No no.  There was someone that had a problem with his hand, that I saw him that, but he didn't have a cast, what he had was a dish on.  And that guy left.

Q.    Okay.  He left.

A.    He left around five.

Q.    Okay before, before she left then.

A.    Well I imagine because I was there till five thirty.

Q.    Yes.

A.    I left, and they told me that they were gonna stay, and I left.

Q.    Okay when you left so then you didn't see if she left with one of them.

A.    Francisco was sitting, he was outside.

Q.    Waiting for her.

A.    Well I don't know.  I know when I went outside I saw Francisco outside, and Enrique was in the bathroom.

Q.    Okay.  Buy you didn't see if she left with one of them.

A.    I imagine yes.

STATEMENT OF:     **Ariel Hernandez - VIA PHONE**
CASE NUMBER:

Q.    Okay. But, well I need you to tell me if you saw one of them, this way I will know if I can start to look for these people, because they're telling me that they went back to Columbia [unintelligible].

A.    No, the thing is that I don't know if they went back to Columbia. What I am telling you is that I, I am leaving.

Q.    Oh so they could still be here then.

A.    They could still be here. If you want I can give you a list of the names that they could be using.

Q.    Okay give it to me.

A.    Wait a moment let me get my briefcase.

Q.    Okay.

A.    [pause]. Hello?

Q.    Yeah.

A.    Okay. One of the names that they could be using is I have it here, he is called Jeff Barney.

Q.    Jack?

A.    No Jeff, J-e-f-f.

Q.    Okay.

A.    Barney. And the other one, the other one I can say the first name but I don't know how to say the last.

Q.    What is it.

A.    It is Frank....from what I can read Tanoso or Tenoso.

STATEMENT OF:    **Ariel Hernandez - VIA PHONE**
CASE NUMBER:    ███████████

Q.    Okay. Okay.

A.    They can have a Peruvian or Colombian passport.

Q.    Okay. They don't have family here.

A.    No. They come here two month, two or three months out of the year to make money. Because what they do is make forged checks.

Q.    Another thing, they didn't tell you, Enrique didn't say what he did, she had like a back-pack where she had all of her things, you said that they burned her but they didn't tell you what they did with the back-pack, if they threw it away up there or.

A.    You want me to be, I am telling you the truth I don't know what they did with that.

Q.    No I am just asking you if they told you something about that.

A.    No, no, no, they didn't tell me anything about that.

Q.    There isn't anything else that you remember. What kind of vehicle did they transport her in, in what kind of car.

A.    Well I know that Frank had a Ford Explorer.

Q.    A Ford. Oh and that box would fit in the Ford Explorer.

A.    It was green.

Q.    Yes.

A.    With beige interior. The back cover [hood] was beige.

Q.    Okay. Are there more people involved with them with regard to the checks.

STATEMENT OF:          **Ariel Hernandez - VIA PHONE**
CASE NUMBER:

A.    Well the thing is that [unintelligible]

Q.    A what?

A.    An opinion..

Q.    Yes.

A.    There could be more than, I am calculating Francisco and Enrique were the main ones, the girl, and are two more girls that they used to make the changes, to return as money.    And they were making around two thousand to three thousand a day.

Q.    Not bad.  More than what I make.

A.    And me, well I don't have to make anything because my family left me money.  My family was political.

Q.    Oh yes?

A.    Yes.

Q.    Okay you don't have any idea, you told me that you think it was in Ft. Lauderdale that they killed her, but.

A.    It could be in Ft. Lauderdale or it could have been by the beach because I know that Francisco was saying that he rented a room, and he gave a guy some money to rent him a room.

Q.    Do what?

A.    Rent him the room.

Q.    Okay a room, okay.

STATEMENT OF:    **Ariel Hernandez - VIA PHONE**
CASE NUMBER:

A.    And the guy I don't know his name nor do I know anything about him. I know that, for sure knowing Francisco the way I know, Francisco must have given him two to three hundred dollars and said find me a room, and this and that.

Q.    To whom.

A.    I don't know to who.

Q.    Oh okay. So then you think that it may be a room by the beach here in Ft. Lauderdale, or could it be in Miami.

A.    It could be in several places, I couldn't tell you exactly where he went. I know that I was with them in the club that night.

Q.    Okay. There wasn't anyone else there that you know there at the club that may be able to help us?

A.    Well if you want I know that the guy that was, one of the guys that works as security, I know that the guy that she was sitting with, its that she seemed as if Francisco and Enrique, and he told her he told the bodyguard to take the, you know to remove the people from in front of her.

Q.    Oh. Oh he told the guard to move the people from in front.

A.    Well Francisco was in front of her, and Enrique was behind her. The guy was sitting down on a chair, and the girl sat next to him. Because he was looking at another dancer. And then when I was looking, because I was in front of the bar, I saw that they guy said something to the security guard, who was dressed in a suit, and he behind Francis and told him to leave.

STATEMENT OF:    **Ariel Hernandez - VIA PHONE**
CASE NUMBER:    

Q.    Oh okay I understand you.

A.    And then he went, and then the girl didn't feel good, by what I saw. and then the guy he went in front of Enrique and he told Enrique, and Enrique left. And then after that the guy left. The girl, also the girl it seems like she also left because when I turned around the girl wasn't there. Because I was paying for my bill.

Q.    Yes.

A.    And then as I was walking out I bought a pack of cigarettes, and then that is when my wife beeped me and he told me that my eldest daughter was sick. And then I left. And it was around five in the morning.

Q.    Tell me these people Francisco and Enrique have they done this to other girls, are there other people that they have killed that we know of.

A.    Well I know that there is a girl that disappeared from a club, it is called Miami Boat. And I know that they were [unintelligible] in that club.

Q.    They were in the club [unintelligible]

A.    I really couldn't tell you, [unintelligible].

Q.    Is that something recent or something from long ago.

A.    From long ago.

Q.    Okay. Listen I am losing you on the cellular because I am going far.

A.    Okay, okay, the pilot is telling me if we're leaving or not.

Q.    Huh?

A.    The pilot is telling if we're leaving or not.

STATEMENT OF:        **Ariel Hernandez - VIA PHONE**
CASE NUMBER:

Q.   Okay well look I'll see you because I am losing you on the cellular.  Okay?

A.   Okay.  What is your name.

Q.   Frank.

A.   Francisco?

Q.   Yes.

A.   And your telephone over there is 954-383-4104?

Q.   Yes.  That's the cellular.  The office is 321.

A.   Wait, wait, let me look for a pencil, what is the office.

Q.   321.

A.   321.

Q.   4210.

A.   4210?

Q.   Uhu.

A.   954?

Q.   Yes.  When you return, I am the only Francisco there, and when you
     return, if you return from Columbia call me.  Okay?

A.   Okay.  I told you that I am going [unintelligible] but I don't know if I am
     going over there.  The thing is [unintelligible].

Q.   Okay I can hardly hear you.  Okay?

A.   Okay look when I get to Columbia [unintelligible]

Q.   Okay.

A.   [unintelligible].

STATEMENT OF:    Ariel Hernandez - VIA PHONE
CASE NUMBER:    ▮▮▮▮▮▮▮▮

Q.   Okay.

A.   [unintelligible]

Q.   Thanks a lot.

A.   Okay.

Q.   Okay bye.  Alright I see you.

A.   [unintelligible] and they left me [unintelligible] with the dog.

Q.   Yes.

A.   [unintelligible] I know that when I lived over here [unintelligible] because there [unintelligible]

Q.   Yes.

A.   Because over there the best [unintelligible].

Q.   Yes.

A.   You know what [unintelligible] are, no?

Q.   What?

A.   Lomentisas.

Q.   No.

A.   [unintelligible]

Q.   The what?

A.   The Indians

Q.   Okay the Indians, yes.

A.   [unintelligible]

Q.   Uhu.  I am losing you buddy.

STATEMENT OF:      **Ariel Hernandez** - VIA PHONE
CASE NUMBER:

A.    Okay well you have all the information that I gave you.

Q.    Yes.

A.    Okay whatever other information that I have I'll call you in two or three days and I'll give you more.

Q.    Okay thanks a lot.

A.    Okay I should ask for you, no?

Q.    Yes. What, what is your name?

A.    I am not going to tell you.

Q.    Okay.

A.    Okay?

Q.    Alright, that's okay.

This conversation came in at approximately 2300 hours, of Saturday, March 27, 1999. The conversation ended at approximately 2325 hours, or correction 2320 hours of the same date. The conversation ori, the phone call originally went to the Metro Dade Police Department at their Homicide Division. They in turn transferred the call to my cellphone number at 383-4104.

**Translated/Transcribed by: Maritza M. Rodriguez**

**March 29, 1999**

CASE NUMBER: ████████████████

The foregoing statement of *Ariel Hernandez*

_____ pages *01* to *24* inclusive, is a true

and accurate translation/transcription of the taped sworn statement, conducted by

Detective *FRANK E. ILLARRAZa*_____ , CCN # *5844*.

Translated/Transcribed by: _____ ,

MARITZA M. RODRIGUEZ, CCN #4580

on *March 29, 1899*_____ .


STATE OF FLORIDA

COUNTY OF BROWARD

    The foregoing instrument was acknowledged before me this

_____ day of _____ , 199_____ , by: Maritza M. Rodriguez ,

who is personally known to me.


        (Seal)            _____
                          Notary Public's Signature


                          _____
                          Typed/Printed Name of Notary


                          _____
                          Title or Rank (if any)

Broward County Sheriff's Office
P.O. Box 9507
Fort Lauderdale, Florida 33310-9507


I, _____ Ariel HerNANDeZ _____ having been
informed of my constitutional right not to have a search made of the
premises herinafter mentioned without a search warrant and of my right
to refuse to consent such a search, hereby authorize Det. M. Kauman
and Agents of THE FBI Deputy Sheriffs of the Broward County Sheriff's
Office, Fort Lauderdale, Florida, to conduct a complete search of my
residence (and/or vehicle) located at 253 N/E 172 St. #203,
Sunny Isles. FBI FL 33160 _____

These Deputy Sheriffs are authorized by me to take from my residence (and/
or vehicle) any letters, papers, materials or other property which they
may desire.

This writter permission is being given by me to the above names Deputy
Sheriffs voluntarily and without threats or promises of any kind.

(Signed) X _____

03/20/99 @ 19:09 Hours

WITNESS: _____ 5782

_____ FBI

_____

BSO CRI - M # 1 (REV. 10/85`

ATTACHMENT B

Broward County Sheriff's Office
P.O. Box 9507
Fort Lauderdale, Florida 33310—9507


I, _____TAMMY BUBEL_____ having been

informed of my constitutional right not to have a search made of the

premises herinafter mentioned without a search warrant and of my right

to refuse to consent such a search, hereby authorize DET. M. KALLMANT

and AGENTS OF THE FBI AND Deputy Sheriffs of the Broward County Sheriff's

Office, Fort Lauderdale, Florida, to conduct a complete search of my

residence (and/or vehicle) located at _253 N/E 172 ST. #203_

_SUNNY ISLES BEACH, FL. 33160_

These Deputy Sheriffs are authorized by me to take from my residence (and/

or vehicle) any letters, papers, materials or other property which they

may desire.

This writter permission is being given by me to the above names Deputy

Sheriffs voluntarily and without threats or promises of any kind.

(Signed) X _Tammy Bubel_

03/28/99 @ 19:15 HOURS

WITNESS: _Detective M. Kallman 5782_

_SGT _____ 5747_


BSO CRI - M # 1 (REV. 10/85)

YOUR RIGHTS

SUBJECT: _Hir Ariel Hernandez_  PLACE: _2601 W. Broward Blvd_

INTERROGATING
OFFICER: _Det. Iconium_  DATE: _3/28/99 Sunday_

TIME: _10:55 Am_

_Ariel Hernandez_, Before I ask you any questions, I want to advise you of your rights under the law.  Do you understand that I am a Police Officer? _Yes AH_

You have the right to remain silent and refuse to answer any questions.  Do you understand? _Yes AH_

Anything you do say can and will be used against you in a court of law.  Do you understand? _Yes AH_

You have the right to speak to an attorney before speaking to the police and have an attorney present during questioning now or in the future.  Do you understand? _Yes AH_

If you cannot afford an attorney, one will be appointed for you before any questioning if you wish.  Do you understand? _Yes AH_

If you decide to answer questions now without an attorney present you will still have the right to stop answering at any time and speak to an attorney. Do you understand? _Yes AH_

Have you previously requested any law enforcement officer to allow you to speak to an attorney? _NO AH_

Knowing and understanding your rights as I have explained them to you, are you willing to answer my questions without an attorney present? _Yes AH_

I, _Ariel Hernandez_, have read this statement of my rights or have had it read to me and I understand what my rights are.  I am willing to make a statement and answer questions.  I do not wish an attorney at this time.  No threats or promises have been made to me.  No pressure of any kind has been used against me, nor have I been tricked or fooled into giving this statement.  I understand and know what I am doing.  This statement will be used in a court of law against me.

SIGNED: _Ariel Hernandez_

WITNESS: _Jeff Ole 5844_

WITNESS: _Valencia 4406_

DATE: _3/28/99_   TIME: _10:58_

BSO CRI-15 (REV. 7/89)

ATTACHMENT C

STATEMENT OF:   ARIEL HERNANDEZ



The following will be a sworn taped statement taken by Detective Frank Ilarraza of the Broward County Sheriff's Office. This'll be in reference to Broward Sheriff's Office Case # BS99-03-11083, which is the death investigation of one Jeanette Ann Smith, whose body was found on March 21st, 1999 at the 31 Mile Marker of State Road 84. Today's date is March 28th, 1999. The time now is approximately 4:05 p.m., according to my wrist watch. We're currently located at the Broward Sheriff's Office Investigators Division, where I will be taking a statement from a white male by the name of **Ariel Hernandez**. Also present for this statement is Detective Eli Thomasevich.

Q   Ariel, do you understand that I'm a police officer investigating this case?
A   (No response)

Q   As a police officer in the State of Florida, I have the authority to take sworn statements; therefore, everything you tell me must be the truth. Do you understand what the word perjury means? It means..
A   ..yes..

Q   ..you swear to tell the truth. If you lie your committing a crime. Would you raise your right hand? Do you swear to tell the truth, the whole truth, and nothing but the truth, so help you God?
A   Yes

Q   Okay, let the record reflect that Ariel Hernandez has raised his right hand..
A   ..yes..

Q   ..has raised his right hand and has been sworn in. Ariel, could you tell me your full name?
A   Ariel Armando Hernandez

Q   And what is your address?
A   Ah, right now it's ah 215-172nd Street, Apartment 203.

