# United States Court of Appeals
Eleventh Circuit
56 Forsyth Street, N.W.
Atlanta, Georgia 30303

**Thomas K. Kahn**
Clerk



For rules and forms visit
www.ca11.uscourts.gov

September 01, 2004

Clarence Maddox
Clerk, U.S. District Court
301 N. Miami Avenue
Miami FL 33128

**Appeal Number: 02-12352-AA**
Case Style: USA v. Frederick J. Massaro
District Court Number: 00-06273 CR-PCH

The enclosed certified copy of the judgment and a copy of this court's opinion are hereby issued as the mandate of this court.

Also enclosed are the following:
    Original Exhibits, consisting of: two folders, seven boxes supplemental
    Original record on appeal or review, consisting of: thirty-four volumes, seven volumes supplemental

The district court clerk is requested to acknowledge receipt on the copy of this letter enclosed to the clerk.

A copy of this letter, and the judgment form if noted above, but not a copy of the court's decision, is also being mailed to counsel and pro se parties. A copy of the court's decision was previously mailed to counsel and pro se parties on the date it was issued.

Sincerely,

THOMAS K. KAHN, Clerk

Reply To: James O. Delaney (404) 335-6113

Encl.

MDT-1 (03-2004)

# United States Court of Appeals

For the Eleventh Circuit

No. 01-2352

District Court Docket No.
00-6273 CR-PCH

```
                                    ┌─────────────────────────────┐
                                    │           FILED             │
                                    │  U.S. COURT OF APPEALS      │
                                    │    ELEVENTH CIRCUIT         │
                                    │                             │
                                    │      Jun 24, 2004           │
                                    │                             │
                                    │    THOMAS K. KAHN           │
                                    │        CLERK                │
                                    └─────────────────────────────┘
```

UNITED STATES OF AMERICA

Plaintiff-Appellee,

versus

FREDERICK J. MASSARO,

Defendant.

ARIEL HERNANDEZ,
ANTHONY TRENTACOSTA,
a.k.a.
Tony Pep,

Defendants-Appellants.

-----------------------------------------------------------------

Appeal from the United States District Court
for the Southern District of Florida

-----------------------------------------------------------------

JUDGMENT

It is hereby ordered, adjudged, and decreed that the attached opinion included herein by reference, is entered as the judgment of this Court.

Entered: June 24, 2004
For the Court: Thomas K. Kahn, Clerk
By: Jackson, Jarvis

A True Copy - Attested
Clerk U.S. Court of Appeals,
Eleventh Circuit
By:
Deputy Clerk
Atlanta, Georgia

ISSUED AS MANDATE
SEP 0 1 2004
U.S. COURT OF APPEALS
ATLANTA, GA.

[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JUNE 24, 2004
THOMAS K. KAHN
CLERK

———————————

No. 02-12352

———————————

D. C. Docket No. 00-06273-CR-PCH

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

ARIEL HERNANDEZ,
ANTHONY TRENTACOSTA,
a.k.a. Tony Pep

Defendants-Appellants.

———————————

Appeal from the United States District Court
for the Southern District of Florida

———————————

(JUNE 24, 3004)

Before BLACK and MARCUS, Circuit Judges, and SMITH*, District Judge.

BLACK, Circuit Judge:

———————————

* Honorable Fern M. Smith, United States District Judge for the Northern District of
California, sitting by designation.

Appellants Ariel Hernandez and Anthony "Tony Pep" Trentacosta were convicted of various charges centering around a RICO conspiracy. They appeal their convictions and Hernandez appeals his sentence. We affirm.

## I. BACKGROUND

A federal grand jury returned a 25-count indictment against 9 defendants, including Appellants.[1] Hernandez was subject to the following charges: (Count 1) conspiracy to violate the Racketeer Influenced and Corrupt Organizations (RICO) Act, in violation of 18 U.S.C. § 1962(d); (Counts 2–16) bank fraud in violation of 18 U.S.C. § 1344; (Count 17) conspiracy to commit murder in aid of racketeering, in violation of 18 U.S.C. § 1959(a)(5) (the VICAR count); (Count 18) murder in aid of racketeering, in violation of 18 U.S.C. § 1959(a)(1); and (Count 21) uttering counterfeit checks, in violation of 18 U.S.C. § 513(a). Trentacosta was subject only to the RICO conspiracy count.