Q   Okay, and your date of birth?
A   7/10/65

Q   Okay Ariel, going back to this..well before we start, when we first met you..when we first got here, I'd gone over your rights and you signed the..you signed the Rights Waiver Form, is that correct?
A   Yes sir

Q   Okay. Now going back to ah when this happened, this girl. Ah, let's start off with Friday,

Gan                                  Page 1 of  22

ATTACHMENT D

STATEMENT OF:   ARIEL HERNANDEZ 

(Continued)  which woulda been the 19th...March 19th, Friday night.  Did you have an occasion to go to the Doll House?

A    I'm not a regular, or nothin like that.  I usually..you can ask the Manager, and I just..

Q    ..okay, but, but..

A    ..say·high and I walk out.

Q    Alright, but did you go there that night, looking...?

A    Yes, I went there that night looking for Charlie, who was the delivery for the restaurant and that disappeared with the delivery car.

Q    Okay, and what time did you go there?

A    Okay, I was a the Driftwood...I went to the Driftwood, after I..the..closed the restaurant, which was about 3:30.  I was at the Driftwood for about thirty minutes, forty-five minutes, trying to get information on where this guy was.  Somebody told me that he would be at the Doll House.  I called a cab and waited for the cab to show, and then the cab took me.

Q    Alright so you went...what time did you get to the Doll House?

A    I would say bout five.

Q    And that was the one at ah Sunny Isles one...

A    Yeah

Q    Okay, so you get to the Doll House, ah when you get there, did you see the girl Jeanette, the ..or was..

A    Not right away.

Q    Okay, did you...

A    ..ah..I went in, I said hi to the guys, cause "hey I haven't see you in years".

Q    Which guy?

A    Ah, Eric

Q    Eric, and what's his full..do you know his full name?

A    No, I just know him by Eric.

Q    And what does, what does he do?

A    He's ah one of the bouncers.

STATEMENT OF:   ARIEL HERNANDEZ



Q    Alright.  So you saw Eric and meet..greeted him.  Then what'd you do?

A    Then I saw a table and ah I sat by the table by the, by the entrance.  Ah, that girl Jeanette approached me cause there were two, two guys that were apparently they musta..they were annoying her or something.  She asked me if she could sit down wit..next to me.

Q    Have you ever seen her before there?

A    Never

Q    That was your first time that you saw her?  Okay, so she..you made..you made conversation wit her?

A    Yeah, I told..I asked who are these guys your boyfriend or..or somebody, and she goes, 'no, they just give me the creeps, so I gave Eric ten dollars and told him to tell the guys to please move somewhere else.  And then I ask her if she was thirsty.  She said yes.  She, she ordered a, a red wine, a glass of red wine, and I ordered a, a beer and a shot.

Q    Okay, did there come a time when ah she was ready to leave?

A    Well, she got up and left the table bout two, three times.

Q    Okay.

A    Ah, then she came back and she says, 'man, tonight sucks, I only made ah fifty dollars'.  So I said, "yeah, I know, it's pretty rough, ah..I used to be married to a dancer".  So, what I did, I gave her a hundred dollars.

Q    Okay, and then what happened?

A    And then she left and I left.  I saw Chris..well Chris was there.  She took..got off from the table to talk to Chris and then she came back and she was a a little bit chippier mood, you know, happier.  And then ah, she says, 'well I gotta go, cause I gotta, I gotta lot of things to do tomorrow and tonight sucks, I hardly made any money, and only the money you gave me'.  And then ah I said bye.  She went out the..she..I guess she went back to change, and then I went to the front, and Chris was already outside, taking two of the girls home and we talked, da.da..da..and then Eric was walking her out and then she called me over.

Q    Jeanette?

A    Yeah

Q    Okay.

A    And she was askin me what..what am I..what am I gonna do today, you know what am I doin, what are my plans.  I said, "well, I'm lookin for the guy who took off with the..the delivery car.  I'll probably stop and get something eat".  She says, 'oh, let's go..let's go to ah, let's go have breakfast', and then she goes, 'I don't know too much around this area.  Do

STATEMENT OF:   ARIEL HERNANDEZ 

(Continued)  you know any place where we can have breakfast'.  I say, "yeah, there's a Denny's right up the road".  And then we took off.  Ah, she said she was low on gas and I paid for her gas at the Shell Gas Station, and then from there we went to Denny's.  I had just coffee and she ah a breakfast.

Q       One more thing.  At, at  the club, you referred to her as Jeanette.  Do you know her stage name?

A       To tell you the truth, I didn't even know her name or her stage name.

Q       Okay.  Okay, so you go to the Shell Station and you go to Denny's, what happens after Denny's?

A       At Denny's we started talking and then that's when she...I asked her, "what's your name"?  Oh, my name is ah, ah Jeanette.  And I said...and then she goes, 'and what's your name'?  And I told her "Ariel".  She goes, 'oh, that's a pretty name..pretty..that's a girls name...what like the Little Mermaid?'  And we were just kiddin around, and then she was like goin like this and I gave her..with my hand, I just asked her to turn.  I just massaged the back of her neck.

Q       Now your indicating wit your ah left hand is it?

A       Uh huh

Q       ..okay that you massage..Ah, what's wrong with your right hand?

A       Ah, compound fracture of the fourth and fifth  marcupal, plus ah, there two stainless steel plates that broke and the bone separated and I have ah the plate and a couple of screws loose.

Q       So you can't really be able to use that hand, right?  And what...did you have..what'd you have on that hand at the time?

A       I had a brace.   I have a brace that I wear once in awhile when it gets..

Q       ..okay..

A       ..real, real painful.

Q       Alright, so after you leave Denny's ah whatta you guys..

A       ..at Denny's, is when she proposed..

Q       ..that you go somewhere?

A       Yeah

Q       Okay

A       She..again she asked me, 'listen, I really don't have that much to do.  I got to go home and

STATEMENT OF:   ARIEL HERNANDEZ



(Continued)    feed the cat, but my sister should be getting home, so she'll feed the cat...ah..ah, let's go to your place' and then you know, I thought she was jokin, and "yeah, what's it gonna cost me?", and she said, 'five hundred'. And I said, "five hundred". She said, 'yeah, but you can have me the whole day'. And then she..'besides I really need the money, I gotta make a car payment. I'm behind two months'.

Q    So how much did you give her?
A    I gave her five hundred.

Q    You had five hundred?
A    Oh, I had over a thousand dollars on me.

Q    Okay. So where'd you guys go?
A    Ah, we went to my room.

Q    And which..where, where was that at?
A    The Villager Lodge.

Q    In what room?
A    Ah, 121.

Q    121? And how long were..are you been stayin at that room?
A    I been staying in and out, in and out,  because the thing is, ah I got in a fight with my mother and hadda leave.

Q    Okay.
A    Cause I couldn't take it, so then I was there for..I lived actually in that room for about two weeks, but I was never there.

Q    Right.
A    Cause I had, I had court in Orlando. I was back and forth, back and forth.

Q    So you go into the ah..you get to the room. What happens when you go in..in the room? You in her car at that point, right?
A    Yes.

Q    Alright, so you get to the room, what happens?
A    Ah, she takes off her shoes and then she took off her clothes and she had like a little ah G-string thing on and ah she started ah..have a little radio and she put some music on. Started dancing..gave her the money. She kissed me. Ah, she goes let me give you a back rub. She

Gan                              Page 5 of  22

STATEMENT OF:   ARIEL HERNANDEZ    

(Continued) gave me a back rub and then it was my turn, and then I gave her a, a small back rub, and then during that process, she was already naked and I was still in my boxers.  I was partially naked, I only had my boxers left, and I was drinkin a wine cooler and she had this blue..a little..like a little baggy..

Q    Right

A    And there were two pills, blue capsules with ah number 42 ah 422, or 444, or it had a 4 and some 2's in it.  It was like four numbers in black lettering.  And ah, she said she had to go to the bathroom.  She went to the bathroom.  I guess to clean herself and then ah she asked me for my wine cooler, and she took the wine cooler ah I couldn't..I saw only one pill on the table, so I would imagine that she took it and she said 'taking your pill, you'll get more relaxed', cause she says I was, I was too tense.  And I told her, "how you not gonna..how am I not gonna be tense, the delivery guy took of with the fuckin..with the car".

Q  .  So then (?)

A    And then ah she said, 'I'll bet you haven't seen nobody do this before' and the bottle she was sitting like, like I am now, and she just got up and she went like that and she went..

Q    She sat..you motioned that she sat on the wine cooler?

A    On the bottle.

Q    Okay

A    And then she went to the bed and then she put..she was on her side with one leg up..

Q    ..when she..

A    ..and then she was playin with her, with her clit ..

Q    ..right..

A    ..and rubbing her, her anus and then ah she put two, three fingers in her butt, and then she grabbed the bottle and put it in, then she was masturbating.

Q    Put it in where?

A    In her anus.

Q    Put the bottle in there?

A    She was masturbating and I freaked out, I'd never seen a woman do that before and here I am, oh, five hundred bucks, I'm getting a freak show from hell here and then ah, she goes, 'here, I want you to fuck me while I play wid myself' and she was pinchin her nipples, ah grabbing my dick, ah just all kinds of things to get me aroused and she, she got on all fours, she told me to fuck her with the bottle and I pumped it like two or three times and then on

Gan                                Page 6 of  22

STATEMENT OF:   ARIEL HERNANDEZ



(Continued)   the last one, she went, 'ouch', she moved forward and when I pulled it out, there was shit and little bit of ah blood on the bottle. And she said, 'what are ya tryin to do, stick the whole thing up inside me', and I said, "you told me to fuck you with it, I don't know if it hurts or not. The way you were doin it before, it didn't seem like it was hurting you". And then ah, we went to have sex. Ah, she got on her back. I got on top and then I remember getting a condom. Ah, I put the condom in and then she told me to do her on the back in her anus, but with..with her on her back. And I really didn't want that, so we did it the, the traditional way. I went in her vagina and then it slipped out and she grabbed it and put it in her butt and then I was on top of her, holding with my hand on her chest..holding my weight, and all of a sudden I heard a like a real faintly..you know when you break a twig, like a (sound of a snap) and all of a sudden she went, "Uuugh, uugh" and she couldn't breathe.

Q    Now your holding your weight, how much do you weigh?
A    I weigh about 237.

Q    Okay, and you can't use your right hand, so all your weight is on your left hand?
A    On my left hand..on her like this.

Q    Okay, and your indicating round the neck area?
A    Right below the neck, like right here.  Like this.

Q    ...like..
A    ..cause I didn't want to choke her.  I was like this.

Q    Some..Something to fracture, I mean you would've had to have your, your  hand around the neck area?
A    But here..just like..just like that.

Q    Right below the neck area?
A    Right there like that.

Q    Alright.  Do you..can you see where your hand is?
A    Uh huh

Q    And now why is it that your hand is there, while your having sex wit her?
A    Because she had her legs up on, on top of my shoulders.  She was rolled over with her legs up on my shoulders and I'm kneeling down like..between her, and I'm tryin to hold on cause the bed cushion was real soft and I was..wobbling.

STATEMENT OF:   ARIEL HERNANDEZ 

Q    You were...
A    ..my penis kept slippin out, so I just leaned over with her legs on my..on my shoulders and I put my hand on her and started humpin away.

Q    Okay. So what happens when you hear her goin like that?
A    Ah, she gets up, uuugh..uugh. I told her relax, lay down. I figger maybe she choked on somethin, so I do in her mouth, try to open your mouth. She opens her mouth and I'm looking and I don't see nothin. All a sudden ah she went uugh..uugh and I didn't see..like she was hyperventilating and then she went uugh..uugh..uugh and then I didn't see no..no breathing. Right away I started giving her mouth-to-mouth. I blew three..three breaths into her and I saw that her chest was coming up, but it was from my..my air being put inside her and then ah I saw that she wasn't breathing. I checked her pulse. She had no pulse. So then I started doing compressions and I did about ten compressions, and...

Q    Going back to when your having sex wit her, is she struggling at all, is she moving around, or resisting?
A    No, she was grabbing the sheets.

Q    So she's not, she's not resisting? She's not struggling?
A    No, she grabbed the sheets and she was..she was a wild girl.

Q    Alright, so once she passes out ah, whattaya do wit her?
A    Well, I was giving her mouth-to-mouth..

Q    ..did you try to bring her into the bathtub?
A    Well, first I tried to give her mouth-to-mouth. Then I saw that that wasn't working and I did compressions. I checked her pulse and the..I didn't feel nothin so I said, well let me take her in the bathtub. So I grabbed her and dragged her into the bathtub. Laid her in the bathtub...

Q    Your, your indicating just with one hand?
A    Yeah, I grabbed her from the back, around her, her chest. So my arms were underneath..my left arm was under her left arm..

Q    Right.
A    Cupping her right arm under..under this..and I was pulling her in. And then I laid her on the bathtub...before I laid her on the bathtub, she slipped out of my hands and she hit the side of her face.

Q    So your indicating the side of face, she had banged it against?
A    Yeah..

Gan                              Page 8 of  22

STATEMENT OF:   ARIEL HERNANDEZ



Q    ..what the bathtub?
A    Ah, I could..I really wasn't payin attention, I was so worried about tryin to get her back.

Q    Right
A    ..that she coulda hit the floor, she coulda hit the thing, but then I..most likely she hit the floor, because there was ah..I hadda ta..towel..when you come out of the shower to step on..

Q    ..right..
A    ..and there was a little spot of blood on it.

Q    Right
A    So I figure she probably hit that side, and then I turned the cold water and turned it on and I saw that she wasn't breathin and she wasn't..nothing was happening, so I picked her up again and put her..took her to the bed.

Q    Was..was she bleeding at this time now?
A    There was blood in the bathtub.

Q    Okay
A    Not a..I mean, just like..

Q    ..normal amounts?
A    Yeah, like when you get cut?

Q    Right
A    And like when you get a cut on your finger and it drips a little bit, there was like a little drip of blood and then I saw a little bit of blood from the corner of her mouth, which I figure that's when she hit. She may have hit her teeth or somethin on it, and there was a little bit of blood.

Q    And your indicating the left side?
A    Yeah

Q    Okay. Now you take her outta there, whattaya do wit her?
A    I put her on the bed.

Q    Okay, and what'd you do?
A    Then I ran outside..theres..ta..ta see what I could do.

STATEMENT OF: ARIEL HERNANDEZ 

Q    ..alright..
A    ..to get some help and then I locked myself out.

Q    Alright, so what'd you do then?
A    I asked the..the housecleaning lady to let me in.

Q    How long did you stay outside though?
A    Not long. Three minutes..

Q    ..okay..
A    ..three minutes. And then I was gonna call 911, but being on probation and this and that, I freaked out.

Q    Alright, so you go back in again. The housekeeper let's you in?
A    Yeah

Q    What'd, what'd she look like?
A    The housekeeper was a short black girl

Q    Okay, so she lets in and you go in and whatta ya do then?
A    Ah, she was ah..she was on the bed and I wrapped her up left her on the bed.

Q    Alright, and do you make contact wid anybody, or does anybody call you, or what?
A    Ah, I called ah a friend of mine.