After a jury trial, Hernandez was found guilty of Counts 1 through 18 and 21 (all the counts in which he was charged). He was sentenced to life imprisonment as to each of Counts 1 and 18, 360 months' imprisonment as to each

---

[1] Six of the defendants pled guilty. Frederick Massaro, who was one of the central figures in the RICO conspiracy and was named in all the counts of the indictment save Count 19, also appealed his conviction. He passed away subsequent to the filing of briefs in this case and his appeal was dismissed as moot. Both Hernandez and Trentacosta, however, adopt arguments raised in Massaro's briefs.

2

of Counts 2 through 16, and 120 months' imprisonment each as to Counts 17 and 21, all to run concurrently. Trentacosta was found guilty of the RICO conspiracy, the only charge against him, and was sentenced to 100 months' imprisonment.

The facts at trial revolved around a South Florida "crew" connected to the Gambino Family of the Cosa Nostra. According to the Government, Trentacosta, a "made-man" or "soldier" in the Gambino Family (a fact to which he stipulated), directed the crew, which committed various criminal acts, including producing counterfeit checks, dealing in stolen merchandise, loan sharking, and ultimately murder. Trentacosta lived in Atlanta, where he operated Father & Son Moving Co., and, according to the Government, collected tribute from co-defendant Frederick Massaro (an "associate" of the Family, i.e., not a "made-man") from his South Florida activities. Trentacosta often traveled to Florida, and spoke to Frederick Massaro on the phone several times a week.

Massaro owned, *inter alia*, Father & Son Moving and Storage of Jacksonville, and Beachside Mario's, a North Miami Beach pizzeria out of which Massaro ran loan sharking activities. Frankie Valdes and co-defendant Carlos Garcia acted as Massaro's "muscle" for collecting money. The check counterfeiting scheme was also operated out of the pizzeria. Co-defendant Julius Chiusano, who operated a check cashing store, would obtain account numbers for

3

Massaro and Hernandez. The counterfeit checks were used to purchase supplies for the pizzeria and to buy items that were later returned for a cash refund or re-sold.

Hernandez went to Office Depot on several occasions to purchase items with counterfeit checks. On at least one occasion, and possibly others, he was accompanied by Jeannette Smith, an exotic dancer who worked at "Thee Dollhouse." On March 21, 1999, an unidentified woman's body—which was soon identified as Ms. Smith—was found inside a Sony box in a canal on Alligator Alley. Police soon discovered that Ms. Smith was seen leaving "Thee Dollhouse" in the company of Hernandez around 5–6 a.m. on March 20. Later that afternoon, Hernandez received a call from Massaro. Hernandez told Massaro that "things got a little messy," that he had just "tied up the loose end," and that he had a package he needed to "get rid of." Massaro called co-defendant "Sonny" Silverman and instructed him to bring his truck to the pizzeria. Together, Silverman, Massaro, Hernandez, and Dominick Marchese hid the body and effects of Ms. Smith.[2] The next day, March 21, Massaro sent some of his employees to Hernandez's hotel room to help Hernandez move out and to dispose of evidence. Still, when the police searched the room a few days later, they found several receipts, including

_____

[2] There is no dispute that Massaro and Hernandez hid the body.

4

one for the Sony box. Police also found traces of Smith's blood. A warrant issued for Hernandez's arrest.

Meanwhile, on March 26. Massaro asked Valdes to kill Hernandez because of the threat he posed. Valdes and Garcia planned to kill Hernandez by injecting him with cocaine (to make his death look accidental), using needles provided by Massaro. Valdes and Garcia. however, were unable to find Hernandez. The next day, Hernandez showed up at the pizzeria, but Massaro told Valdes not to kill him because Hernandez was driving Massaro's car and Massaro did not want blood in his car. Later that day, Hernandez anonymously called police and said that two Colombians had killed Smith because they were afraid she would turn them in for writing bad checks (subsequently, in his post-arrest interview, Hernandez reiterated Smith's involvement in the check operation). Hernandez was located and arrested on March 28.

After being advised of his rights, Hernandez waived them and gave a statement in which he confessed to having accidentally killed Smith during "rough sex." On March 29, during an intercepted phone call to Massaro, Hernandez related the "story" he had given to the police and told Massaro there was nothing to worry about because he would be taking "the whole rap." The medical examiner subsequently ruled Smith's death a homicide by strangulation.

5

entered into a 20-page stipulation on September 17, 2003, which was adopted by order of the district court the next day, that specifies what tape recordings were played and provides pinpoint cites to the record to identify when they were played. Given this stipulation, there is no longer a "substantial and significant omission" in the record that might warrant a new trial.