Q    Who's that?
A    Ah, Freddie

Q    Freddie? Know Freddie's last name?
A    Lazaro

Q    Okay, did you call im, or did he call you?
A    I called him. I beeped him and then he call..

Q    ..he..okay, you beeped im. What's his beeper number?
A    1-800-239-8947

Q    Okay, and then does he call you back?
A    Yeah, after awhile he called me back. I beeped him several times.

STATEMENT OF:   ARIEL HERNANDEZ 

Q    And when he calls you back, whatta you tell him?
A    I tell  him that I need to..to speak to him, that I have a situation.

Q    Okay.  You mentioned to us before that you had mentioned something to him about a detective, that you had a run in..?
A    Yeah, but that's..

Q    That was kind of a cue for him?
A    Yeah

Q    Okay, ah..
A    ..since there was a detective, he was goin by my Mom's house asking for me, but that was on a case pending in 97 for Office Depot, two bad checks.

Q    Okay.  So you toll him that ah you had a run in with a detective, now..
A    ..this and that..

Q    So what does he tell ya?
A    ..and since this..he, he, he  could let me keep one of the stereos.  I toll him that I had to get it outta there.

Q    Okay, so...?
A    But I had the..the stereo wasn't there.

Q    Right
A    Anyway I had the box.

Q    So you led him to believe that you had something there that you had to get rid of and what is it he tell ya?
A    Pardon me?

Q    What does he tell ya?
A    He says oh yeah, get rid of everything.

Q    No, no, no, what does he tell ya?  Does he tell ya he's gonna come over, or what?
A    He said he was gonna make a call and call a friend of his and see who..if he could help me out.

STATEMENT OF:   ARIEL HERNANDEZ 

Q    Okay, so you told me before that..something to the fact that he was gonna come over?  You know, stay there and I'll be right over?  Freddie.
A    No, no.  I beeped him and he said that he'll be right over.

Q    Right, I'm saying, he would be right over?
A    But he didn't come right over..

Q    ..okay..
A·    ..until like thirty, forty-five minutes.

Q    Okay right, but he did come over, right?
A    Yeah

Q    Okay, so when he comes over, what happens?  What does he do?
A    Nothin.  Ah, I toll him that I had, I had the..

Q    He comes into the room, right, and he sees what you got?
A    No, he never went into the room.

Q    Okay, so you toll him...
A    ..he was in the car.  He honked the horn and I came out.

Q    And what'd you tell him?
A    I toll him that there was a situation and ah, I need to get rid of this, this..the stereo.  I toll him take the stereo.  It was the only way I could hide it.  I didn't want him to know anything.

Q    You mean he doesn't know..he had..your trying to tell me that he doesn't that there was a dead girl in there, you had to get rid of her?
A    The only one who knows was Sonny, cause when I went, Sonny went with me to put it..well, once I made a little bed in the box and..you know, just out of respect..

Q    What'd you make the bed out of?
A    Towels

Q    Towels from the hotel?  Okay.  So, when does Sonny come over?
A    Ah, he came over in the late afternoon.  But, please don't ask me about the time, cause I wasn't thinkin...

Q    ..go ahead
A    ....at the time of lookin at clocks.

STATEMENT OF:   ARIEL HERNANDEZ 

Q    Do you know Sonny's last name?
A    No, I don't.

Q    Alright.  Who does Sonny ah work for?
A    Ah, Sonny works for ~~Jean~~ *King* International.

Q    Alright, is he related to Freddie?  Does, does he work for Fred?  Do work jobs for Freddie or?
A    Yeah, he handles some of Freddie's accounts.

Q    Okay.  So he comes over and whatta you and him do?
A    Ah, he helps me with the box, cause I only got one hand, and then in that process the box gave out.

Q    Before you put her in the box, whattaya do to her?
A    Oh, ah, the only way I could get her to fit in the box was I, I tied her arms and her legs and put her like in a fetal position inside the box.

Q    Okay, what'd you do to the box to try and conceal it?
A    Ah, I ripped the tags off and...

Q    Which tags did you rip off?
A    Two white tags.

Q    Okay, and what'd you do with...you said that the box was fo..ripped off, what'd you do at that point?
A    I re..retaped it.

Q    You retaped it.  Okay.  What'd you do with the box then?
A    It was put in the truck.

Q    Who's truck?
A    Ah Sonny's.

Q    Sonny's truck?  What kinda truck is it?
A    Ahm, a blue utility vehicle.

Q    Okay, and then what'd you..what happened?
A    I took the car, dropped it off at Collins and 88th.

Gan                              Page 13 of  22

STATEMENT OF:    ARIEL HERNANDEZ 

Q    Who's car?
A    Ah, the girls car.

Q    Okay.  Before you..did you take anything out of the car?
A    Yeah, her, her bags and stuff like that.

Q    Which bags?
A    A black bag that ah like a gym bag.

Q    Okay, and what else?
A    And another black bag and that was it.

Q    Okay, you indicated before..a backpack?
A    Yeah, it was like a backpack. A..

Q    Okay.  Alright, so you took..what'd you do with those items?
A    Ah, threw em on the other side of the, of the canal, or whatever.

Q    No, no, before we get there.  When you took em out of her car, where did you put them?
A    I put em in the truck.

Q    In the truck, okay.  So then you take the car down there, you toll us.  Okay, what happens when you..where do you drop the car off at?
A    On Collins and 88 Street.

Q    What type of neighborhood?
A    Ah, whatta ya call em ah Miami Shores?

Q    Okay, but was it in front of a house, (unintelligible)
A    Yeah, it was in front of a house that..one that was being manufactured.

Q    Okay, and how did you get out of the area?
A    I walked back to Collins and I called a cab from the pay phone.

Q    Which cab company did you call?
A    Well, I called Tropical, but a, a Yellow Cab came up.

Q    And where did they take you to?
A    Ah, to the restaurant.

STATEMENT OF:   ARIEL HERNANDEZ



Q    To the restaurant?  When you got to the restaurant, who was there?
A    Ah, Freddie was there.  Ah, I was there all..and then Sonny showed up.

Q    Okay, where was the ah truck with the body?
A    Ah, parked in the parking lot..the restaurant has immediate parking in the front and across from that park, there is more additional parking and it was parked right next to where one of the entrances is. Right there.

Q    Okay.  What happens then?
A    Ah, Loeble tells me to..whose ah..you know, I don't really know im that well or his last name, but I know he, he's a wiseguy.  He just told me, "no, listen, go dump it over here".

Q    Over here, where?
A    At ah the Everglades?

Q    Right.
ET   He said Alligator Alley?
A    Yeah

ET   Who told ya to do that?
A    Some guy named Joe

Q    Whatta they call him?  What do they call him?
A    They call him..his name Joe

Q    Where is he from?
A    Ah, Philly.

Q    Philadelphia?  Okay, has he just come down, or he..was he around for awhile?
A    He just came down.  He was there.  He was eating.

Q    Okay, is he friends wit ah Freddie?
A    I would imagine so, or he just a vis..you know he's a friend of Freddies.

Q    Alright, so who goes out to ah dispose of the body?
A    Ah, it was me.

Q    And who else?
A    Ah Sonny.

STATEMENT OF:   ARIEL HERNANDEZ 

Q    And Sonny?  Okay, anybody else?
A    Ah, Joe

Q    And Joe.  Okay, who's car did ya..it was still the truck?
A    Yeah

Q    Same truck, okay..so when you go out there, tell me what happens when you get out there to the Alley, Alligator Alley?
A    Ah, we parked.

Q    Did you go through the toll plaza?
A    I..to tell you the truth I couldn't remember..I, I was so tired and I was..

Q    Alright, so where, where did you park?
A    ..I was so..I, I..it was, to me it was such a bad..

Q    Alright, where did you park?
A    In one of the rest areas.

Q    Alright.  And what..what happens when you park in the rest area?  What did you do?
A    Ahm, back the, the truck to..next to the ramp..

Q    ..right..
A    ..and then ah..ah, Joe and me grabbed the box and put it in the water.

Q    Alright, you have one hand, did you grab it wi..how did you grab the box?
A    Like this and then I rested  the, the other part.

Q    Rest it on your hand?
A    On my forearm.

Q    Okay, where at in the water did you throw it?
A    On the side.

Q    Just threw it..tossed it on the side?
A    Well, I didn't toss it, I, I wanted to place it because..

Q    Okay, so you..did you..
A    ..out of respect.

STATEMENT OF:  **ARIEL HERNANDEZ** 

Q  Did you have to go down, or up, or..you just put..placed it on the waterline there?  Okay. What'd you guys do next?

A  Went back to the..to the restaurant.

Q  What happened to her belongings then?

A  Okay, on the way back, threw her ah belongings, we throw..we, we, meaning myself, you know cause I was in the company of two other people, we threw em in the ..on the opposite side.

Q  ..how did you get on the opposite side..

A  (Talking at same time, ?)  We had to go get gas, so we went up..drove up to the near..to a gas station that was off one of the things there.

Q  Oh, in the middle of the Alligator there?

A  Yeah

Q  Okay, so you went..

A  ..and then..

Q  ..to that gas station?

A  Yeah, and then we turned around and came back.

Q  Comin back on the Alley then, and then..

A  ..yeah, going..

Q  Eastbound?

A  ..ah east.

Q  Okay, in the same direction that you came from ?

A  Yeah

Q  Alright.

A  And then at another rest stop area..

Q  ..you stopped?

A  Yeah, and..

Q  Who tossed it out?

A  Ah, Joe threw a bag, or I handed it to im, and Joe threw a bag.

STATEMENT OF:   ARIEL HERNANDEZ

Q     What about..
A     (unintelligible)

Q     ..her identification?
A     Her I.D.'s and stuff like that?

Q     ..right, yeah.  What happened with that?
A     Probably got thrown in the garbage.

ET    Well, did it, or didn't it, because ..
A     ...yeah..

ET    ..there definitely missing.
A     Yeah, got thrown in the garbage.

ET    Who threw it in the garbage?
A     That's the thing I don't know, cause there was still like two...there was ah her purse was still
      in the truck.

Q     Now, there was a conversation last night that we had, me and you, where you called
      Metro/Dade Police Department and you had supposely information on this. Ah, when we
      were talking, you..Metro/Dade transferred you to me and I was talking to you on my cell
      phone.  Ah, you mentioned that her I.D's had been burned?
A     Yes.  They were, they were burned.

Q     Okay, who did that? Tell me about that?
A     Ah, her I.D's ..the..Joe burned the I.D's and he put em in a aluminum bucket and put lighter
      fluid,  and then  I.D's in some plastic..they turn into a big glob of like black tar.

Q     Okay, that was Joe did that?  Okay, now when you get back from Alligator Alley, you go
      back to the restaurant, you said?
A     Uh huh.

Q     Okay
A     Okay, and as soon as I got back there, I went, I went home.

Q     Was there any discussion of what was gonna happen if anybody came around asking, or like
      that?
A     Nope.  Nobody said nothing.

Gan                        Page 18 of  22

STATEMENT OF:   ARIEL HERNANDEZ



Q    Alright
A    I went straight home and then I lit a candle.

Q    Alright, but going back to the Sony box that she was placed in.  Where did that..those boxes come from?
A    Sharper Image

Q    Where is that at?
A    Sawgrass.

Q    And who bought that?
A    I did

Q    Okay, who was wit you when you bought that?
A    Ah, Freddie

Q    Freddie?  Anybody else?
A    No.  Wait a minute.  Freddie was there the first time, the second time was ah a guy named Tony.

Q    Tony?
A    Tony was wit me.

ET   Do you know who Tony is?  Full name?
A    I don't know what his full name..I just know Tony.

Q    Where's he from?
A    Ah, he's from Key West.

Q    Is he a friend of Freddie's?
A    Pardon me

Q    Is he a friend of Freddie's?
A    He used to be an employee.

Q    Of Freddie's?
A    Yeah

Q    At the restaurant?
A    Uh huh

STATEMENT OF:   ARIEL HERNANDEZ 

Q    Is he also into this ah you know..does he..does he still work with Freddie?
A    Uh uh

Q    Eli, you got any questions?
ET   You said you tried to clean up the ah apartment..you told us when we were talkin before we
     went on tape.  Did you actually try to clean up the apartment, or was that not true?
A    Ah, I, I just cleaned the phone, cleaned the tub and ah cleaned the chairs.

Q    You also were telling me before that you had seen it on the news the next day and you either
     got ahold of Freddie and told him that ah you..did you say something like that..that you seen,
     saw it on the news the next day?
A    No, when I saw it the next day on the news..

Q    ..right..
A    ..ah, that's when, when it hit that she really was gone and I flipped.  I just..

Q    You told me before that ah..was it six people knew about this?  And who are those?
A    Ah Sonny, Frankie, Joe, Tony, ah..

Q    You said Freddie before?
A    Yeah, but Freddie..would imagine woulda put it together.  You know, if he saw..if, if I told
     ....

Q    ...Well, Freddie knows about this, there's no doubt about that.  Right or wrong?
A    Well, I would imagine, yeah.  He went out there, if he saw the box, he knows that, that box
     was like.

Q    Is it because your afraid of Freddie at this point, that you just don't want to bring him into
     it?
A    Huh?

Q    Is it because that you afraid of Freddie that you kinda..it sounds like your minimizing it, is
     it because your afraid of im?
ET   Before we went on tape Ariel, and we discussed this, there was no question that Freddie
     knew about his.  Okay, you try to minimize it now because your worried about Freddie, or
     your afraid of Freddie?

Q    You told us that his only involvement was helping you after it happened, okay.
ET   I mean you told, also told us that Freddie gave you advice about getting rid of the body.
A    Uh huh

STATEMENT OF:  ARIEL HERNANDEZ 

| | |
|---|---|
| ET | Right? |
| A | Right.  Ah, there..yes I'm afraid. |

| | |
|---|---|
| ET | Are you afraid? |
| A | Yeah, because my girlfriend lives right behind the restaurant. |

| | |
|---|---|
| ET | Okay, but the truth of the matter is when you had that conversation.. |
| A | ..and any repre..repercussions when this goes public.. |

| | |
|---|---|
| ET | But the truth of the matter is, when we discussed it earlier, you said that when this happened, you called Freddie? |
| A | Yeah, but when I called him, I toll him.. |

| | |
|---|---|
| ET | ..you also.. |
| A | ..that I was in a situation. |

| | |
|---|---|
| ET | And you also said to Freddie, what should I do, is what you told me before? |
| A | Yeah.  I asked him..I got..I, I used the cover that the two detectives were.. |

| | |
|---|---|
| ET | Okay, but when Freddie came down to that ah hotel..motel..you toll me, you said, that you toll him what happened? |

TURNED TO SECOND SIDE OF TAPE

| | |
|---|---|
| ET | Cause you toll me earlier that you told Freddie about the girl dying and he said, Wow, and said you had to get rid of the body? |
| A | Yes |

| | |
|---|---|
| ET | Is that true? |
| A | Yes |

| | |
|---|---|
| ET | Okay |
| A | Just that I'm..I'm afraid because of my girlfriend. |

| | |
|---|---|
| ET | Okay.   Have you ah, have we treated you properly Ariel, I mean, we..? |
| A | You've been nothing but gentlemen. |

| | |
|---|---|
| Q | We let you use the bathroom? |
| A | You've been nothing but gentlemen. |

STATEMENT OF:   **ARIEL HERNANDEZ**   

Q    Alright.  Let the record reflect that this'll conclude at 4:35 hours of this date.