B. *The Severance Motions*

Both Appellants argue the district court should have granted their requests to sever the trial. Fed. R. Crim. P. 8(b) permits the joinder of two or more defendants in the same indictment if they are alleged to have participated in the same act or transaction or series of acts or transactions constituting an offense or offenses. There is a preference that defendants indicted together be tried together, *United States v. Knowles*, 66 F.3d 1146, 1158 (11th Cir. 1995), particularly in conspiracy cases, *United States v. Morales*, 868 F.2d 1562, 1571 (11th Cir. 1989). Even where initial joinder is proper, the defendant may move for a severance under Fed. R. Crim. P. 14. A motion to sever need not be granted unless the defendant shows a "serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro v. United States*, 113 S. Ct. 933, 938 (1993).

7

Denials of motions to sever under Fed. R. Crim P. 14 will be reversed only for abuse of discretion. *Morales*, 868 F.2d at 1571.

Hernandez argues he was not a "made-man," but merely associated with Massaro's legitimate businesses and, even if he was involved in some counterfeiting, he had no knowledge of Massaro's ties to the Gambino crime family. He further argues that Smith's "accidental" death had nothing to do with the counterfeiting scheme. Finally, Hernandez argues it is improper to join his case with the individual who placed a "hit" on him.[3]

These arguments are not persuasive. Hernandez has not demonstrated that a specific trial right was compromised by joint trial, or that the jury could not make a reliable judgment about guilt or innocence in a joint trial. *See Zafiro*, 113 S. Ct. at 938. There was significant evidence establishing Hernandez's ties to Massaro, and his ties to Trentacosta and the Gambino Family. Likewise, there was evidence of Hernandez's knowledge of these ties—indeed, soon after he was arrested, Hernandez told police he knew many people connected to organized crime and wanted to provide information.

---

[3] Hernandez also refers to "mutually antagonistic defenses," as a basis for severance. He fails, however, to specify what defenses were antagonistic.

8

The Appellants[4] also attempt to make a "spillover" argument, contending "the jury was unable to separate the evidence pertaining to [them] from that pertaining to [their] co-defendants, and that the spillover effect of the latter caused [them] to suffer compelling prejudice." *United States v. Starrett*, 55 F.3d 1525, 1553 (11th Cir. 1995). The key question is whether the jury could "individualize each defendant" and make individualized guilt determinations. *Id.* Here, the district court instructed the jury on numerous occasions as to the importance of considering each charge and each defendant separately and individually, and the jury appears to have rendered individualized verdicts. Trentacosta, for example, was found not to be involved in Smith's murder, and Massaro was acquitted on Count 25 (felon in possession). *See United States v. Morales*, 868 F.2d 1562, 1571 (11th Cir. 1989) ("The jury's ability to isolate the evidence and consider it against the separate defendants is best illustrated by its acquittal of Manzano on Count III, resisting a federal officer."). Accordingly, we are not convinced by the spill-over argument.

Appellants have failed to meet their "heavy burden" to show that joinder was improper or that severance was required. They have not shown significant

---

[4] Trentacosta adopted the arguments of Hernandez and Massaro, but did not brief the issue himself.

9

prejudice to a specific trial right, or that the jury was unable to make individual determinations of guilt or innocence. Therefore, we affirm the district court's denial of the severance motions.

C. *Sufficiency of the Evidence*

Both Hernandez and Trentacosta insist there was insufficient evidence to support their convictions. This Court reviews sufficiency of the evidence presented at trial de novo, with the evidence reviewed in the light most favorable to the Government. *United States v. Chastain*, 198 F.3d 1338, 1351 (11th Cir. 1999). A conviction must be upheld unless the jury could not have found the defendant guilty under any reasonable construction of the evidence. *Id.*

To establish a RICO conspiracy under 18 U.S.C. § 1962(c), the Government must prove the defendant "objectively manifested, through words or actions, an agreement to participate in the conduct of the affairs of the enterprise through the commission of two or more predicate crimes." *United States v. Starrett*, 55 F.3d 1525, 1544 (11th Cir. 1995). The Government may show agreement in two ways: "(1) by showing an agreement on an overall objective, or (2) . . . by showing that a defendant agreed personally to commit two predicate acts and therefore to participate in a 'single objective' conspiracy." *Id.* "If the government proves an

10

agreement on an overall objective, then it is 'not necessary that the defendant
agree to personally commit two predicate acts . . . .'" *Id.* (citation omitted).