FD-302 (Rev. 10-6-95)

- 1 -

## FEDERAL BUREAU OF INVESTIGATION

Date of transcription    03/31/1999

On Sunday March 28, 1999 ARIEL ARMANDO HERNANDEZ was contacted at the Broward Sheriff's Office, (BSO), Public Safety Headquarters, 2601 West Broward Boulevard, Ft. Lauderdale, Florida 33312. Hernandez was being held on a warrant by the BSO in connection to the death of Jeanette Ann Smith, an employee of "Thee Dollhouse" (DH), Lounge located in Sunny Isles, Florida.

HERNANDEZ was provided with his "Advise of Rights" protections by the BSO upon his initial interview. HERNANDEZ was advised of the identities of Special Agents, (SAS), William Howe Grover and Terry L. Feisthammel of the Miami Offices of the Federal Bureau of Investigation, (FBI). Prior to interview of HERNANDEZ, the interviewing agents reminded HERNANDEZ of his waiver of rights by BSO, and was questioned as to his decision to continue these waivers. HERNANDEZ advised he understood his rights, and at 5:08 PM on 3/28/99, HERNANDEZ provided his signature next to a waiver of rights notation made on the interviewing agents debriefing sheet. Due to the circumstances and limited time frame for the interview, the below information is general in nature, and limited in scope to HERNANDEZ' knowledge of, and involvement in organized crime . in South Florida. HERNANDEZ was not questioned directly regarding the details of the Smith homicide.

HERNANDEZ provided the SAS his date of birth, 7/10/65; Place of Birth, Miami Florida; and Social Security Number, 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. HERNANDEZ advised he is a Cuban American and is currently residing with his girlfriend, TAMMY BUBEL, 251 172ND Street, Apt 203, Sunny Isles Beach, Florida.

HERNANDEZ said he currently is involved with members and associates of organized crime, (OC) that are part of the "JOHN GOTTI" family, or Gambino LCN family. These members/associates include Anthony Trentacosta, Fred Massaro, Bruce Chiusano, Mike Falco, and others who HERNANDEZ knows only by first names, or nick names. HERNANDEZ was shown and identified photographs of individuals as outlined below: (It is noted that frequently the first name is the only name by which HERNANDEZ knew the below listed individuals).

Investigation on    3/28/99    at Ft. Lauderdale, Florida

File #                                                         Date dictated  3/31/99

William Howe Grover

by    Terry L. Feisthammel

ATTACHMENT E

This document contains neither recommendations nor conclusions o    the FBI. It is the property of the FBI and is loaned to your agency;

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of ___Ariel Armando Hernandez___ , On _3/28/99_ , Page __2__

     "TONY PEP" - (photograph identified); ANTHONY TRENTACOSTA
identified as a "made" member of the Gambino family, who resides in
Atlanta and frequently travels to South Florida. HERNANDEZ said Pep
is very well connected, and recalls that he met with a "Federal
Judge" at the "Doral" in Miami Florida in April last year at the
"Italian of the Year Festival". HERNANDEZ says Pep is involved in
the Foreign Exchange marketing Room called "Trump", and other stock
and/or commodity businesses. HERNANDEZ added that he has seen
MASSARO on at least two occasions pay Pep large amounts of cash,
indicating with his fingers a thick "stack" of cash. Additionally
HERNANDEZ said he himself has given Pep merchandise to include
cigars, coffee makers, and a TV - (32" Phillips Magnavox).
HERNANDEZ said MASSARO got Pep an apartment to stay in near the
Turnberry Isles area of South Florida. HERNANDEZ says Pep has
stayed at the Radisson Hotel, Sunny Isles, Florida, and the Hilton
on Sunrise in Ft Lauderdale, Florida. HERNANDEZ said that John
Porcaro had put up Pep in an apartment at Turnberry Isles, (exact
address unknown) which HERNANDEZ has seen, and described as very
expensive.

     FRED MASSARO - (photograph identified) also known as
(aka) "ten percent Freddy" is a Gambino associate who reports to
"Tony Pep"; owns and operates the Beach Side Mario's restaurant,
(BSM), 17210 Collins Ave, Sunny Isles, Florida, and a "Father and
Son" Moving and Storage Company in Northern Florida; resides at
1499 Shoreline Way, Hallandale, Florida. HERNANDEZ said MASSARO and
he have been partners in a major counterfeiting check fraud scam
for several years. MASSARO operates out of BSM where Freddy meets
and directs his different crews which conduct his criminal
activities. HERNANDEZ advised that MASSARO has run a "small book"
out of BSM and has numerous loanshark loans out on the street.
MASSARO has several employees who assist in his business as
follows: Charlie (last name unknown - LNU) is a delivery guy, and a
"booster" who will shop lift, or steal items, especially beer from
stores they have targeted. HERNANDEZ related that MASSARO himself
has been caught stealing a $9.00 stuffed bear from a store. TONY
LNU is another "booster" and assistant who works out of BSM. BARRY
is a "booster" who recently was banned from BSM for getting into a
fight with another associate of MASSARO's. HERNANDEZ advised that
MASSARO's son, LOUIS MASSARO is also involved in petty larceny
schemes with his father. HERNANDEZ says Louis MASSARO lives in
Reston, Florida, has red hair, drives a Honda Acura, and is
involved in credit card scams and burglaries. HERNANDEZ advised
that MASSARO is currently attempting to sell BSM for $100,000.00 as
it is too "heated up". HERNANDEZ related that MASSARO recently got

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of ___Ariel Armando Hernandez_____ , On __3/28/99____ , Page ___3___

a tip from a "law enforcement" contact who said that they were being watched. HERNANDEZ said MASSARO's contacts include a female from the "Probation Department" (not further identified), and a lady clerk who currently works at the Broward Sheriff's Department. HERNANDEZ described this female who is also giving MASSARO information if "anybody is hot". HERNANDEZ described this female as heavy, reddish brown curly hair, possibly Italian decent, and has a daughter approximately 6-8 years old. HERNANDEZ said she formerly worked at the "Department of Corrections", and eats at BSM every week.

MIKE FALCO - (photograph identified) is a close associate to Fred Massaro, who resides at 6701 NW 169 Street, building/apt B#301, Miami, Florida;  owns and operates a boileroom-type business named "A-OK TRAVEL", 633 NE 167th Street, North Miami Beach, Florida. HERNANDEZ said Falco has a girl Debbie, LNU who works in his office and does a scam with credit cards. Debbie is described as approximately 5'5", 135 LBS, and has blond hair in a pony tail. FALCO also has a manager named David LNU, described as 34 years, 6'2" muscular, 240 LBS, uses steroids, and has brown/blonde hair. HERNANDEZ said David makes up batches of a liquid drug in quantities of 200-300 gallons which he sells on the street. HERNANDEZ does not know how it is made up, but has tried it, and said it will "screw you up". HERNANDEZ said this building is owned /operated by a former New York cop who had captured the "Son of Sam" killer. HERNANDEZ said FALCO has been connected with several television personalities to include Al Pacino, Dom Delouise, Connie Francis, and has bit parts in movies to include "Get Shorty". HERNANDEZ said FALCO has some form of cancer, and takes a strong pain medication as a result. HERNANDEZ said FALCO is related to former politician Geraldine Ferrao from New York.

JOHN PORCARO - (photograph identified) is the previous owner of the Father and Son moving company, Ft Lauderdale, Florida; and the "Trump" Corporation which is a foreign monetary exchange company. HERNANDEZ said Trump is another telemarketing business. Porcaro was a close associate to Massaro and Tony Pep. HERNANDEZ believes Porcaro has been killed by members or close associates of this Gambino organization.

"MARTIN" - (photograph identified) MARTIN SISKIND who is closely associated to Massaro, and operates a criminal rehabilitation and consulting business, (name and address unknown). HERNANDEZ said SISKIND works with a former black judge who retired as a result of the "court room case". HERNANDEZ said SISKIND is

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of ___Ariel Armando Hernandez_____ , On __3/28/99___ , Page ___4___

into all types of scams with MASSARO to include insurance scams;
"flipping numbers on vehicles, i.e. changing the VIN numbers of
stolen vehicles; and shylock loans. HERNANDEZ said SISKIND has
"connections" overseas, and is currently considering opening up an
escort service.

"JOHN" - (photograph identified) JOHN ROGAN identified
as the son-in-law to Massaro, or ROGAN is married to Massaro's
girlfriend's (Carol Mosher), daughter. HERNANDEZ says Massaro
indicated that he "trusts" ROGAN to do "work", i.e. contract
murder upon request. HERNANDEZ also knows John to be a "dealer" in
narcotics, (not further described). ROGAN currently is running a
club on West Dixie Highway called Wesley's Sports bar. HERNANDEZ
believes that ROGAN and his wife have separated.

MIKE BILOTTI - (photograph identified) is a former close
associate to Massaro who owned the Princess Beach Motel near 176th
Street and Collins Avenue, Sunny Isles, Florida. HERNANDEZ says
BILOTTI additionally was partners with Massaro, and subsequently
took over ownership of the "Party Girls Strip Club" on Biscayne
Blvd, Miami, Florida. HERNANDEZ said Massaro and BILOTTI had a
financial disagreement and no longer associate with one another.
BILOTTI believed MASSARO was robbing a percentage of the profits
from Party Girls through his, Massaro's, girlfriend, (Carol
Mosher), who worked there.

"JOE" - (photograph identified) JOSEPH SPITILERI who is
an associate of Massaro's who sets up and operates foreign monetary
exchange telemarketing scams. Massaro, Porcaro, and SPITILERI were
partners in the "Trump Corporation". Hernandez added that SPITILERI
was attempting to set up another business account with Mike Falco
but did not know the nature of this account. HERNANDEZ said
SPITILERI was "waiting for Ron (LNU) and his brother Paul (LNU)" in
order to proceed on this account.

KENNY DEFILLIPO - (photograph identified) a.k.a. "Vice
Commissioner" of North Miami Beach who is a close associate to
Massaro and Falco. DEFILLIPO is also the former owner of the
"CASINO" business located adjacent to Massaro's BSM, Sunny Isles,
Florida. HERNANDEZ said the machines located in the CASINO would
"payout" if you knew the right people. HERNANDEZ said DEFILLIPO
recently sold the CASINO to two brothers, (not further identified)
who are now selling drugs from this location. HERNANDEZ says that
DEFILLIPO owns a lounge called "The Jazz" and a computer store near
163rd Street, and 6th Avenue, N. Miami Beach, Florida.  DEFILLIPO

FD-302a (Rev. 10-6-95)



Continuation of FD-302 of ____Ariel Armando Hernandez____ , On _3/28/99_ , Page ___5___

now has almost 100 gambling machines in storage, and is "shaking down" numerous bars in the South Beach area in order to have them installed.

"BRUCE" - (photograph identified) BRUCE CHIUSANO who is the owner/operator of a check cashing store located on Dixie Highway, at the "Five Corners" area of Wilton Manors, Florida. Chiusano provides 90% of the names, and bank accounts for Hernandez and Massaro in their counterfeiting check operations.

Unknown male - (photograph identified) HERNANDEZ identified RICHARD GAZIE to be an individual who visits Massaro at BSM, and has discreet discussions during walks with MASSARO outside BSM.

HERNANDEZ provided the names of additional individuals and associates of this group whom are further described below. No photographs of these individuals were presented to, nor identified by HERNANDEZ.

HERNANDEZ advised MASSARO has a close associate named JOE LNU who is described as "an old wise guy", late 50's, 5/6", 150 lbs, stocky, large red and green tatoo on his forearm (which is very hairy), wears silver framed glasses and drives a silver Lincoln Town car. HERNANDEZ believes Joe lives in the Ft. Lauderdale, Florida area.

HERNANDEZ said MASSARO has another associate named "FRANKIE" LNU who HERNANDEZ described as a Cuban, approximately 40 years of age, bald head, prominent gold tooth, scar on his face, and lives with his wife and small daughter in an apartment close to Miami Lakes, Florida, phone number 305-698-1416. HERNANDEZ said FRANKIE is the "collector" and strong arm enforcer for any of MASSARO'S tasks. HERNANDEZ says MASSARO has shylock monies out on the street, and anyone who is late, or runs out on payments, FRANKIE will handle. HERNANDEZ says Frankie has a close associate who helps him on these collections named "CARLOS" (possibly FIGEROA). HERNANDEZ said CARLOS resides in the first apartment on the right of NE 143 Street, N. Miami Beach, Florida, (Memorial Apartments). HERNANDEZ said CARLOS drives a green Dodge Ram. HERNANDEZ said Carlos and Frankie were currently shaking down South Beach bars to put in casino gambling machines for the "vice mayor", KENNY DEFILLIPO. HERNANDEZ said both Frankie and Carlos "collect" or strong arm for MASSARO, BRUCE CHIUSANO, MIKE FALCO, AND DEFILLIPO. HERNANDEZ says that Frankie and Carlos take a piece of

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of _____ Ariel Armando Hernandez _____ .On 3/28/99 _____ .Page ___ 6

everything they collect for these above individuals. HERNANDEZ
added that MASSARO is associated with two "Colombian triggermen"
named FRANCISCO SANTANA, and ENRIQUE ESTEVES who do drug ripoffs.

HERNANDEZ named another associate of MASSARO's called
MIKE MONZER who owns the cell phone store called "LAZERSOUNDS", in
North Miami Beach, (Address not provided). MASSARO has a shylock
loan out to MONZER, and MONZER provides MASSARO with whatever cell
phones or beepers he needs. HERNANDEZ advised that MONZER was
supposed to have been deported from the United States, but through
MASSARO's connections he has been able to remain in the country.

HERNANDEZ described another associate of Massaro's named
"RICHIE" LNU who is described as an older associate from
Philadelphia, who chews fat cigars, and has gray hair. Richie has a
warehouse/moving company off of Ives Dairy Road, just West of I-95.