1. *Hernandez*

Hernandez does not contest his bank fraud convictions (Counts 2–16), and
these acts constitute predicate acts sufficient to support the RICO conviction.
Hernandez's claims of ignorance of the organized crime ties are belied by his
statements to Massaro after his arrest that the police "had everybody's picture,"
and that he recognized "everybody except two guys." Hernandez also told the
police that he had a lot of information about organized crime to share. Hernandez
was also intimately involved in Massaro's criminal activities. There was sufficient
evidence for the jury to conclude Hernandez was aware of Massaro's connections
to organized crime.

Moreover, Hernandez's arguments that Smith's death was not related to
Gambino family interests are not persuasive. The evidence showed that Smith was
involved in the counterfeit check operation, or at least aware of it—on numerous
occasions, she had gone to Office Depots and purchased merchandise with
counterfeit checks and had returned such merchandise for cash—and there was
evidence suggesting that Massaro believed Smith had given information to the
police. Hernandez's initial story to the police noted that Smith was killed because

11

(the "two Colombians") were afraid she would turn them in for writing bad checks. After Smith's death, Massaro called Hernandez at his hotel, and Hernandez stated that "things got a little messy," that he had "tied up the loose end," and that "I gotta package I gotta get rid of." Massaro did not act surprised by this news and, immediately thereafter, procured the truck from Silverman to dispose of the body. After his arrest, Hernandez called Massaro from the police station and told him that "my story was that . . . it was like rough sex . . . . So you don't have to worry about that."

The Government's inability to produce a tape-recorded discussion planning the murder is not decisive. The Government wiretap of Massaro's phone was authorized less than two days before the murder, and there was evidence that Hernandez was with Massaro the day before the murder   explaining why there were no intercepted phone calls "planning" the murder. As noted above, Hernandez's post-arrest phone call to Massaro suggests that Hernandez's account of Smith's death was a "story," not the truth. Additionally, there was medical evidence presented that was inconsistent with Hernandez's "rough sex" account of Smith's death.

In sum, the evidence was sufficient to allow the jury to conclude Hernandez objectively manifested, through words or actions, an agreement to participate in

12

the affairs of the enterprise through the commission of two or more predicate acts. Therefore, we reject Hernandez's sufficiency of the evidence objection.

2. *Trentacosta*

Unlike Hernandez, Trentacosta did not commit any predicate acts, and his conviction is based solely on the jury's conclusion that he agreed to the overall objective of the charged conspiracy. Trentacosta, though, argues the evidence was not sufficient to reach this conclusion—that the Government essentially made insinuations based on his long friendship with Massaro and his stipulation to being a member of the Gambino Crime Family. Specifically, Trentacosta disputes the Government's evidence of tribute payments from Massaro (in the form of payments from Father & Son in Jacksonville to Father & Son Consulting in Atlanta). He also argues the jury could not reasonably conclude that he "controlled" Massaro. Rather, according to Trentacosta, the "unavoidable" explanation for the evidence presented at trial was that Massaro used Trentacosta's name when it suited him and partly because his "real" boss, "Fat Andy" Ruggiano, was in jail.

While Trentacosta's characterization of the evidence is plausible, the jury was free to reach an alternative conclusion—that Trentacosta controlled Massaro and that he received tribute from Massaro's criminal activities. *See United States*

13

*v. Goggin*, 853 F.2d 843, 846 (11th Cir. 1988) (when presented with two narratives by the parties, jury was entitled to choose the account offered by the government). Here, the Government presented evidence regarding Mafia structure and protocol explaining how the tribute system worked, as well as fact witnesses linking Massaro and Trentacosta and describing the pattern of payments between the two. There was evidence that Massaro deferred to Trentacosta in business matters, that he required Trentacosta's approval before certain loans were made, and that Massaro acted as an intermediary between Trentacosta and the Federal Bureau of Investigation (FBI) on at least one occasion. Viewed in the light most favorable to the Government, this evidence can reasonably be interpreted as supporting the conviction. Therefore, we reject Trentacosta's sufficiency arguments.

D. *Co-Conspirator Hearsay*

Prior to trial, counsel for Hernandez and Trentacosta challenged whether sufficient evidence existed to permit the use of various co-conspirator hearsay statements, generally involving co-conspirator testimony and intercepts of phone conversations in which Massaro implicated Hernandez and Trentacosta. The district court, after conducting a hearing pursuant to *United States v. James*, 590 F.2d 575 (5th Cir. 1979), notified Appellants that it found "sufficient proof for the

14

existence of the RICO conspiracy that's alleged in the indictment." Trentacosta now contends there was no substantial independent evidence to corroborate the existence of the alleged conspiracy and his participation in it.