HERNANDEZ named another associate of MASSARO's, "PETE THE
GREEK". HERNANDEZ said he had met Pete in the Metropolitan
Correctional Center, (MCC), in Miami Florida in 1992. HERNANDEZ
said Pete owed him $6,500 from a previous deal, (not further
identified). HERNANDEZ said Pete got him, (HERNANDEZ) to attempt to
burn down the house of an attorney, Fred Haddad (PH) who had "made
a move" on Pete's wife. HERNANDEZ said that MASSARO is now
utilizing Pete's green Cadillac for his own vehicle in that Pete is
currently in jail. HERNANDEZ said Pete owed money to MASSARO, and
as a result told HERNANDEZ that he was keeping the vehicle.
HERNANDEZ advised that MASSARO and he, (HERNANDEZ) utilized this
vehicle to go "shopping" for merchandise purchased with
counterfeit checks he, (HERNANDEZ) made in Massaro's pizza shop.
HERNANDEZ also mentioned that Pete, MASSARO, and another associate
named ANTONIO BLACK, who operates a florist shop next to MASSARO'S
Pizza restaurant, joined him in a "drug ripoff" of an individual
about a year and a half ago. HERNANDEZ said a drug pusher was
selling coke in the area of Sunny Isles, Florida. MASSARO gave one
of his pistols to Antonio and the four of them drove over to his
apartment. Pete and MASSARO stayed in the car, (beige Toyota
Forerunner) while he, (HERNANDEZ) and Antonio went up to the drug
dealer's apartment. HERNANDEZ described the apartment location as
at the end unit apartment on the 2nd or 3rd floor of a rental
building in the "Eastern Shores" area of North Miami, Beach,
Florida. HERNANDEZ described how he went to the door as a pizza
delivery. When the dealer opened his apartment door, Antonio put
MASSARO'S stainless steel 38 revolver to the victim's head. They
subsequently robbed him of about $37,000.00. HERNANDEZ said almost

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of ___Ariel Armando Hernandez_____ , On _3/28/99_____ , Page ___7___

$10,000.00 of this money was counterfeit. HERNANDEZ said they all
split up the money. HERNANDEZ added that Antonio would also provide
MASSARO with account numbers from customers who used credit cards
or checks at his flower shop for his, (MASSARO's) counterfeit check
operation.


        HERNANDEZ described another of MASSAROS'S associates,
"Sonny" LNU who drove JEANETTE SMITH's body in a truck, from the
hotel back to MASSARO's restaurant on Saturday, 3/20/99. HERNANDEZ
was shown a photograph of ADAM TODD SILVERMAN, and identified this
individual as "Sonny". HERNANDEZ indicated he, HERNANDEZ, drove
Smith's car, while Sonny drove the truck.. HERNANDEZ further
described Sonny as working for the "King Corporation", and he was
putting a bus scam together with MASSARO where they buy
deteriorated vehicles to include trucks and motorcycles. At King
Corporation they refurbish them, and re-sell them to third world
countries at inflated prices.

        HERNANDEZ said that another associate of MASSARO's is a
Doctor Jeff Stuart who drives a green Jaguar, and has a pony tail
haircut. HERNANDEZ says Stuart works in the Mt Sinai Hospital, and
will write prescriptions for MASSARO's associates in addition to
providing alibi's for him, (HERNANDEZ), (not further described).

        HERNANDEZ said Massaro was also close with a Gambino
associate, "Jr Abbandando", who was formerly partners with him in
the "Party Girls" strip club on Biscayne Blvd in Miami, Florida.
HERNANDEZ said when "Jr" was killed by the brother of the "guy that
washed up on Haulover beach", MASSARO took over the whole strip
club. HERNANDEZ advised that he, HERNANDEZ, overheard a
conversation several years ago between MASSARO and JOE LNU
(described above with the forearm tatoo) at the Princess Beach
Hotel, (currently torn down) in Sunny Isles, Florida. This
conversation was in the second floor lounge area of this hotel.
Present during this conversation was Tony Pep, Joseph SPITILERI,
and "Pete the Greek". HERNANDEZ recalled MASSARO bragging to Joe
LNU saying "remember when we were on the boat with an axe, and
hacked up his body". HERNANDEZ said he believed this referred to
the body that washed up on the beach. HERNANDEZ said MASSARO
subsequently became partners in the Party Girls lounge with a
MICHAEL BILOTTI, the owner of the Princess Beach Hotel. MASSARO and
BILOTTI broke up this partnership, and BILOTTI took over MASSARO's
interest in Party Girls.

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of    __Ariel Armando Hernandez_____ , On _3/28/99_____ , Page ___8___

     HERNANDEZ advises that these Gambino crew members and associates meet at several different locations in the South Florida area. HERNANDEZ outlined them as follows: Dominic's Italian Restaurant, Hollywood, Florida; Guzzo's Mexican Restaurant, Hallandale Beach Blvd, and Federal Highway, Hallandale, Florida; an unnamed restaurant on Biscayne Blvd and 156 Street, North Miami, Florida; Rascal House, 172nd Street and Collins Ave, Sunny Isles, Florida. HERNANDEZ specifically recalled a meeting or sit-down in September of 1998. HERNANDEZ said he drove Tony Pep, and FRED MASSARO up to what he recalls as a major eastbound highway off of Interstate 95, through the city of Pompano, Beach, Florida. They drove to an Italian restaurant which looked like a "village cottage", beige with brown trim, approximately two to three blocks from the ocean. At this meeting Tony Pep met a "wise guy" described as a big fat, bald-headed guy.

     HERNANDEZ said he joined the above group or "crew" as an associate because he has the reputation of being an "earner", or one who is capable of making a lot of money for the Gambino crime family. HERNANDEZ advised he initially became acquainted with these individuals in approximately November of 1997 when he started making counterfeit identifications,(IDs) and driver's licenses. HERNANDEZ said he is an expert with the use of computers, which he utilizes to make these counterfeit documents. HERNANDEZ said he utilizes the "MIPPS Versa Checks Computer program" in order to accomplish his counterfeiting projects. HERNANDEZ admitted to making false IDs for various people from the states of Texas, Georgia, Mississippi, and Washington, D.C. HERNANDEZ said that because of his talent in counterfeiting, "everyone wanted a piece of me".

     HERNANDEZ advised on the previous Tuesday, (3/23/99), MASSARO had taken him to a Florida Drivers License Bureau in order to obtain a real Florida drivers license made out in a fictitious name. HERNANDEZ advised this fake license is currently located in a personal wallet located at his residence. HERNANDEZ said this contact at the Florida Bureau was obtained through another "wise guy" associate of MASSARO's described as "JOE FLOWERS" (LNU). HERNANDEZ describes JOE LNU as a "made" guy supported from conversations with Bruce Chiusano and Mike Falco. HERNANDEZ said JOE FLOWERS drives a red corvette, and wears a large gold medallion around his neck. HERNANDEZ said he has met this individual on two occasions. The first occasion was approximately 3 weeks ago at a Miami Subs restaurant on Commercial Boulevard, and the second time was on Tuesday (3/23/99) at the Drivers License Bureau located west

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of ___Ariel Armando Hernandez___ , On _3/28/99_ , Page ___9___

on Oakland Park Blvd, (exact address not provided). On this
occasion he was told to go inside and see the "black girl" at the
counter. HERNANDEZ received his photograph and license in a very
few minutes, and left the Bureau.

HERNANDEZ said before he was a part of this Gambino
group, he initially met and associated with the following
individuals: GIOVIANNI (last name unknown - LNU) who introduced him
to BRUCE CHIUSANO, the owner of a check cashing store, located near
the "five corners area" of Dixie Highway, Wilton Manors, Florida.
HERNANDEZ said this store is located next to the "ESTRELLA"
Insurance Agency, South of a Winn Dixie, or Publix Food store on
Dixie Highway. HERNANDEZ described GIOVANNI as a white male; 34
years of age; black hair; sharp dresser; drives a Porsche.
HERNANDEZ believes GIOVANNI is currently in jail charged with
telemarketing fraud. HERNANDEZ said he became acquainted with
GIOVANNI when he, GIOVANNI, would bring checks to be cashed from
his boileroom operations. HERNANDEZ became involved with CHIUSANO
after he, (HERNANDEZ) bounced a $6,500.00 check at his,
(CHIUSANO's) store. MIKE FALCO, (described above), came after him,
as a "collector", and took him back to CHIUSANO. HERNANDEZ said at
the time CHIUSANO was operating a small postal/mail box business
out of the RK Arcade Plaza near Aventura, Florida, (exact address
not given). CHIUSANO told HERNANDEZ he could became partners in
their counterfeiting scams in order to work off his $6,500.00 debt.

HERNANDEZ, subsequently became more involved with FRED
MASSARO, MIKE FALCO and their associates. HERNANDEZ said while he
initially worked with CHIUSANO, he lived at FRED MASSARO's
residence. 1499 Shoreline Way, Hallandale, Florida. HERNANDEZ said
MASSARO lives with his girlfriend, named CAROL MOSHER who is from
the Philippine Islands. HERNANDEZ says MASSARO claimed to have 40
acres in the Philippines where he could hide out if the need arose.

HERNANDEZ said he later was part owner of a business
named "Primos Pizza", (PP) located on Biscayne Blvd, near 137th
Street, North Miami, Florida. HERNANDEZ said he owned PP with PETER
ROUSSONICOLAS, aka, "Pete the Greek". HERNANDEZ said he had a
female, (not further described) who was working in an adjacent
check cashing store in the same strip mall as PP. HERNANDEZ said he
would counterfeit checks, and get this female to cash them for a
10% kickback. HERNANDEZ said the girl was discovered and fired for
this scam.

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of ___Ariel Armando Hernandez___ , On _3/28/99_ , Page __10__

      HERNANDEZ said approximately a year ago several Florida State Lottery boiler rooms were being operated in South Florida. HERNANDEZ listed the approximate locations for these boileroom as follows: (1) Collins Avenue and 170th Street, Sunny Isles Florida; (2) Oakland Park Boulevard, and Federal Highway, Ft. Lauderdale, Florida; (3) Oakland Park and 15th Ave, Ft. Lauderdale, Florida. HERNANDEZ said that Gambino associate, Anthony Truglia and his mother, (not identified) operated the daily operations of the Sunny Isles Lottery Room. HERNANDEZ said other partners in this scam were Steve Duluca, Tony Pep, John Porcaro, and Ronnie LNU. HERNANDEZ said Duluca's father owns the "Casa Deluca" Restaurant/lounge in Pompano Beach, Florida.

      (HERNANDEZ added that Deluca was involved originally in a "Medicaid Fraud" scam in 1993 where he, Deluca was giving HERNANDEZ $1,000.00 for every bank account he opened up. HERNANDEZ indicated that Deluca would write up false claims and use these accounts in this scam).

      HERNANDEZ advised during this period he would obtain the names, addresses, and bank account information from the telemarketing rooms. When the victim callers provided this information to obtain chances at the Florida State Lotteries, it would enable him to counterfeit the victim's checks with their account numbers. He and Massaro would cash several checks in a short period of time; over-billing the accounts. Additionally HERNANDEZ advised from these counterfeit checks, he supplied all of the boiler-rooms with office furniture and supplies, in order to set them up and operate them.

      HERNANDEZ said after the lottery rooms were raided and shut down, several of the above Gambino associates switched to the Foreign Monetary Exchange telemarketing scams where they sold to "investors" or victims "trade options" in the "Japanese Yen". HERNANDEZ said that John Porcaro set up one of these telemarketing operations named "Trump" Corporation, (not further identified). HERNANDEZ said the "Trump Corporation" was shut down after Porcaro disappeared, and was reopened under the name "Sheffield Group". HERNANDEZ advised Porcaro reportedly lost almost 1.8 Million on his investment through Trump, and was deeply in debt to "investors" who helped set up the Trump operation. HERNANDEZ said Porcaro had taken a large shylock loan out from Bruce Chiusano in order to set up TRUMP.

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of ___Ariel Armando Hernandez___ , On _3/28/99_ , Page __11__

     HERNANDEZ added that Chiusano puts out numerous shylock loans on the street from his check cashing store, but only for large loans. Chiusano did not deal in any small amounts of money. HERNANDEZ said he was able to get a small $1,500.00 shylock loan from Chiusano because Massaro obtained it for him from Chiusano. HERNANDEZ advised he paid $45.00 per week on this loan.

     HERNANDEZ said Porcaro attempted to set up a large cocaine deal to recuperate his large losses at Trump. HERNANDEZ said Tony Pep was against this drug deal being set up by Porcaro. HERNANDEZ said approximately one week before Porcaro disappeared he, Porcaro, called HERNANDEZ to put in an order for two "Nokia" cell phones, and one Panasonic 19" TV for his offices at Trump. HERNANDEZ recalled he saw Porcaro on the Friday before he disappeared on Sunday in early summer of 1998. Two days later, on Sunday, Massaro called HERNANDEZ and told him Porcaro was missing, and that he probably was on a "binge" with "hookers". Massaro told HERNANDEZ to accompany him to look for Porcaro's vehicle. Massaro told Hernandez that Porcaro's wife, Filomena Porcaro, had told him, (Massaro), that John Porcaro had called her indicating that he was flying over to the Bahamas in order to go fishing. On Sunday, Massaro and Hernandez drove to the Ft Lauderdale airport parking garage. They circled the first floor of the garage, and on the second floor of the garage Massaro spotted Porcaro's vehicle. HERNANDEZ believed that Massaro knew exactly where the car was located. Massaro had a key to the vehicle which Porcaro's wife had given to him, and they searched the vehicle. HERNANDEZ said Porcaro's wallet and cell phone were on the car seat. Hernandez said Porcaro's 24 carat gold plated 38 pistol in an ankle holster was in the center console pocket of the vehicle, and his "Gucci" designer briefcase (beige with squares) was found in his trunk. Massaro took possession of all these items. HERNANDEZ added that he later removed Porcaro's weapon from Massaro's house, and it is currently in the possession of his, HERNANDEZ's brother, Richard HERNANDEZ. HERNANDEZ indicated he has left instructions for his brother to bring it to the authorities.

     HERNANDEZ said they returned to Porcaro's house with his vehicle. Filomena Porcaro said her husband had left all of his jewelry at the house before he left on this recent trip. HERNANDEZ said this included Porcaro's favorite black onyx ring, encircled with diamonds. HERNANDEZ said Massaro subsequently took over Porcaro's interests in Father and Son Storage, (FS), and was trying to help out Filomena with expenses. HERNANDEZ indicated that Massaro has run FS since Porcaro's disappearance and has attempted

FD-302a (Rev. 10-6-95)



Continuation of FD-302 of _____Ariel Armando Hernandez_____ , On 3/28/99 , Page __12__

to get the "Zimmerman brothers" interested in the Father and Son Moving and Storage business for reasons unknown to HERNANDEZ.

HERNANDEZ said that Tony Pep "put on an act", and made a big show of trying to "look for" John Porcaro after his disappearance. HERNANDEZ said on one occasion, not long after Porcaro was missing, he, Massaro, Tony Pep, and Martin SISKIND were in the Rascal House Deli/Restaurant on 172nd Street, and Collins Avenue, Sunny Isles, Florida. HERNANDEZ said the discussion concerned the whereabouts of Porcaro. Tony Pep became irate at SISKIND; picked up a knife from the table, grabbed SISKIND by the necktie, and threatened to stab him. When Massaro attempted to intervene, Tony Pep grabbed Massaro by the throat, screaming and threatening him regarding Porcaro's disappearance. HERNANDEZ said he believes Porcaro's disappearance is a murder caused by Tony Pep and Massaro. HERNANDEZ said that Tony Pep's concern over Porcaro's disappearance was "fake", and that Massaro has told him and others that Porcaro is "gone".