A district court's determination that a statement is in furtherance of a conspiracy is subject to clear error review.[5] *United States v. Garcia*, 13 F.3d 1464, 1473 (11th Cir. 1994). Any such error is subject to harmless error analysis. *Id.*

Rule 801(d)(2)(E) excludes from the definition of hearsay statements made "by a coconspirator of a party during the course and in furtherance of the conspiracy." Thus, testimony by a witness to co-conspirator statements may be admissible "if the trial judge determines that the government has proven by a preponderance of the evidence that (1) a conspiracy existed, (2) the defendant and the declarant participated in the conspiracy, and (3) the statement was made during the course of and in furtherance of the conspiracy." *Garcia*, 13 F.3d at 1472–73. The proffered statements alone are not sufficient to establish the existence of the conspiracy, Fed. R. Evid. 801(d)(2)(E), but may be considered in conjunction with independent evidence of the conspiracy, *United States v. Byrom*, 910 F.2d 725, 735 (11th Cir. 1990).

---

[5] The Government contends the plain error standard should apply because Trentacosta did not renew his objections at trial, and stated affirmatively that he had no objections. We need not decide this issue because, even under the clear error standard, we affirm.

15

In this case, in addition to the contested co-conspirator statements, the Government submitted tape recordings on which Trentacosta's voice was captured and documentary evidence linking Massaro and Trentacosta. This evidence was sufficient to establish the existence of the charged conspiracy and Trentacosta's involvement in it. The district court did not clearly err in admitting the co-conspirator hearsay statements.

E. *Rule 404(b) Evidence*

Both Appellants contest the admission of evidence regarding (1) a 1988 gas-tax scam in New York City. and (2) Massaro's attempt to take over the Trump Financial Group and Trentacosta's involvement in this activity. Trentacosta contends the evidence should have been excluded under Fed. R. Evid. 404(b). Although this evidence was admitted against Trentacosta, Hernandez also objects to its admission as unduly prejudicial under Fed. R. Evid. 403. For purposes of this opinion, we assume without deciding that this evidence was in fact Rule 404(b) evidence, and not "direct" evidence against Trentacosta.

We review a district court's evidentiary rulings for abuse of discretion. *United States v. Cunningham*, 194 F.3d 1186, 1193 (11th Cir. 1999). Rule 404(b) provides that "[e]vidence of other crimes. wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It

16

may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident . . . ." Fed. R. Evid. 404(b). The rule permits the introduction of evidence of a prior or uncharged act if the Government can show: (1) a proper purpose for introducing the evidence; (2) the prior act occurred and that the defendant was the actor; and (3) the probative value of introducing the evidence outweighs any prejudicial effect the evidence might have. *United States v. Cancelliere*, 69 F.3d 1116, 1124 (11th Cir. 1995).

We find the Government satisfied these requirements in this case. Both the gas-tax scam evidence and the Trump Financial evidence were admitted for a proper purpose[6] and both involved Trentacosta. Nor has Trentacosta (or Hernandez) shown that any prejudicial impact from this evidence outweighed its probative value. The evidence has significant probative value as to Trentacosta's control over Massaro—a critical issue in this case—as well as demonstrating how the illegal relationships between the Appellants developed in the context of organized crime. *See United States v. Diaz*, 176 F.3d 52, 79–80 (2d Cir. 1999). Therefore, we conclude the district court did not abuse its discretion.

---

[6] By pleading not guilty and categorically denying his involvement in the conspiracy, Trentacosta thereby made his intent—a permissible 404(b) purposes—a material issue. *See United States v. Costa*, 947 F.2d 919, 925 (11th Cir. 1991).

F. *The Motion to Suppress*

Hernandez argues his March 28 statements to law enforcement at the time of his arrest should have been suppressed because they were not freely, knowingly, and voluntarily given. *See generally Miranda v. Arizona*, 86 S. Ct. 1602 (1966). He contends his statements (admitting involvement with organized crime members, admitting to passing counterfeit checks, and asserting that Smith's death was accidental due to "rough sex") were extracted by threats of violence, threats of enhanced prosecution for first degree murder, and by promises of a reduction of charges and admission into a witness protection program. He also argues his waiver of rights pertained only to the check charges, not any conduct regarding Ms. Smith's death.