HERNANDEZ advised Massaro has a number of pistols which he will carry on occasions when he goes to "meetings he is worried about". HERNANDEZ says MASSARO carries the pistols in an ankle holster, or under the seat of his car. HERNANDEZ says Massaro has a 45 cal, 38 cal, and a 32 cal pistol. Massaro also has several silencers which he, Massaro has asked him, (HERNANDEZ), to adapt to these pistols. HERNANDEZ says Massaro wanted him to work on these pistols tomorrow, 3/29/99 to have the silencers put on the weapons. HERNANDEZ says MASSARO either keeps these weapons in a safe in his house, or in the "fourth cabinet over the stove in his kitchen".

HERNANDEZ described the counterfeiting bank check operation he ran with Massaro as follows: HERNANDEZ described his skill of using a computer to create counterfeit checks. HERNANDEZ described his Compaq Computer with a 15" screen; "233 MHZ; 6.0 Gig hard drive; 512K memory; and a MMK-6 processor".HERNANDEZ said he has used this computer for about two years to process these checks. HERNANDEZ said he started making the counterfeit checks at Massaro's house, and then moved his operation to the Hotel Village Lodge near 157th Street and Collins Ave, Sunny Isles Florida. HERNANDEZ said MASSARO has a close contact in this hotel named "JUDY LNU. HERNANDEZ said he and MASSARO would provide her with numerous items and merchandise for her hotel. In return Judy gave preferred rates for rooms that MASSARO would use for merchandise storage, and for his other associates who would need a place to stay. HERNANDEZ said he recently had purchased a fax machine,

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of    Ariel Armando Hernandez                . On 3/28/99        . Page    13

coffee machine, television, kitchen supplies, and a time clock for
Judy at her hotel. HERNANDEZ said he actually moved his computer
counterfeiting operation to MASSARO's restaurant, (BSM), 17210
Collins Ave, Sunny Isles Florida in December of 1998. HERNANDEZ
said he put the computer on a table in plain view in the back area
of BSM, and would print up the checks on a daily basis. HERNANDEZ
said he would print up about 12 checks a day which would average in
amounts between $400.00 and $2,500.00. HERNANDEZ estimated on a
good month they could net 30 - 40 thousand dollars or close to a
half a million dollars a year. HERNANDEZ said he and MASSARO split
everything 50/50, and we sold all the items we purchased with the
checks at 50% of their face value. HERNANDEZ said he was to buy
MASSARO's daughter's, (ERICA MASSARO) wedding champagne with these
counterfeit checks. HERNANDEZ said he and MASSARO would get
numerous "orders" from different associates of Massaro for
expensive equipment to include electronics, and other merchandise.
HERNANDEZ said all of these items would be purchased through their
counterfeiting check scam. HERNANDEZ said they would counterfeit
the checks using the names and accounts provided by CHIUSANO and
others, and then go out and "shop" for the merchandise. HERNANDEZ
said in some instances their purchases would be "returned" to the
store after several days for a full cash refund which they then
split. HERNANDEZ indicated MASSARO had several crews or teams which
would carry out these purchases and returns. HERNANDEZ said MASSARO
stores large quantities of merchandise in a 40 foot trailer
somewhere in Hollywood, Florida, (location unknown to HERNANDEZ);
and also somewhere in the Jacksonville, Florida area, (location
unknown to HERNANDEZ). HERNANDEZ bragged they had purchased two
motorcycles from the "Super Bike Company", 163rd Street and Dixie
Highway, a "shark" jet ski, and a new Lexus vehicle from fictitious
names and accounts set up from credit cards and counterfeit checks.

        HERNANDEZ bragged he also could counterfeit licenses and
social security cards using his computer, and mentioned the names
of MICHAEL GALOLETTA, JAMES WAGNER and ANTHONY GRAZIANO as people
who were connected to this scheme.

        HERNANDEZ provided the following fictitious names of
companies he utilized when he created the counterfeit checks:

        TWO JAYS RESTAURANT
        TELEPHONE TAKE-OUT AND DINE
        FAIRLANE ENTERPRISE
        CORE MARINA
        AVW BUILDERS

FD-302a (Rev. 10-6-95)



Continuation of FD-302 of ___Ariel Armando Hernandez___ , On _3/28/99_ , Page _14_

          ABC DRYWALLERS
          FARM STORE
          PRO PREMIUM INSURANCE
          ALEXANDER INSURANCE

     HERNANDEZ advised that he and MASSARO have a routine of
"shopping" with these bad checks where they will visit different
stores to purchase these expensive items. The main stores and/or
their franchises which would be targets are as follows:

          SPORTS AUTHORITY,
          OFFICE DEPOT,
          OFFICE MAX,
          BED, BATH, AND BEYOND,
          SHARPER IMAGE,
          TJ MAX,
          SERVICE MERCHANDISE,
          MACY'S,
          MARY KAY JEWELRY,
          FRANKLIN MINT,
          SAN FRANCISCO MUSIC BOX,
          JOHNSON AND MURPHY SHOES.

     HERNANDEZ advised that he created these counterfeit
checks using several banks as the account holders, but that the
large percentage were drawn on the Nations and Barnett bank
accounts. HERNANDEZ said other banks he utilized were "Union
Planters", "Washington Mutual", and "NCMB". HERNANDEZ said the main
clearing agent for the bad checks was the "Equi-Fax" Corporation in
Houston, Texas. HERNANDEZ said this company was the largest in the
United States, and were the ultimate loser who would have to make
good on the checks. When asked, HERNANDEZ said MASSARO did handle
some of the checks after he, (HERNANDEZ), had printed them off the
computer. HERNANDEZ said MASSARO was interested in the quality of
the checks.

     HERNANDEZ described the disposal of the body of
JEANETTE SMITH on Saturday evening, 3/20/99. HERNANDEZ said he was
"crying" and a nervous wreck over her death. MASSARO made him
accompany him, along with his, (MASSARO's) associate JOE LNU
(previously described above with a tatoo on his forearm) when the
body was dropped off in the Everglades. HERNANDEZ said during the
afternoon of Saturday, 3/20/99, after he and MASSARO went shopping
for merchandise using counterfeit checks, they transported SMITH's





U.S. Departmr    of Justice

*United States Attorney*
*Southern District of Florida*

500 East Broward Boulevard, Suite 700
Fort Lauderdale, FL 33394-3002
Telephone: (954) 356-7392
Facsimile: (954) 356-7230

April 2, 1999

Jerry Velazquez, Esq.
840 W. 49th St.
Suite 100
Hialeah, Miami, Florida 33012

Re: Ariel Hernandez

Dear Mr. Velazquez:

This letter is intended to set forth the ground rules governing the debriefing of your client, Ariel Hernandez. It is understood by all the parties that he must be completely truthful during the course of this interview. The purpose of this interview is to permit our office to evaluate the quality and quantity of the evidence your client wishes to provide. No other promises have been made by the United States Attorney's office and/or the Federal Bureau of Investigation other than those expressly set forth below.

It is also understood that no statements made by your client during the course of his interview will be used <u>directly</u> against him, however, any federal, state or local law enforcement agency may make derivative use of and may pursue any investigative leads suggested by his statements and/or information provided by him during the interview and may use any evidence so developed against him and/or other persons.

Furthermore, in the event that your client is a witness at any official proceeding for any party and offers testimony materially different from any statement or other information provided during the interview, any federal, state or federal prosecutor may cross-examine your client concerning the statements and/or information provided during the interview.

Moreover, should your client willfully make materially false

ATTACHMENT F

)

statements or information, any such statement or information can be used against him in a subsequent prosecution. In addition, your client may be subject to prosecution for any and all appropriate federal criminal violations in connection with making false statements, or giving false testimony and/or information, including but not limited to perjury, making a false statement to a government agency and obstruction of justice.

The government makes no other promises or assurances to you other than those set forth in this agreement.

Very truly yours,

THOMAS E. SCOTT
UNITED STATES ATTORNEY

BY: _____
J. BRIAN McCORMICK
CHIEF, ORGANIZED CRIME SECTION

I have read the above to my client, Ariel Hernandez. I am satisfied that he understands and agrees with the contents of this letter.

_____
JERRY VELAZQUEZ, ESQ.

I have read the above and understand and agree to the conditions set forth in this letter.

_____
ARIEL HERNANDEZ

FD-302 (Rev. 10-6-95)

*AUSA copy*

- 1 -

## FEDERAL BUREAU OF INVESTIGATION

Date of transcription _____10/17/2000_____

On Thursday April 8, 1999, ARIEL ARMANDO HERNANDEZ was contacted at the Broward Sheriff's Office, (BSO), Public Safety Headquarters, 2601 West Broward Boulevard, Ft. Lauderdale, Florida 33312. HERNANDEZ was being held on a warrant served by the BSO in connection to the death of JEANETTE ANN SMITH, an employee of "THEE DOLLHOUSE" (DH) lounge, located in Sunny Isles, Florida. HERNANDEZ requested the interview as arranged by his attorney who was present, JERRY VELAZQUEZ, Palm Springs Center, Suite 100, 1840 West 49th Street, Hialeah, Florida 33012. HERNANDEZ provided information as outlined below which included and expanded previous information from his original interview conducted on Sunday March 28, 1999. It is noted that HERNANDEZ knows several of MASSARO's associates only by their first name or nickname. HERNANDEZ has previously identified several of these associates by their complete names from photographs during his original interview on March 28, 1999.

HERNANDEZ was again advised of the identities of the interviewing agents, (SAS) William Howe Grover and Terry L. Feisthammel of the Federal Bureau of Investigation, (FBI). HERNANDEZ provided further information concerning FRED MASSARO, MASSARO's associates, and an illegal counterfeit check scam they operated out of MASSARO's business named BEACHSIDE MARIO's (BSM), located in Sunny Isles, Florida.

HERNANDEZ advised that MASSARO was connected to organized crime through an individual known to him as TONY PEP who would frequently visit MASSARO at BSM. HERNANDEZ said that he himself gave TONY PEP $1,000.00 on one occasion and then gave him several items or merchandise which he had purchased using counterfeit checks. HERNANDEZ said MASSARO paid for TONY PEP's rental cars, and rented his hotel room for him when he came to Florida. HERNANDEZ said TONY PEP was given monies to spend at the race track, (not further detailed).

HERNANDEZ described another older "wise guy" connection of MASSARO's who resembled TONY PEP but only "beefier" who resides in Hollywood. HERNANDEZ further described this individual as the driver of a white Lincoln Town car, and who sells Pizza ovens on West Dixie Highway.

---

Investigation on _____4/8/99_____ at _Ft. Lauderdale, Fla_____

File # ██████████████_____    Date dictated _____10/17/00_____

by William Howe Grover
   Terry L. Feisthammel

This document contains neither recommendations nor conclu it and its contents are not to be distributed outside your ag(   of the FBI and is loaned to your agency;

ATTACHMENT G

FD-302a (Rev. 10-6-95)



Continuation of FD-302 of    ARIEL ARMANDO HERNANDEZ    , On 4/8/99 , Page 2

       HERNANDEZ said another associate of MASSARO's and TONY
PEP's was an individual named JOHN PORCARO. HERNANDEZ said PORCARO
disappeared in June 1998 and two days later MASSARO was attempting
to take over his telemarketing business named TRUMP, (not further
described). HERNANDEZ said MASSARO knew exactly where to locate
PORCARO's vehicle at the airport and MASSARO recovered PORCARO's
gun described as a Smith and Wesson 24 carat gold plated pistol
with an ankle holster. HERNANDEZ said he retrieved PORCARO's
weapon from MASSARO and gave it to his brother, RICHARD HERNANDEZ.
HERNANDEZ said he knew that PORCARO had a large mortgage on his
house, and that his wife Philomena, (PH - PHONETIC) was now running
their moving business called FATHER and SON, (FS). HERNANDEZ said
he thinks that PORCARO was killed and subsequently cremated.
HERNANDEZ said TONY PEP hired a private investigator to look into
PORCARO's disappearance but the investigator had little success.
HERNANDEZ said he has overheard MASSARO and TONY PEP discussing an
individual named "FAT ANDY".

       HERNANDEZ said MASSARO was involved with or had interests
in several telemarketing businesses which were a scam. HERNANDEZ
advised one of these business involved the selling of vacation
packages for $395.00. HERNANDEZ recalled one business, NATIONWIDE
TRAVEL run by a STEVE KILOWALSKIE (PH) located off of Commercial
Boulevard, (exact location unknown). Another scam was operated by
MASSARO's associate MIKE FALCO at the business named A-OK Travel.
HERNANDEZ said many of his counterfeit checks were used to make A-
OK travel business operational.

       HERNANDEZ described another MASSARO associate as MARTY
SISKIND who resides behind a Walgreens store in Sunny Isles,
Florida. HERNANDEZ said SISKIND ran an escort service and was into
several scams. HERNANDEZ said SISKIND is closely associated with a
former Judge by the name of PHIL DAVIS. HERNANDEZ said he used the
name of SISKIND's business and it's address on several of his
counterfeit checks. HERNANDEZ said MASSARO doesn't trust SISKIND
anymore in that several of their business deals had gone bad.

       HERNANDEZ said he originally met JEANETTE SMITH when he
was introduced to her by a local drug dealer from the Sunny Isles
area named CHRIS LNU (last name unknown) who usually sold cocaine
and steroids. HERNANDEZ said CHRIS' phone number is listed in his
planner notebook. HERNANDEZ said CHRIS LNU is an associate of
MASSARO's and also of ANTONIO LNU who operates a flower shop close
to MASSARO's business. CHRIS reportedly is close with another drug

FD-302a (Rev. 10-6-95)



Continuation of FD-302 of    ARIEL ARMANDO HERNANDEZ    , On  4/8/99  , Page  3

dealer named RONNIE LNU who specializes in distributing the drug GHB in the Sunny Isles area. HERNANDEZ said RONNIE LNU resides in an apartment complex west of I-95 in Miami, Florida, (exact address unknown). HERNANDEZ said RONNIE was making GHB with the Russians in 55 gallon drums. CHRIS usually can be located at a small bar, (name not provided) near the PARTY GIRLS strip club located on Biscayne Boulevard in North Miami Beach. Additionally CHRIS hangs out at a bar named BILLY's BAR, located on 137th and Biscayne Boulevard, North Miami Beach, Florida.