At the suppression hearing, the magistrate credited the law enforcement officers' account of the interrogation and ruled the statements had been made voluntarily in hope of obtaining some benefit for cooperation. Hernandez did not object to the report and recommendation of the magistrate following the suppression hearing. Accordingly, Hernandez may attack the factual findings of the district court only for plain error or manifest injustice. *United States v. Hall*, 716 F.2d 826, 828–29 (11th Cir. 1983).

18

Both the police and the FBI read Hernandez his *Miranda* rights, and Hernandez signed a waiver form. Both Broward Detective Ilarazza and FBI Special Agent Grover testified that no threats or promises were made. Detective Ilarazza also testified that he told Hernandez there was a warrant for his arrest for murder and that, when Hernandez started telling him about his connection to organized crime, he directed the conversation back to the murder. Hernandez has presented no evidence (he did not testify at the suppression hearing) as to what happened, and the magistrate judge was entitled to credit the testimony of the law enforcement officers over Hernandez's account. Therefore, we affirm the denial of the motion to suppress.

G. *Hernandez's Sentencing Objections*

Hernandez raises several objections to his sentence. First, he argues the district court erroneously applied the two-level obstruction of justice enhancement. U.S.S.G. § 3C1.1. This enhancement, however, had no effect on Hernandez's sentence. For purposes of calculating the Guideline range, Hernandez's total offense level of 45 was treated as 43, which provides for life imprisonment, because 43 is the highest offense level listed in the sentencing table. U.S.S.G. Ch. 5 Pt. A & cmt. n.2. Thus, even without the enhancement, Hernandez's total offense level would be 43, and he would still be subject to life

19

imprisonment. *Cf. United States v. Rice*, 43 F.3d 601, 608 (11th Cir. 1995) (declining to address propriety of enhancement where defendant's mandatory sentence remained life imprisonment under statute).

Even if this objection was not moot, we would affirm. We review the district court's factual findings for clear error and give "due deference to the district court's application of the guidelines to the facts." 18 U.S.C. § 3742(e). "[W]here the defendant's credibility or demeanor is not at issue, and the defendant's conduct can be clearly set forth in detailed, non-conclusory findings, we review de novo the district court's application of the enhancement to those facts." *United States v. Banks*, 347 F.3d 1266, 1269 (11th Cir. 2003).

Pursuant to U.S.S.G. § 3C1.1, a defendant may receive a two-level enhancement if he "willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the course of the investigation, prosecution, or sentencing of the instant offense of conviction . . . ." This enhancement applies where the defendant destroys or conceals evidence that is material to an official investigation. U.S.S.G. § 3C1.1, cmt. n.4(d). Here, the district court found a combination of factors, including the disposal of Smith's body, the anonymous phone call made to police, and the cleaning of Hernandez's apartments, merited the enhancement. We agree.

20

Hernandez also argues that imposition of a life sentence violated *Apprendi v. New Jersey*, 120 S. Ct. 2348 (2000), because the jury did not specifically find that Hernandez murdered Smith. This argument is without merit because the jury necessarily found Hernandez murdered Smith. The verdict form submitted to the jury contained the following interrogatory: if Hernandez is guilty of the RICO conspiracy, did he agree to the commission of murder in violation of Fla. Stat. § 782.04? The jury answered "yes." Additionally, the district court also instructed the jury (1) that a racketeering activity included acts or threats involving murder, and (2) for the jury to convict Hernandez of the VICAR count, it had to find that Hernandez murdered Smith. Accordingly, there was no *Apprendi* violation.

Finally, Hernandez argues that the district court's refusal to continue the sentencing hearing was reversible error. We review a district court's ruling on a continuance for abuse of discretion. *United States v. Garmany*, 762 F.2d 929, 936 (11th Cir. 1985).

The pre-sentence investigation report was provided to Hernandez and his attorney two weeks prior to sentencing, well within the statutory notice period. See 18 U.S.C. § 3552(d). Hernandez was permitted to file objections to the PSI out of time— indeed, one day before sentencing—and did not at that time ask for a

21

continuance. Nor did Hernandez attempt to contact any of his proposed witnesses prior to the sentencing hearing. Under these circumstances, the district court did not abuse its discretion when it denied Hernandez's request at sentencing for a continuance.

## III. CONCLUSION

Appellants have not shown error with regard to the evidence or conduct of the trial that merits reversal of their convictions. Nor has Hernandez presented any meritorious objection to his sentencing. Accordingly, we affirm their convictions and sentences.

AFFIRMED.

A True Copy    Attested
Clerk U.S. Court of Appeals,
Eleventh Circuit

By: _____
Deputy Clerk
Atlanta, Georgia

22