HERNANDEZ said SMITH assisted in the counterfeit check scheme he operated by making returns on items which were purchased with the counterfeit checks. HERNANDEZ also said he had given her blank counterfeit checks so she could purchase items which would later be returned for the cash. HERNANDEZ said SMITH had taken a "sheet" of blank checks from him because she had been late on her car payment in the amount of $496.00 per month and her "rent" in the amount of $975.00 per month. HERNANDEZ said he attempted to keep an accounting of the checks as he made them on the computer; but in fact there were checks he had left all over BSM. HERNANDEZ said he also had left these counterfeit checks in the side pockets of MASSARO's green Cadillac. HERNANDEZ indicated he was able to make the counterfeit checks from legitimate account numbers MASSARO was able to obtain from BRUCE LNU who operated a check cashing store. HERNANDEZ described how he would print out the checks on his computer, place a real or a fake company name on the check with a phone number, and after checking the stolen account numbers for sufficient funds, place these legitimate account numbers on the counterfeit checks.

HERNANDEZ also said MASSARO obtained legitimate account numbers from another of his associates named RICHIE LNU who operated an auto body shop near Miami Gardens Drive and Dixie highway, North Miami Beach, Florida. HERNANDEZ described RICHIE LNU as approximate age 50's, 250 - 260lbs, 6' 6", grey hair, and was on some type of probation. HERNANDEZ said RICHIE LNU would deal in stolen auto parts and RICHIE would place orders for auto parts with HERNANDEZ. HERNANDEZ said he purchased the ordered items from auto parts stores with the counterfeit checks and resold them to RICHIE LNU. HERNANDEZ said he also purchased two computers for RICHIE LNU one of which RICHIE kept in his auto body shop and one RICHIE gave to his daughter.

HERNANDEZ described another associate of MASSARO's as SONNY LNU who was partners with MASSARO in a mailbox and shipping

FD-302a (Rev. 10-6-95)



Continuation of FD-302 of    ARIEL ARMANDO HERNANDEZ    , On  4/8/99    , Page    4

business called "PLACE, PACK, and SHIP" located near a "Walmart
store" on Hallandale Beach Boulevard, (exact address not provided).
HERNANDEZ said MASSARO had an account in an unknown bank across the
street from this business. HERNANDEZ said SONNY LNU accepted two
counterfeit checks and an amount of cash totaling $10,000.00 as it
related to this business. HERNANDEZ said SONNY and MASSARO had a
deal, (not further described) but it involved the "KING" business
where SONNY worked in Miami. HERNANDEZ further described SONNY as
the person to see for strip club contacts intimating that SONNY
knew a lot of the local strippers. HERNANDEZ said SONNY once dated
a stripper from the Las Olas area of Ft. Lauderdale, Florida who
subsequently had committed suicide. HERNANDEZ said SONNY also
deals in stolen credit cards, (not further detailed).

     HERNANDEZ provided the following telephone numbers for
two other MASSARO associates as FRANKIE (GOLDTOOTH) LNU 698-1416,
and CARLOS LNU 895-6731.

     HERNANDEZ advised that on Wednesday, March 17th, 1999,
after midnight he was reviewing his computer records and realized
that approximately nine (9) counterfeit checks were missing.
HERNANDEZ recalled several of the checks missing were those
written on the following companies:

          (1)   ART STUDIO GRAPHIC GROUP
          (2)   PALM COAST VEAL
          (3)   FAIRLANE ENTERTAINMENT

     HERNANDEZ recalled that the name "JADE" was listed next
to these checks along with the names of FRANKIE and CHARLIE.
HERNANDEZ advised MASSARO regarding the missing checks and he
indicated he would take care of it. HERNANDEZ said he was
concerned about the missing checks because he gets a commission for
each check he prints out, and also he received 60% of the cash
received from returns which are made.

     HERNANDEZ related that during the afternoon on the
Thursday before SMITH was killed; he, MASSARO, and MASSARO's
associate JOE LNU who had tattoos on his arm, TONY LNU and CHARLIE
LNU who both lived with MASSARO, all went shopping using the
counterfeit checks he had made. HERNANDEZ recalled they went to the
Office Depot located on Route 441 and Sunrise Boulevard, Ft.
Lauderdale and also to the Office Depot located on Sheridan
Boulevard just West of I-95. They additionally went to the Pep Boys
store located on University Boulevard and I-595, and the Pep Boys

FD-302a (Rev. 10-6-95)



Continuation of FD-302 of    ARIEL ARMANDO HERNANDEZ _____ , On 4/8/99 _____ , Page ___ 5 ___

located on Commercial boulevard, (exact locations not provided).
HERNANDEZ said MASSARO would operate two crews who would make these
purchases using the counterfeit checks.  HERNANDEZ described a blue
Mazda Navajo truck with a CB antennae and equipped with a chrome
step-up running board which was a vehicle they used during these
purchases. HERNANDEZ said they all made purchases that day and the
following day they made the returns for cash of these items which
had been purchased from these stores.  HERNANDEZ said MASSARO had
him alter the receipts with a bleach mixture in order to change the
date of the purchases.  HERNANDEZ said he changed the dates on
these receipts to read seven or ten days later than the actual date
of the purchase.  HERNANDEZ said he changed the date in order to be
eligible to receive a cash refund before the store realized the
checks were fraudulent.

        HERNANDEZ said on Friday night, (MARCH 19th), before
SMITH was killed, MASSARO called a meeting at the RASCAL HOUSE
restaurant located across the street from BSM in Sunny Isles,
Florida.  HERNANDEZ said he was there in addition to CHARLIE LNU,
TONY LNU, FRANKIE LNU, JOE with the tattoos, MASSARO's brother in
law, (name unknown) and sister in law, (name unknown).  MASSARO
told everyone at the meeting that they were "under observation" by the
authorities.  HERNANDEZ said MASSARO had a connection with the
INTERAMERICAN car rental company who supplied MASSARO with
information regarding law enforcement.  MASSARO told him,
HERNANDEZ, to remove the computer from BSM which he used to make
the counterfeit checks.  HERNANDEZ said he was driven to his hotel
in Sunny Isles, Florida in order to move numerous items purchased
with these counterfeit checks. HERNANDEZ recalled moving four fax
machines, a GE microwave, another stereo, numerous radar detectors,
vehicle carburetors, and manifolds.  HERNANDEZ said they were going
to do returns with these items the following day. HERNANDEZ said at
around 10:00 PM JOE LNU who had helped him load these items
departed the hotel.

        HERNANDEZ said JUDY LNU, the owner of the hotel where he
was residing drove him back to BSM. HERNANDEZ said JUDY LNU was a
close associate of MASSARO's.  HERNANDEZ said JUDY gave him the
hotel room in return for items he had bought for her with the
counterfeit checks.  HERNANDEZ recalled he had purchased for JUDY a
fax machine and a TV which she was using in her hotel. HERNANDEZ
said he moved into JUDY's hotel approximately two days prior to the
Super Bowl in 1999. HERNANDEZ said he acted like a tourist when he
went out and bought merchandise with the counterfeit checks and
then he stored them in his hotel room.

FD-302a (Rev. 10-6-95)



Continuation of FD-302 of    ARIEL ARMANDO HERNANDEZ    , On   4/8/99   , Page   6

HERNANDEZ said when he returned to BSM that evening,
MASSARO and he discussed the missing checks and MASSARO wanted to
know where they were. HERNANDEZ recalled seeing on his computer
the name "JADE" or "FADE" who had made several purchases and some
returns regarding the counterfeit checks. HERNANDEZ said he needed
to keep track of which checks were outstanding. HERNANDEZ recalled
he had heard her name mentioned by SONNY LNU who he described as a
"pill popper". HERNANDEZ said he went to locate CHARLIE across the
street in the "Driftwood" bar but CHARLIE was drunk and didn't know
anything about the missing checks. HERNANDEZ said he called from a
payphone to CHRIS LNU who said he, CHRIS, was going to the
DOLLHOUSE and maybe they could locate "JADE" there. HERNANDEZ said
he got PAULIE LNU, the bartender at the Driftwood lounge to order
him a cab which he then took over to the DH in Sunny Isles,
Florida.

HERNANDEZ said when he arrived at the DH he paid a ten
dollars cover charge and saw the DH bouncer ERIC LNU whom he
greeted. HERNANDEZ said he sat at the bar and had a drink.
HERNANDEZ said he then recognized two Colombians, ENRIQUE LNU and
FRANCISCO LNU as they came into the DH. HERNANDEZ described them
as strong arm "collectors" and "beaters" who would intimidate
people or make collections on their outstanding debts. HERNANDEZ
said he heard the dancer announced as "JADE" and saw her come to
the stage area. HERNANDEZ called her over and bought a $20.00 tee
shirt from her which he gave to the doorman. HERNANDEZ got her to
sit down just inside the VIP room and introduced himself.
HERNANDEZ said he told her he knew what she was doing by stealing
the checks. HERNANDEZ told her MASSARO and his associates were
irate over the checks and were looking for her. HERNANDEZ told her
to admit the theft of the checks and he would cover for her.
HERNANDEZ said she finished her drink and started to get up when
FRANCISCO LNU came in the VIP area and stared at her. HERNANDEZ
said she was scared and FRANCISCO started to move closer when
HERNANDEZ called ERIC over and told him to keep FRANCISCO away from
them. ERIC took FRANCISCO out and she agreed to have another red
wine with him. JADE then returned to the stage and HERNANDEZ said
he got $100.00 in one dollar bills and gave them to JADE. HERNANDEZ
gave her another $100.00 and she again came and joined him at the
table. HERNANDEZ said he told JADE that he knew the people she was
involved with, and she in fact had reason to be afraid of them. .
JADE admitted to him that she had taken three checks. JADE said she
had been behind on her car payments, her apartment rental payments
and needed the cash. JADE told HERNANDEZ that she lived in Ft.
Lauderdale, Florida. HERNANDEZ told her that she was jeopardizing

▐▬▬▬▬▬▬▬▬

Continuation of FD-302 of ___ARIEL ARMANDO HERNANDEZ_____ , On _4/8/99_____ , Page ___7___

herself and us. JADE then gave HERNANDEZ the three checks and
HERNANDEZ said he took them out to the rear of the DH and burned
the checks on the ground. HERNANDEZ recalled one check she had
given him as one written on the company name of ART STUDIO GRAPHIC
GROUP INC, with a Hollywood address and phone number of 954-706-
1129. Additionally HERNANDEZ said she also had two car payment
checks made out and one rent check filled out. When HERNANDEZ
returned inside he saw ENRIQUE LNU and was going to confront him in
defense of JADE. JADE told him to not make a scene in the DH and
he instead had ERIC tell ENRIQUE to leave the DH. HERNANDEZ said
at approximately 5:00 AM JADE asked him to take her out for
breakfast. ERIC walked her and HERNANDEZ to her car which he
recalled was a black Mazda. They ate at a Denny's restaurant on
Collins Avenue next to a Walgreens Store. HERNANDEZ recalled they
were waited on by a black waitress with a blonde wig. They stopped
for gas and she was going to drop me off at my hotel.

     HERNANDEZ said she was still very afraid of ENRIQUE and
FRANCISCO so he told her she could stay awhile in his room in case
they were still looking for her. HERNANDEZ recalled the time was
approximately 6:30 AM - 7:00 AM and they talked in his hotel room
for about two hours. HERNANDEZ said JADE told him that she had to
do returns for MASSARO but she was still afraid. HERNANDEZ said he
would move her car from the immediate area so that FRANCISCO and
ENRIQUE wouldn't recognize it and further threaten her. JADE told
him she had to call her sister and he left the hotel room to move
her car to the DAYS INN located two blocks North. HERNANDEZ said
he also was getting them some cokes to drink. HERNANDEZ said as he
was returning to the hotel room he saw ENRIQUE and FRANCISCO as
they were departing the area in a green and tan Ford Explorer with
a Florida registration. HERNANDEZ recalled the license plate he
saw on their vehicle with the partial identification as XT 9.
HERNANDEZ recalled the time was about 12:00 noon. HERNANDEZ said
the door to his hotel room was locked and he went to get a hotel
cleaning lady whom he described as very small and she let him into
the room.

     HERNANDEZ said as he entered the room he saw JADE wrapped
in a blanket with a belt wrapped around her neck. HERNANDEZ said
he heard her gasp and release air from her lungs. HERNANDEZ said
he attempted to give her mouth to mouth resuscitation and started
doing compressions on her chest. He then carried/dragged her to
the hotel room bathtub and when he was lifting her into the
bathtub, he slipped and her face hit the tub.

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of     ARIEL ARMANDO HERNANDEZ            , On  4/8/99        , Page    8

      HERNANDEZ said he was extremely upset and immediately beeped FRED MASSARO. HERNANDEZ said MASSARO called him and then said he would call from a payphone. HERNANDEZ said MASSARO called him approximately twenty minutes later at around 12:00 Noon. HERNANDEZ told MASSARO that he had a situation where he had to get rid of a package. HERNANDEZ said MASSARO told him to go to a payphone and call him on his cell phone at 954-224-7512. HERNANDEZ called MASSARO back and told him "there's a package here and we need to get rid of it". MASSARO told him he would get back with him. HERNANDEZ said he waited for about two hours and attempted to clean up the blood from the floor and to get rid of her clothes and shoes in a dumpster. HERNANDEZ said he found a bottle and a spatula with human feces on them in addition to finding feces on the floor. HERNANDEZ described seeing blood in her vagina and bruises on her face.

      HERNANDEZ said MASSARO finally arrived in his green Cadillac and provided a stereo box to put her body into. HERNANDEZ said he broke the foam which was part of the stereo box. HERNANDEZ said he told MASSARO the girl was JADE but MASSARO didn't seem excited, and was not nervous about the whole incident. HERNANDEZ indicated he, HERNANDEZ, was a religious "Bolero" (PH - phonetic)which allowed him to have the ability to talk to the dead with a stick. HERNANDEZ said he was very nervous and upset over the whole incident. MASSARO told HERNANDEZ to collect all the item receipts and remove them from his room.

      HERNANDEZ said MASSARO called his pizza business, (BSM) and spoke to his cook, PETE LNU, regarding food supplies he needed. HERNANDEZ described other people who worked at BSM for MASSARO as TONY LNU who lived at MASSARO's residence, a new kid named JOEY LNU who was from Canada and looked like an Italian, and a girl named SHERRY LNU who MASSARO had helped to obtain an attorney from Ft Lauderdale, Florida named JEFF LNU. MASSARO told HERNANDEZ he, MASSARO, had called another of his associates named SONNY LNU who had a truck they could use to remove the body. HERNANDEZ and MASSARO return to BSM and waited for SONNY to bring the truck. SONNY LNU was 45 minutes late. HERNANDEZ said he and SONNY returned to his hotel room to remove the body. HERNANDEZ said when they were loading the stereo box containing JADE's body into the rear of the truck the box broke apart. HERNANDEZ was worried about SONNY's reaction to realizing they were moving a body. SONNY told HERNANDEZ "don't worry it is not my first time". HERNANDEZ said he drove JADE's car while SONNY followed him over to the area of Collins and 88th Street, Miami, Florida. HERNANDEZ said it was a

FD-302a (Rev. 10-6-95)



Continuation of FD-302 of    ARIEL ARMANDO HERNANDEZ _____ , On __4/8/99__ , Page ___9___

dead end street and he parked her car. HERNANDEZ recalled SONNY
called MASSARO from his cell phone. HERNANDEZ recalled SONNY's
cell phone number as 366 or 383 - 5646. MASSARO directed them to
use the blue shop towels located in the truck to wipe the car clean
of any fingerprints. HERNANDEZ said he did this and he and SONNY
removed articles from her car. HERNANDEZ recalled removing from her
car a wallet, a black Adidas gym bag, a purse, and a black 14" to
16" by 5" zippered case covered with decals and metallic reflective
stickers. HERNANDEZ said SONNY took this case with him.

        HERNANDEZ said they returned to BSM after stopping and
buying some beer. HERNANDEZ said he was extremely upset over this
incident and SONNY gave him some pills from his suitcase to take.
HERNANDEZ said it was approximately 8:30 PM when he, MASSARO and
SONNY conversed next to the pay phones located outside of the
CASINO CLUB adjacent to BSM. HERNANDEZ asked MASSARO who was
responsible for this murder and MASSARO just smiled. HERNANDEZ
said MASSARO threatened SONNY to keep his mouth shut or he would
stick him, SONNY, in a TV box. HERNANDEZ indicated to MASSARO that
it was FRANCISCO and ENRIQUE who murdered the girl. MASSARO told
HERNANDEZ to calm down and sit outside BSM while he, MASSARO, made
some calls from inside. MASSARO then told SONNY to take the El
Camino home and to wait for a call from him. HERNANDEZ said SONNY
lives in the Ocean Towers located across from the hotel where he
had been residing in Sunny Isles, Florida. MASSARO told HERNANDEZ
that JOE LNU was on the way to BSM. HERNANDEZ described MASSARO's
close associate JOE LNU as 5'7", 160-175 lbs, heavy Italian accent,
white/gray hair pulled back in a "fluff" who resides in the Ft.
Lauderdale, Florida area. HERNANDEZ said they had to wait 45
minutes for JOE LNU to arrive and HERNANDEZ was extremely upset
over the whole affair especially when a local police unit came and
parked right next to the truck containing JADE's body. HERNANDEZ
said JOE LNU arrived in a silver Lincoln Continental and was
wearing blue jeans, white sneakers, a white tennis shirt, silver
metallic rimmed glasses, a pinky ring, and possibly a Rolex watch.
HERNANDEZ recalled JOE had hairy arms and a red and green tattoo on
his forearm. HERNANDEZ said he recalled that JOE LNU once had a
small thin mustache.

        MASSARO gave HERNANDEZ the keys to drive the truck and
rode in the front passenger seat with JOE LNU seated in the back.
HERNANDEZ recalled the time was approximately 9:00 PM when they
finally left BSM. HERNANDEZ recalled the driving route they took
was Ives Dairy Road West to Interstate 95, North to the Ft
Lauderdale airport, and West on Interstate 595. JOE LNU discussed

FD-302a (Rev. 10-6-95)



Continuation of FD-302 of    ARIEL ARMANDO HERNANDEZ                          , On  4/8/99     , Page    10

the possible locations where they could dispose of JADE's body,
describing a rest area or an area further north. HERNANDEZ recalled
they stopped at the second rest area off of Interstate 75.
HERNANDEZ said they pulled off the road at an angle on a bank next
to a boat ramp. MASSARO directed HERNANDEZ and JOE LNU to put
gloves on when they were lifting the box from the truck.  HERNANDEZ
recalled that JOE LNU ripped off two white tags or labels from the
box.  HERNANDEZ said as they lifted the box the handle grip broke
and the box fell to the ground near the edge of the canal.  JOE
just shoved or "chucked" the box into the water from this area.

        HERNANDEZ said they then returned to the truck and
continued west on Interstate 75.  HERNANDEZ said he began throwing
out the vehicle window several articles belonging to JADE.
HERNANDEZ recalled these items included a weight belt, maroon and
black boxing gloves, towels, a plastic dispenser containing pills,
contact lens eyewash, a gym bag, her purse, and chewing gum.
HERNANDEZ said they arrived at a rest area several miles west of
where they had disposed of JADE's body.  HERNANDEZ said they
stopped in order to get some fuel.  HERNANDEZ recalled JOE LNU had
mentioned the broken stereo box would allow her body to be exposed
to alligators which would further dispose of her body.  HERNANDEZ
recalled MASSARO called his wife CAROL from the gas station, and
JOE LNU fueled the vehicle. HERNANDEZ said he stayed in the vehicle
during this time.  HERNANDEZ recalled seeing MASSARO giving JOE LNU
a "wad" of money of which one bill he recognized was a ten dollar
bill.  HERNANDEZ recalled them mentioning toll monies.  HERNANDEZ
said they started back East bound on Interstate 75 and still had
articles belonging to JADE that they had not discarded.  They
subsequently pulled over at another rest area located just east of
two bridges they passed over. They pulled to the edge of the
pavement next to the canal which was several yards away. HERNANDEZ
recalled there were two vehicles parked at the rest area at this
time and described them as a brown Ford pick up truck and a white
station wagon, both of which had trailers attached to them.
HERNANDEZ recalled JADE had a Nokia cell phone which he recalled
partial numbers to be either 2160 or 6160. HERNANDEZ recalled
MASSARO threw out this cell phone from the vehicle window in the
direction of the canal.  JOE LNU threw the towels which HERNANDEZ
had shoved into JADE's boxing gloves into a garbage can located at
the rest area.  MASSARO also threw her chewing gum into this
garbage can. HERNANDEZ recalled he got out of the vehicle to
urinate at this rest area and then fell asleep as they continued
back to BSM.  HERNANDEZ said MASSARO woke him up when they returned



Continuation of FD-302 of    ARIEL ARMANDO HERNANDEZ                    , On   4/8/99    , Page    11

to BSM and instructed him to go home and stay there until MASSARO called him.

HERNANDEZ said he went home to his girlfriend, TAMMY BUBEL's apartment, located behind BSM in Sunny Isles, Florida. HERNANDEZ said he woke up on Sunday, (March 21, 1999) when SONNY called him telling him to put on the TV. HERNANDEZ saw the television newscast which showed fishermen who had discovered JADE's body in the box. HERNANDEZ said he called BSM at 305-944-2929 and spoke to MASSARO at approximately 2:00 PM - 3:00 PM. HERNANDEZ said he told MASSARO about the newscast and MASSARO told him not to worry about it as they had no prints on anything. MASSARO told HERNANDEZ to meet him at the RASCAL HOUSE Restaurant located just South of BSM in Sunny Isles, Florida. HERNANDEZ said he met MASSARO there. HERNANDEZ mentioned he saw NEAL LNU who was working at the RASCAL HOUSE. HERNANDEZ said NEAL LNU had a wife who worked at BSM. HERNANDEZ said he told MASSARO that he needed money and MASSARO gave him $50.00. MASSARO told him not to worry about the girl. HERNANDEZ said he returned to his girlfriend, TAMMY BUBEL's residence. HERNANDEZ said he received a call from SONNY and they discussed the incident regarding moving the body. HERNANDEZ recalled SONNY had taken JADE's case of CD's from her vehicle. HERNANDEZ said he called MASSARO at approximately 5:00 PM at BSM to mention that SONNY had taken the CD's. MASSARO said he would talk to SONNY about it. HERNANDEZ said late on Sunday night, between the hours of 11:00 PM - 2:00 AM, he moved from the beach hotel to his girlfriend's residence. HERNANDEZ said MASSARO, JOEY LNU, CHARLIE LNU, TONY LNU, and himself went over to the hotel and cleaned everything out of his hotel room number 121. HERNANDEZ said he believes they drove the El Camino and possibly the Mazda SUV to transport everything. HERNANDEZ recalled Tony LNU removed the sheets from the room where the murder took place. HERNANDEZ recalled that MASSARO gave him ammonia and windex in order to wipe up and clean the doors, walls, and phones in the room.

HERNANDEZ said on the following Monday, (March 22, 1999), he was considering what to do about the situation with JADE, and he stayed home all day. On Tuesday, (March 23, 1999), HERNANDEZ said he met up with MASSARO and they continued with their counterfeiting check scam. HERNANDEZ said MASSARO had some receipts from purchases they had previously made and they were going to return some items for cash. HERNANDEZ described store requirements of returning purchases made for cash. HERNANDEZ said when you make a purchase at Circuit City and you want to return your merchandise and receive cash back; the store requires a four day waiting period

FD-302a (Rev. 10-6-95)



Continuation of FD-302 of   ARIEL ARMANDO HERNANDEZ _____ , On 4/8/99 _____ , Page   12 _____

for the check to clear prior to customers receiving a cash refund.
HERNANDEZ said he had a method of erasing and redating the purchase
date on the store receipts in order to get cash refunds before the
stores realize the checks are bad.  HERNANDEZ said MASSARO had a
forty foot trailer in which he stored these illegally purchased
items.  HERNANDEZ said the items included houseware items, statues,
furniture, and barbeque grills. HERNANDEZ said MASSARO stored the
trailer in Hollywood, Florida, the exact location unknown to him.
HERNANDEZ said MASSARO would additionally take orders from his
associates as to specific items they wanted.  MASSARO then would
make the purchases reselling them to his associates at 50% of their
value.

HERNANDEZ recalled on Tuesday, (March 23, 1999), he and
MASSARO made fraudulent purchases/exchanges of restaurant supplies
at a SMART AND FINAL store located on Route 441.  Additionally they
made purchases and exchanges at a BEST BUY store located on
Biscayne Boulevard near the Gulfstream Racetrack, Hallandale Beach,
Florida. At the BEST BUY they purchased a $698.00 27" Sony
Trinitron TV which had the "picture in a picture" feature to it.
HERNANDEZ said MASSARO had received an order for this TV from his
friend BRUCE LNU at the check cashing store.  HERNANDEZ said the
fraudulent account and "ABA" numbers which he used on the
fraudulent checks originated from BRUCE LNU who operated a check
cashing store.  HERNANDEZ recalled on Tuesday night at BSM he had
reviewed numerous new ABA and account numbers from a manila
envelope which had come from BRUCE LNU. HERNANDEZ recalled that
MASSARO's associate, JOEY FLOWERS, who drove a red Corvette had
also put in orders for items purchased from the fraudulent check
scheme.

HERNANDEZ described a storage tray he kept with his
computer which contained several businesses he utilized in creating
the counterfeit checks. HERNANDEZ provided several company names
as follows:

            FAIRLANE ENTERTAINMENT, (or ENTERPRISES)
            RICHARD MARTINEZ CONSTRUCTION
            PALM COAST VEAL COMPANY
            DOC's SALOON
            PRO PREMIUM INSURANCE
            FLORIDA WINDSTORM UNDERWRITERS INSURANCE
            ART GRAPHIC STUDIOS CO.

FD-302r (Rev. 10-6-95)

Continuation of FD-302 of    <u>ARIEL ARMANDO HERNANDEZ</u> , On <u>4/8/99</u> , Page <u>13</u>

       HERNANDEZ recalled on Wednesday, (March 24, 1999), at
approximately 12:00 noon he called MASSARO and they discussed that
he had to get out of the country before he was connected to JADE's
murder. HERNANDEZ said he thought MASSARO had connections with a
Senator or a Congressman from the Philippines who could help him.
HERNANDEZ said he recalled that JUDY LNU who owned the hotel where
SMITH was killed had called MASSARO and told him that the police
nad come and searched the hotel for evidence related to the murder.

       HERNANDEZ said he went to meet MASSARO at BSM at
approximately 1:00 PM. HERNANDEZ and MASSARO returned to his house
to pick up the counterfeit checks which he had stored in a zippered
bag. HERNANDEZ said they didn't buy anything that day and only
made returns on the previously purchased items. HERNANDEZ said
they returned clothes from MASSARO's girlfriend CAROL LNU to a TJ
MAXX store. HERNANDEZ said they would frequently buy items from
chain stores in Miami and then make the returns to the store chains
in Broward County. HERNANDEZ said MASSARO returned a dining room
table and a TV. HERNANDEZ recalled he and MASSARO had previously
purchased three (3) stereos. HERNANDEZ said MASSARO kept two of
them and HERNANDEZ recalled he gave one to CHARLIE LNU; but added
that he wasn't sure whether it was his or MASSARO's. HERNANDEZ
recalled two other returns he made on Wednesday as a $300.00 and
$400.00 purchase.

       HERNANDEZ said on Thursday (March 25, 1999), he stayed
home at his girlfriend's apartment

       HERNANDEZ said on Friday (March 26, 1999), MASSARO called
him and said he had received a tip that the authorities were
watching the business, BSM. MASSARO commented to HERNANDEZ that
they can't tap a cell phone and for HERNANDEZ to only make calls to
him on his cell phone. HERNANDEZ said he had his brother and
cousins over Friday night for a visit.

       HERNANDEZ said on Saturday (March 26, 1999) he and
MASSARO went out and purchased jewelry at MACY's store in Aventura
Florida. HERNANDEZ said he purchased a watch for MASSARO to give
to his girlfriend CAROL. HERNANDEZ described the watch as follows:
silver stainless steel and gold band, with a diamond studded bezel.
HERNANDEZ recalled it cost $2,295.00 and he purchased it using a
fake identification in the name of RICHARD MARTINEZ. HERNANDEZ

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of    ARIEL ARMANDO HERNANDEZ              , On  4/8/99      , Page    14

said they also purchased a COMPAC PRESARIO computer at OFFICE MAXX in Oakwood Plaza on Sheridan Avenue and Interstate - 95.

HERNANDEZ said he was beginning to get very depressed and worried over SMITH's death.  HERNANDEZ said he couldn't sleep and when he did fall asleep he had dreams that he was dressed all in white, wearing a mask, and he had sacrificed a chicken and a goat.

HERNANDEZ said he also had made an anonymous call to the police department from TAMMY's apartment using her cell phone. HERNANDEZ said he told the police that the people who had murdered SMITH were two Colombian guys, and described the vehicle they drove as a Ford Explorer.

HERNANDEZ said on early Sunday morning, (March 27, 1999) he was arrested at his girlfriend's residence by the police for SMITH's murder.

HERNANDEZ said since the day he was arrested he has called MASSARO in order for MASSARO to help out his girlfriend, TAMMY BUBEL.  HERNANDEZ said MASSARO promised to pay her $2,300.00 which was due HERNANDEZ from the returns and exchanges of their check scam business.  HERNANDEZ also indicated MASSARO and BUBEL had an argument but that he, HERNANDEZ, smoothed things over. HERNANDEZ said he is "taking the rap" for this whole incident over the death of JEANETTE SMITH.